UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
ANU ALLEN,                                          :
                                                    :
                              Plaintiff,            :          **ECF CASE**
                                                    :
            - against -                             :          12-CV-6758-RPP
                                                    :
CHANEL, INC.,                                       :
                                                    :
                              Defendant.            :
-----------------------------------------------------------------x

## DEFENDANT'S STATEMENT OF UNDISPUTED
## MATERIAL FACTS PURSUANT TO LOCAL RULE 56.1

Pursuant to Rule 56.1 of the Local Civil Rules of this Court, defendant Chanel, Inc.

("Chanel") submits this statement of undisputed material facts as to which Defendant contends

there is no genuine issue to be tried.[1]


**The Parties**

1.      Plaintiff Anu Allen ("Allen") was born on February 24, 1969.  (Allen Dep. 31:10-12).

Allen is a female of Asian/Indian descent.  (Compl., ¶ 7).


2.      Chanel is a New York corporation and manufacturer and/or distributor of luxury goods,

including fashion products.  (Almon Decl., ¶ 2).


3.      Chanel maintains an Equal Employment Opportunity Policy providing for "equal

employment opportunity to qualified individuals regardless of religion, race, color, sex, age,

disability, national origin, genetic information, or any other protected characteristic as

established by law."  (Almon Decl., Ex. D (Policies & Procedures)).  In addition, Chanel

---

[1] The undisputed facts set forth herein are followed by citations to their support in the record.  Copies of all
pleadings, deposition testimony and exhibits cited herein are annexed to the accompanying Declaration of Lorie E.
Almon, Esq. ("Almon Decl.").

maintains a Non-Discrimination and Anti-Harassment Policy which ensures employees work in a professional environment free from all forms of discrimination and/or harassment and likewise provides appropriate complaint mechanisms for such employee concerns.  (*Id.*)

4.      Allen acknowledged receiving copies of Chanel's policies throughout her employment. (Allen Dep. 47:7-49:15; Almon Decl., Ex. K).

**Allen is Hired by Chanel, Promoted and Awarded Her Requested Transfer**

5.      In May of 1993, Plaintiff Anu Allen ("Allen") began working at Chanel as a full-time executive receptionist at Chanel's corporate headquarters on the 44th floor of Nine West 57th Street, New York, New York.  (Allen Dep. 41:14-18; Compl. ¶ 9).

6.      As a receptionist, Allen's job responsibilities included traditional receptionist duties including greeting clients, answering telephones, coordinating with the switchboard operator and booking conference rooms.  (Allen Dep. 41:19-25; 42:21-43:9).  Allen was paid on an hourly basis as a receptionist.  (Allen Dep. 54:15-18).

7.      Allen held the position of receptionist at Chanel for approximately seven years.  (Allen Dep. 43:10-12; Compl. ¶ 11).

8.      After working as a receptionist, Allen was promoted to the position of Office Services Coordinator effective January 2001.  (Allen Dep. 49:16-50:14; 51:5-19; Compl. ¶ 11).  Allen was pleased with the promotion because she no longer found the receptionist role fulfilling. (Allen Dep. 51:20-52:9)

9.     The promotion to Office Services Coordinator came with an increase in compensation. (Allen Dep. 50:15-20).  In addition, Allen was paid on a salary basis as the Office Services Coordinator.  (Allen Dep. 54:19-22).  She received periodic raises while in the position of Office Services Coordinator.  (Allen Dep. 59:13-16).

10.     In her new position, Allen reported to Doug Ostling ("Ostling"), who was that time the Office Manager, and assisted with taking care of the facilities.  (Allen Dep. 50:21-51:4).  Allen got along with Ostling and enjoyed working with him.  (Allen Dep. 52:10-14).  She enjoyed working as the Office Services Coordinator because it gave her a sense of accomplishment and allowed her to learn different aspects of Chanel.  (Allen Dep. 61:2-14).

11.     The Office Services Coordinator position was a new position created specifically for Allen.  (Allen Dep. 53:6-11).  In this position, Allen's desk was located in the mailroom.  (Allen Dep. 53:2-5: Compl., ¶ 11).  Allen was not happy with her placement in the mailroom - she found it "belittling" - so she complained.  (Allen Dep. 53:16-55:23)  After her complaint, Allen was moved to another location on the 44th floor.  (Allen Dep. 57:2-7).

12.     Allen no longer desired to be the Office Services Coordinator and saw that a Samples Coordinator position was available in the Fashion Wholesale Division.  (Allen Dep. 61:24-62:19).  Allen spoke with Ostling about her interest in the position and then applied for a transfer.  (*Id.*).  Allen had never worked in the Fashion Division before and was interested in doing so.  (Allen Dep. 62:20-63:14).

13.     Allen went through a formal interview process for the Samples Coordinator position. (Allen Dep. 64:7-10).  There was at least one other candidate for the Samples Coordinator

position - a Caucasian who was younger than Allen.  (Allen Dep. 64:14-65:18).  Ultimately, Allen was selected for the Samples Coordinator position.  (Allen Dep. 63:15-64:6).

14.     After working as the Office Services Coordinator for approximately six years, Allen was transferred to the position of Samples Coordinator for Chanel's Fashion Wholesale Division in 2007.  (Allen Dep. 61:15-21; Compl. ¶ 12).  The Samples Coordinator position was located in a different building - 15 East 57th Street.  (*Id*.).  Allen received a salary increase when she became the Samples Coordinator.  (Allen Dep. 65:8-11).

15.     As the Samples Coordinator, Allen first reported to the Manager of Events & Training, a position held by Jason Jobson ("Jobson") in 2007.  (Allen Dep. 66:10-15).  Thereafter, Jobson left the position and Allen reported to the new Manager of Events & Training, Cat Porter ("Porter").  (Allen Dep. 68:13-25).  After reporting to Porter for approximately two years, Porter was promoted to a different role.  (Allen Dep. 71:17-20; 72:18-8).

16.     After Porter was promoted to a different role in or around August of 2011, Allen reported directly to Susanna Klein ("Klein"), Executive Director Ready to Wear & Wholesale Events & Training.  (Allen Dep. 73:9-74:25; Glickman Dep. 13:17-25; 174:25-175:12; Almon Decl., Ex. E; Klein Dep. 15:3-16:2).  Klein, in turn, reported to Stephanie Zernik, Senior Vice President of Wholesale Fashion who reported to Barbara Cirkva, President of Fashion, Watches and Fine Jewelry.  (Allen Dep. 73:9-74:25; Almon Decl., Ex. E; Glickman Dep. 156:15-19; 175:16-176:2).

**Demographics of the Fashion Wholesale Division**

17.     As of January 2012, there were thirty-two employees working in the Fashion Wholesale Division, including Allen, Klein and Zernik.  (Almon Decl., Ex. F (EEO Report)).

18.     Of the thirty-two Fashion Wholesale employees, thirty-one were female, including Allen, Klein and Zernik.  (*Id.*).

19.     Of the thirty-two Fashion Wholesale employees, seven were over the age of forty, including Allen and Zernik.  (*Id.*).  In addition, Zernik and Cirkva are older than Allen.  (Allen Dep. 165:5-13; Cirkva Decl., ¶ 5).

20.     Of the thirty-two Fashion Wholesale employees, eight were of Asian ethnicity.  (Almon Decl., Ex. F (EEO Report)).

**Allen Has a Friendly Work Relationship with Klein, Yet Claims She And Everyone Else Felt She Was Extremely Difficult to Work With**

21.     More specifically, Allen and Klein had a friendly relationship at work, during which they shared personal things about their lives.  (Allen Dep. 106:5-107:9; Klein Dep. 72:9-73:6).  Allen and Klein would joke around together at work.  (Allen Dep. 127:6-7; 166:14-170:20; Klein Dep. 72:9-73:6).  In fact, Allen even referred to Klein's skin tone in an email and joked to Klein that she needed to wear her sunscreen to protect her "porcelain" skin.  (Allen Dep. 170:21-174:9).

22.     Allen now claims that she was only friendly towards Klein to "play the game."  (Allen Dep. 174:10-175:10).

23.     Allen also claims that Klein was "extremely difficult" to work with and that "everyone was afraid of her."  (Allen Dep. 75:4-76:16).  Allen further claims that Klein was "unfair, not liked, aggressive, abrasive, rude, disrespectful and out of line."  (Allen Dep. 76:17-77:2).

24.     Allen believed Klein did not like her because Klein was "rude" and "mean-spirited." (Allen Dep. 80:10-15; *see also*, Allen  Dep. 127:23-128:2 ("she was miserable, mean, unprofessional.")).

25.     According to Allen, other co-workers, Porter included, felt the same way about Klein and that she was frequently discussed.  (Allen Dep. 77:3-80:21).  Porter told Allen that Klein was "crazy."  (Allen Dep. 78:20-79:4).    According to Allen, Katie Cherrchio ("Cherrchio") also told Allen that Klein was "crazy" and a "bitch."  (Allen Dep. 103:17-105:4).  Allen believes Klein mistreated Cherrchio because Klein was jealous that Cherrchio was "a beautiful blonde with a great husband and a beautiful baby on the way."  (Allen Dep. 105:5-22).  Christina Baynes Reid also told Allen that Klein was "crazy."  (Allen Dep. 109:8-20).

26.     According to Allen, Klein mistreated many people she worked with - "different people at different times."  (Allen Dep. 109:21-110:13).  Allen believes Klein mistreated those she worked with because of the power she possessed.  (Allen Dep. 110:19-111:17).  In other words, "because of her position…she could be rude she could be nasty."  (*Id*.).

**The Fashion Division is Restructured Under Zernik**

27.     Stephanie Zernik joined Chanel in April of 2011.  (Glickman Dep. 80:25-81:4; Zernik Decl., ¶ 2).  When Zernik came to Chanel as the SVP of the Fashion Wholesale Division, she

reviewed the structure of the Division to determine the appropriate restructuring necessary to match the needs of Chanel's business at the time.  (Allen Dep. 165:14-25; Zernik Decl., ¶ 3).

28.     Discussions regarding the restructuring of the Ready-to-Wear & Events Department began when Zernik got to Chanel and were ongoing for some time.  (Glickman Dep. 80:16-81:4; 135:4-10).

29.     The first restructuring that occurred under my leadership was the transfer of Training out of Fashion Wholesale, which had been under the Executive Director of Ready to Wear & Wholesale Events & Training, Susanna Klein.  (Zernik Decl., ¶ 4).   This restructuring occurred in the summer of 2011.  (*Id.*).

30.     In addition to the removal of Training, which had involved the use of sample products, there was also a significant cut back on the sample budgets.  (Zernik Decl., ¶ 6).

31.     Further, while the previous focus of Fashion - Ready to Wear had been on point of sale trunk shows, it was determined that this focus was not "brand right" and the number of trunk shows was greatly reduced - *i.e.*, trunk shows declined from approximately one hundred to twenty a year.  (Zernik Decl., ¶ 7)  The new focus would be on the facilitation of events versus trunk shows.  (*Id.*; Glickman Dep. 79:23-80-15).

32.     The combination of these changes only further confirmed that a Samples Coordinator position was no longer necessary.  (Zernik Decl., ¶ 8).

33.     In August of 2011, it became clear to Zernik that they would no longer require a position that was one hundred percent dedicated to samples - *i.e.* a Samples Coordinator.  (Zernik Decl., ¶

5; Glickman Dep. 79:23-80-15).  Discussions concerning the need to eliminate the Samples

Coordinator position began in the fall of 2011.  (Zernik Decl., ¶ 10).

34.     In eliminating the Samples Coordinator position, the department could focus its

headcount on someone with the ability to take on more executive level responsibilities.  (Zernik

Decl., ¶ 9).

35.     Klein was aware of the restructuring and the possible elimination of Allen's position.

(Glickman Dep. 67:16-22; Klein Dep. 21:22-22:16).  As part of the restructuring discussions,

Glickman involved Klein in revisions to the Samples Coordinator position to reflect a possible

new position that would be responsible for managing events and better suited to the business

objectives.  (Glickman Dep. 136:13-140:17; Klein Dep. 25:14-26:20; 36:4-21; 39:9-40:10;

47:13-22).

36.     Allen did not have the requisite presentation skills and training experience to fill this

position as envisioned by Chanel.  (*Id.*; Klein Dep. 86:10-87:17).  In fact, there were no available

positions in the Fashion Division for which Allen was qualified.  (Glickman Dep. 176:3-7).

37.     In the end, the new position was never filled as that particular restructure was not

implemented.  (Glickman Dep. 148:13-24; 150:4-9; Klein Dep. 36:4-37:5; 47:23-48:2; 93:21-

94:13).

**Chanel Decides to Eliminate the Samples Coordinator Position As
Part of the Restructuring**

38.     The decision to eliminate the Samples Coordinator position and to terminate Allen's

employment was made by Zernik, with final approval from the President of Fashion, Watches

and Fine Jewelry and the Senior Vice President of Human Resources.  (Allen Dep. 195:12-196:2;

Glickman Dep. 135:17-23; Zernik Decl., ¶ 11; Cirkva, ¶ 3).  This decision was reached in the fall of 2011.  (Glickman Dep. 49:6-52:6; 61:12-15).

39.      Klein had previously exhibited difficulty in managing Allen and had a friendly relationship in the workplace.  As a result, Klein was not involved in ultimately making the decision to eliminate Allen's position and terminate her employment.  (Klein Dep. 28:13-18; Zernik Decl., ¶ 39).

**Allen Discusses Her Concerns Regarding Klein to HR & Zernik, But Did Not Raise Specific Concerns of Discrimination**

40.      At all relevant times, Megan Glickman was the Director of Human Resources for Fashion, Watch and Fine Jewelry.  (Glickman Dep. 18:6-10).  In this capacity, employees raising complaints of discrimination and/or retaliation would come to Glickman or her team.  (Glickman Dep. 38:17-39:35; *see also*, (Almon Decl., Ex. D (Policies & Procedures))).  Very few employees ever came to Glickman with those concerns and none ever reported discrimination or retaliation on the part of Klein or Zernik.  (Glickman Dep. 40:2-16; 44:5-17).

41.      Glickman began interacting with Allen, in her Human Resources capacity, when Allen became the Samples Coordinator in 2007.  (Glickman Dep. 20:19-21:17).  Glickman was never aware of Allen's race, whether she was married or if she had children.  (Glickman Dep. 22:22-24:17).

42.      Allen spoke with Glickman in Human Resources about her working relationship with Klein, as early as 2009.  (Allen Dep. 177:7-179:18).  More recently, Allen sent emails to Glickman on December 19, 2011, December 22, 2011, January 27, 2012, February 15, 2012 and February 21, 2012 requesting to speak.  (Allen Dep. 179:19-181:16; Almon Decl., Ex. G).  Allen

does not recall, however, what concerns she specifically raised to Glickman.  (Allen Dep. 181:17-182:13).

43.     During the week of January 30, 2012, Glickman and Allen spoke about Allen's working relationship with Klein.  (Glickman Dep. 49:6-52:6).  Specifically, Allen explained to Glickman that she was uncomfortable working with Klein and that she felt she treated her poorly and differently from others because she was not well educated, blonde or from money.  (*Id.*).  Allen never complained that she was being discriminated against, whether on the basis of her age, race, sex or otherwise.  (*Id.*; Glickman Dep. 63:23-64:6).

44.     While Allen did not raise claims of discrimination, Glickman still looked into the situation by speaking with both Klein and Zernik, and the Senior Vice President of Human Resources because the restructuring was already underway.  (Glickman Dep. 51:3-56:15; 59:5-23).

45.     Glickman and Zernik discussed Allen's concerns regarding Klein, how to ensure that the team remain productive and confirmed with Zernik that she is available to the various team members to speak with her directly about their concerns.  (Glickman Dep. 61:9-63:3; 69:11-70:16).

46.     Allen complained to Zernik about working with Klein because she felt she was moody and difficult to work for.  (Zernik Decl., ¶ 15).  Allen never complained that Klein was discriminating against her and never mentioned her race, age or sex.  (*Id.*)

47.     Allen never made any complaints to Cirkva and Cirkva was not aware that she had raised concerns to Zernik and/or Human Resources.  (Cirkva Decl., ¶ 4).

**Allen's Employment Is Terminated**

48.     Allen's employment with Chanel was terminated on February 28, 2012.  (Allen Dep. 182:14-16; Compl., ¶ 12).

49.     After Allen's employment was terminated on February 28, 2012, Klein resigned from Chanel in the middle of March of 2012.  (Glickman Dep. 11:7-12:15; Klein Dep. 7:5-7).  Klein accepted another opportunity with Oscar de la Renta.  (Glickman Dep. 65:5-66:5; Klein Dep. 7:8-15).

50.     Zernik and Robin Gruber ("Gruber"), an attorney for Chanel, were present at the termination meeting.  (Allen Dep. 182:17-183:3).  Gruber was present because there were concerns that Allen had been involved in the sale of missing Chanel sample goods, which Allen was responsible for managing, and Gruber questioned Allen about this at the termination meeting.  (Allen Dep. 184:15-185:14; Glickman Dep. 73:9-16; 74:13-75:24).

51.     Allen was advised that her employment was being terminated because Chanel was restructuring the department and the position and no longer required a Samples Coordinator. (Allen Dep. 183:16-184:14; Allen Dep. 257:257:15-23 ("Q:  Did they ask about your separation from Chanel during your job interviews?  A:  Yes  Q:  And what did you tell them about that? A:  ***The truth.  I told them that my job was -- that the position was eliminated***.") (emphasis added).

52.     The Samples Coordinator position was eliminated and never refilled.  (Glickman Dep. 142:17-22; Klein Dep. 35:3-7; Zernik Decl., ¶¶ 12-13; *see also*, Almon Decl. Ex. J, July 2012 Organizational Chart).

53.     The responsibilities previously handled by Allen as the Samples Coordinator were absorbed by the account representatives and Events team in Fashion Wholesale.  (Glickman Dep. 149:8-150:3; Klein Dep. 35:8-23; Zernik Decl., ¶ 12).

**Allen is Provided a Separation Package at the Time of her Termination, Which She Unilaterally Modified Without Chanel's Knowledge or Agreement**

54.     At the conclusion of the termination meeting, Allen was provided a separation package, entitled "Separation and Release Agreement," which set forth terms regarding Allen's separation from Chanel, and was told to review it, speak with an attorney and get back to Chanel.  (Compl., ¶ 13; Allen Dep. 185:15-186:6; Allen Dep. 213:23-214:21; Almon Decl., Ex. H ("Release Agreement")).

55.     The separation package provided to Allen by Chanel at the termination meeting was signed by Glickman at the time it was delivered.  (Allen Dep. 215:6-218:13; Almon Decl., Ex. H ("Release Agreement"); Glickman Dep. 89:23-91:13; 177:16-22).  Allen never received an electronic copy.  (Glickman Dep. 177:16-22).

56.     Paragraph 3 of the Release Agreement provided in relevant part:

> **In return for your signing (and not revoking) this Agreement, which contains a general release of claims ("Release")**, as is described in detail under Paragraph 4 below, as well as your agreement to be bound by the other terms and conditions of this Agreement, the Company will provide you with the following additional payments and benefits:
>
> > (a) You will receive severance pay in the total amount of twenty one thousand seven hundred and eighty nine dollars and twenty cents ($21,789.20), less applicable taxes and withholdings, which represents nineteen (19) weeks of wages at your current base salary . . .
> >
> > (b) . . . the Company shall pay your applicable premiums under COBRA for continued group medical coverage under the Company's existing medical plan and based on your coverage elections at the time of termination on a month-to-month basis for a period of up to five (5) months . . .

(c) The Company shall retain an outplacement firm of its choosing to provide you with up to four (4) sessions of outplacement services in connection with your efforts to locate and secure new employment following the termination of your employment . . .

. . .

You agree that the payments and benefits provided to you in this Paragraph 3: . . . **are in full discharge of any and all of the Company's liabilities and obligations to you**, whether written or oral.

. . .

You further acknowledge and agree that the consideration set forth in this Paragraph 3 is adequate and complete consideration for your promises and undertakings under this Agreement, **including, but not limited to, your release of claims** as set forth in Paragraph 4 . . .

(Almon Decl., Ex. H ("Release Agreement") (emphasis added)).

57.   As provided to Allen, Paragraph 4 of the Release Agreement stated in relevant part:

For and in consideration of the payments and benefits to be provided to you under Paragraph 3 above, you . . . (collectively "Releasors"), hereby forever release and discharge the Company . . . (collectively referred to as "Releasees") from any and all claims, demands, causes of action and liabilities of any kind whatsoever, whether known or unknown, by reason of any act, omission, transaction or occurrence, which Releasors ever had, now have or may have against any and/or all of the Releasees up to and including the date you sign this Agreement, **_including_**, but not limited to, claims of discrimination and harassment on the basis of race, color, national origin, religion, sex, sexual orientation, age, disability and any other legally protected characteristic, claims under the New York State and City Human Rights Laws, New York Labor Law, the Age Discrimination in Employment Act ("ADEA"), the Older Workers Benefit Protection Act ("OWBPA"), Title VII of the Civil Rights Act of 1964 ("Title VII"), the Civil Rights Act of 1991, the Civil Rights Act of 1866, the Americans With Disabilities Act ("ADA"), the Employee Retirement Income Security Act of 1974 ("ERISA") (excluding claims for accrued, vested benefits under any employee benefit plan of the Company in accordance with the terms of such plan and applicable law), the Worker Adjustment and Retraining Notification Act ("WARN"), the National Labor Relations Act ("NLRA"), the Family & Medical Leave Act ("FMLA") (all as amended) and all other federal, state and local discrimination, labor and wage laws, claims for discrimination, harassment and/or retaliation in employment, as well as claims for breach of contract, wrongful discharge, constructive discharge, retaliation, whistleblower retaliation, defamation, negligence or intentional torts, wages or benefits, including, but not limited to bonuses and other compensation, emotional distress, bodily injury, punitive damages, attorneys' fees and costs, and any and all claims under any contract, statute, regulation, agreement, duty or otherwise.  **Excluded from the foregoing release of claims above** are any claims or

rights that cannot be waived by law, claims for enforcement of this Agreement, claims that arise after you sign this Agreement, claims for unemployment and workers' compensation benefits, and your right to file a charge with a government agency (including, without limitation, the U.S. Equal Employment Opportunity Commission) except even if you file such a charge, you have waived your right to recover monetary, compensatory and punitive damages, and to obtain equitable relief with respect to the claims waived in this Paragraph 4.

(Almon Decl., Ex. H ("Release Agreement") (emphasis added)).

58.     Paragraph 3 of the Release Agreement reemphasized the purpose of the Release

Agreement, stating *inter alia*:

> **In return for your signing (and not revoking) this Agreement, which contains a general release of claims ("Release")**, as is described in detail under Paragraph 4 below, as well as your agreement to be bound by the other terms and conditions of this Agreement, the Company will provide you with the following additional payments and benefits: . . .
>
> You agree that the payments and benefits provided to you in this Paragraph 3: . . . **are in full discharge of any and all of the Company's liabilities and obligations to you**, whether written or oral . . .
>
> You further acknowledge and agree that the consideration set forth in this Paragraph 3 is adequate and complete consideration for your promises and undertakings under this Agreement, **including, but not limited to, your release of claims** as set forth in Paragraph 4 . . .
>
> (Almon Decl., Ex. H ("Release Agreement") (emphasis added)).

59.     Chanel understands that employees may not agree to all terms of the separation package

and/or seek to add additional terms and in those instances, the employee or their representative

would negotiate the terms with in-house counsel for Chanel.  (Glickman Dep. 86:19-87:17;

91:14-21).  Indeed, the Release Agreement specified that "[t]his Agreement…may be modified

only by a writing signed by both parties."   (Almon Decl., Ex. H ("Release Agreement")).

60.     Had Allen sought to make a change to the agreement, Chanel expected Allen or a

representative to contact Chanel, as all previous employees had done under similar

circumstances.  (Glickman Dep. 179:5-14).

61.     Allen spoke with her attorney, Christopher Thompson, about the package and no one else.  (Allen Dep. 218:14-22).  In particular, Allen did not agree with certain components of the agreement presented to her - in particular the waiver of her right to sue for discrimination - and discussed that her with attorney.  (Allen Dep. 218:23-220:20).

62.     Mr. Thompson provided Allen with advice as to how to proceed.  (Allen Dep. 220:21-221:13).  Thereafter, Mr. Thompson's office made changes to the proposed separation agreement.  (Allen Dep. 221:14-222:12).

63.     Specifically, the general release provision contained in the separation agreement was changed so that the word "including" became "excluding" and appeared in the same font.  (Allen Dep. 235:3-236:22; Glickman Dep. 176:23-177:15):

> For and in consideration of the payments and benefits to be provided to you under Paragraph 3 above, you, for yourself and for your heirs, executors, administrators, trustees, legal representatives, successors and assigns (collectively "Releasors"), hereby forever release and discharge the Company, any and all of its past and present parents, subsidiaries, divisions, affiliates, related entities, employee benefit and/or pension plans or funds, successors and assigns and any and all of its and their past and present directors, officers, agents, contractors, trustees, administrators, attorneys, employees and assigns (whether acting as agents for the Company, its affiliates or related entities, or in their individual capacities) (collectively referred to as "Releasees") from any and all claims, demands, causes of action and liabilities of any kind whatsoever, whether known or unknown, by reason of any act, omission, transaction or occurrence, which Releasors ever had, not have or may have against any and/or all of the Releasees up to and including the date you sign this Agreement, ***excluding***, but not limited to, claims of discrimination and harassment on the basis of race, color, national origin, religion, sex, sexual orientation, age, disability and any other legally protected characteristic, claims under the New York State and City Human Rights Laws, New York Labor Law, the Age Discrimination in Employment Act ("ADEA"), the Older Workers Benefit Protection Act ("OWBPA"), Title VII of the Civil Rights Act of 1964 ("Title VII"), the Civil Rights Act of 1991, the Civil Rights Act of 1866, the Americans with Disabilities Act, ("ADA"), the Employee Retirement Income Security Act of 1974 ("ERISA") (including claims for accrued, vested benefits under any employee benefit plan of the Company in accordance with the terms of such plan and applicable law), the Worker Adjustment and Retraining Notification Act ("WARN"), the National Labor Relations Act ("NLRA"), the Family & Medical Leave Act ("FMLA") (all as amended) and all other federal, state and local

discrimination, labor and wage laws, claims for discrimination, harassment and/or retaliation in employment, as well as claims for breach of contract, wrongful discharge, constructive discharge, retaliation, whistleblower retaliation, defamation, negligence or intentional torts, wages or benefits, including, but not limited to bonuses and other compensation, emotional distress, bodily injury, punitive damages, attorneys' fees and costs, and any and all claims under any contract, statute, regulation, agreement, duty or otherwise. Excluded from the foregoing release of claims above are any claims or rights that cannot be waived by law, claims for enforcement of this Agreement, claims that arise after you sign this Agreement, claims for unemployment and workers' compensation benefits, and your right to file a charge with a government agency (including, without limitation, the U.S. Equal Employment Opportunity Commission) except even if you file such a charge, you have waived your right to recover monetary, compensatory and punitive damages, and to obtain equitable relief with respect to the claims waived in this Paragraph 4.

(Almon Decl., Ex. I ("Altered Release Agreement") (emphasis added)).

64.     Allen claims that she then placed a post-it note on the section that had been modified, informed Glickman that the agreement was being returned and returned a fully-signed revised copy to Chanel.  (Allen Dep. 222:20-227:7; 2345:3-16; Almon Decl. Ex. I).

65.     Glickman received the agreement as returned by Allen and reviewed it only to confirm that it had been signed and dated and to review the payment terms.  (Glickman Dep. 93:15-94:18; 108:15-109:7; 177:23-178:10).  Glickman did not review every word because she had done so before it was presented to Allen for her signature.  (Glickman Dep. 177:23-178:10).

66.     While Allen communicated with Glickman via email concerning unemployment benefits and the arrival of her separation check following her termination, she never informed her about the changes she had made to the separation agreement.  (Allen Dep. 212:16-213:4; Allen Dep. 227:8-229:4).

67.     In fact, Allen never spoke with anyone at Chanel about the changes she made to the separation agreement and never received another copy of the agreement from Chanel.  (Allen

Dep. 228:25-229:11).  Allen has no knowledge as to whether anyone at Chanel became aware of the changes that she made to the separation agreement.  (Allen Dep. 233:10-25).

68.     While Allen made changes to the release provisions of the Release Agreement as set forth in the Altered Release Agreement, she still believes she was entitled to the separation payments because she felt it was appropriate for her having worked there for nineteen years.  (Allen Dep. 227:21-228:24); 232:7-22).

69.     After receiving the agreement and confirming that it was signed and dated by Allen, Glickman authorized the separation payment.  (Glickman Dep. 96:2-97:7).  Allen received the separation payment by way of check in the amount of $14,940.19, which she cashed and Chanel paid for five months of her COBRA premiums.  (Allen Dep. 245:15-246:17; 229:20-231:8; 239:7-9).

70.     Had Chanel been aware that the Release Agreement had been changed, it never would have authorized the separation payment.  (Glickman Dep. 178:19-179:4).

**Allen Lacks Any Evidence of Discrimination And Asserts Conclusory Claims Concerning Her Treatment and the Elimination of Her Position**

71.     Allen felt that she was a "constant outsider."  (Allen Dep. 80:14-15).  Allen believed that Chanel was very "cliquey" and considered it a "girls club."  (Allen Dep. 111:18-112:11).  Allen believed that to "fit in," you had to come from a "background with money."  (*Id*.).  Allen felt she did not "fit in."  (*Id*.).  Allen felt that Klein treated people differently based on their financial background.  (Allen Dep. 112:12-113:14; 115:15-19; 116:11-14; 117:3-118:14).  Allen also noted that Klein treated brunettes differently than blondes.  (Allen Dep. 115:15-19).

72.     Allen claims that Klein treated her differently based on her age.  (Allen Dep. 116:19-22).

Allen believes this because she had conversations with Klein during which Klein allegedly made

comments concerning Allen's age as it related to her having children.  (Allen Dep. 120:4-

122:11).  Allen acknowledges that "[w]omen have babies at 46, 47, 48 years old if they wanted

to."  (Allen Dep. 122-4-5).

73.     Allen claims that Klein treated her differently based on her race.  (Allen Dep. 116:23-

117:2).  This is simply Allen's "belief."  (Allen Dep. 122:24-123:13).  Allen recalls Klein made

jokes from "comedians like Dave Chappelle" and acknowledged that she also told jokes at work.

(Allen Dep. 125:3-13).  Allen could not recall any specific comments made by Klein relating to

her race.  (Allen Dep.  125:8-9).

74.     Allen could not understand why Klein treated her differently:

Q:  Why do you think she treated you differently?

A:  I don't know because I was the kindest person to her.  Not one person liked her and I
was the only person that showed her any kind of kindness.

Q:  Do you have any belief as to why she treated you unkindly?

A:  I don't know.  We were closest in age compared to all the other girls.  I'm surprised.
I really am surprised.

Q:  So as you sit here now do you have any belief about why she treated you in a way
that you felt was inappropriate?

A:  I didn't fit in, I wasn't the blonde-haired blue-eyed, I was the dark girl in the bunch…

(Allen Dep. 113:15-114:19).

**Aimee Trralba, Timothy Doran, Richard Bleaman and Dominic McNally Are Not Similarly-Situated to Allen and Allen Has No Personal Knowledge Concerning Their Employment With or Departures from Chanel**

75.      Neither Aimee Trralba, Timothy Doran, Richard Bleaman or Dominic McNally ever worked with Klein or Zernik.  (Allen Dep. 250:20-251:3).

76.      Allen does not have any personal knowledge concerning the circumstances surrounding their employment with and/or departure from Chanel.  (Allen Dep. 246:22-254:17).

**Allen's EEOC Charge and Lawsuit**

77.      Allen filed her Charge of Discrimination against Chanel with the EEOC on or about May 10, 2012.  (Compl., ¶ 6).

78.      Allen filed this lawsuit on September 6, 2012.  (Docket Entry. No. 1).

Dated: November 13, 2014
       New York, New York

                              SEYFARTH SHAW LLP

                              By:  */s/ Lorie E. Almon*
                                   Lorie E. Almon
                                   lalmon@seyfarth.com
                                   Caitlin S. Ladd
                                   cladd@seyfarth.com
                                   620 Eighth Avenue, 32nd Fl.
                                   New York, NY 10018
                                   (212) 218-5500

                                   *Attorneys for Defendant Chanel, Inc.*