**Anu Allen**
**755 Bronx River Rd.**
**Bronxville, N.Y.  10708**
**anu.allen@yahoo.com**

January 31, 2020

Honorable Judge Loretta A. Preska
US District Court, Southern District
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street, Room 1320
New York, NY  10007-1312
212.805.0240

Re: Request to have case #1:12-cv-06758 Allen vs. Chanel, Inc. sealed

Dear Honorable Judge Loretta A. Preska,

I would like to apologize for not including my exhibits on January 10, 2020  when filing my original request. The clerk at the front desk suggested I wait until they are requested before submitting. My former attorney Christopher Thompson received the request for the exhibits on January 21 at 4:42 PM however, did not advise me until yesterday at 1:55 PM.

Please contact me should you require any additional information. I thank you for your time and consideration in this matter.

Sincerely,

Anu Allen

**Anu Allen**
**755 Bronx River Rd.**
**Bronxville, N.Y.  10708**
anu.allen@yahoo.com

January 10, 2020

Honorable Judge Loretta A. Preska
US District Court, Southern District
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street, Room 1320
New York, NY  10007-1312
212.805.0240

Re: **Request to have case #1:12-cv-06758 Allen vs. Chanel, Inc. sealed**

Dear Honorable Judge Loretta A. Preska,

I appreciate the opportunity to plead my case to you in order to request that case #1:12-cv-06758 Allen vs. Chanel, Inc. be sealed.

I would like to clarify the chronological chain of events that led me to file a formal complaint against my former attorney Christopher Thompson. On February 28, 2012, after almost nineteen years of employment, my position as Samples Coordinator with Chanel, Inc. was eliminated. I was offered a severance package in the amount of $21,789.20 plus five months of paid Cobra. **(Exhibit A)**

I was not satisfied with the terms of my severance agreement nor did not I believe that my position was eliminated due to corporate restructuring. In my opinion, the reason I was terminated was discrimination. Consequently, I contacted Christopher Thompson, Esq. for guidance. Mr. Thompson agreed that I had grounds to sue Chanel and that he would negotiate the Separation and Release Agreement with the company. He said this would allow me to move forward with a lawsuit as well as keep my severance package.

When Mr. Thompson received the agreement from Chanel, he made one change to the document. He changed the word *"including"* to *"excluding"* on page 3, number 4, line 13. He then sent the altered document to me by overnight mail.  I was instructed by Mr. Thompson to initial each page of the agreement, to include a blank post-it note on page 3, and to write my signature on the last page. **(Exhibit B)** He then directed me to forward the altered document back to Chanel Inc. to the attention of Meghan Glickman.  Around the first week of April 2012, Chanel received and approved the signed agreement. On or around April 15, 2012 I received my severance in the amount of $14,940.19. **(Exhibit C)**

I would like to be clear that the changes to the Separation and Release Agreement were made by Mr. Thompson and Mr. Thompson alone. As his client, I followed his legal directive every step of the way and I was never made aware that the change that he made was inappropriate, deceptive or contrary to any agreement made with Chanel, Inc. I was never given any options as to the best course of action. Had I understood the ramifications of what he was doing, I would not have put my signature on the document and would have terminated Mr. Thompson as my representative. I now understand the mishandling of my case was unethical and not in my best interest.

Mr. Thompson misrepresented the validity of the agreement, coerced me into signing a document falsely implicating me as the author, all while assuring me that the change was appropriate. Mr. Thompson admits to doing so in his response to my formal complaint to the Grievance Committee filed on October 18, 2019. **(Exhibit D)** He concealed that the change was made without consent or acknowledgement of Chanel, Inc.  Mr. Thompson prepared and directed me to sign an Affidavit even though he clearly knew it was not truthful. Not having any legal background, I entirely trusted his professional knowledge and put my complete faith in him. I was apprehensive, but followed his directive. He assured me that there would not be any consequences because it was "only protocol." I did not realize at the time that this was actually perjury.

On Sept 6, 2012, Mr. Thompson filed the Employment Discrimination lawsuit against Chanel, Inc. Judge Robert P. Patterson, Jr., U.S.D.J. was the original Judge assigned to my case.  On or around November 12, 2012, Judge Patterson denied Defendants motion without prejudice on the grounds that I had not knowingly, voluntarily or willfully waived my right to file a discrimination suit against Chanel. **(Exhibit E)**

On Dec 3, 2012 Mr. Thompson emailed me an Affidavit that he advised me to sign. The Affidavit, stated that it was I who was personally responsible for modifying the agreement not the offices of Christopher Thompson, Esq. **(Exhibit F)** As stated in my complaint against Mr. Thompson, when I questioned him as to why it said my name instead of the Law Offices of Christopher Thompson, Esq., I was told that legally it had to be written that way because it was all part of the legal negotiation process and it was the only way to proceed with the lawsuit. He assured me that the court understood that his firm was representing me and that he knew what he was doing. Although I felt pressured, I trusted Mr. Thompson's expertise and signed the document.

By this time, I had been recommended for a Showroom Manager position at Ermenegildo Zegna. I was hired in February of 2014. After a little more than 4 years, the company downsized and in March 2018 I was laid off. It was not until April of 2018, when searching for new employment opportunities that I discovered that not only was my case not sealed as Mr. Thompson had promised but the ramifications of being cohered into signing an affidavit that I clearly did not understand was damaging my career prospects. I have been publically humiliated and slandered on various online forums. **(Exhibit G)** From being called a "game playing employee" for changing a legal document to being accused of "chicanery". These disturbing and defamatory articles are extremely damaging to my livelihood as well as to my psyche. I have included an extensive Excel chart that I have put together for your reference. **(Exhibit H)** I have been successful in having several search engines remove the negative articles. However, the remaining sites require a court order stating that the case has been sealed in order to have them taken down.

On November 13, 2014 the ruling of Allen vs. Chanel, Inc. was not in my favor. **(Exhibit I)** I was ordered to repay my severance in the amount of $14,940.19 plus interest, premium payments for five months of COBRA  plus interest, as well as returning all of the discriminating evidence I had against Chanel proving they were aware  that I had been sexually harassed and not protected. Chanel threatened to sue me for fraud for having my personal file in my possession. I discussed with Mr. Thompson my concerns with the word "fraud" being used against me publically. **(Exhibit J)** I felt this was another manipulation tactic from Chanel to try to intimidate someone who does not have the financial means to stand up against a multi-billion dollar corporation.

I expressed to Mr. Thompson the importance of having this case sealed upon completion. Mr. Thompson always assured me that my case would be sealed and I had nothing to worry about. In my opinion, I lost my case as well as my right to appeal because of how Mr. Thompson altered the agreement and absolved himself of any responsibility. Instead he chose to blame me for the change that he made. I was never seen in a positive light due to his actions.

On April 16, 2017, Mr. Thompson sent me a new Settlement Agreement and General Release to sign. Because I lost confidence in Mr. Thompson, I felt compelled to have another attorney review the agreement before signing. **(Exhibit K)**

On or around April 21, 2017 I contacted Peter Ginsberg, Esq., who reviewed the agreement and agreed that my entire case was mishandled. He suggested two minor adjustments to the agreement that would be in my best interest. On April 26, 2017 Beth Bilsborrow, Paralegal in Mr. Ginsberg's firm, reached out to Mr. Thompson regarding those changes. **(Exhibit L)** Mr. Thompson advised Ms. Bilsborrow, that he did not believe that Chanel would negotiate any further but agreed to forward the revised copy to Chanel. Mr. Thompson was clearly insulted that I contacted another attorney for advice and asked if they were willing to take over my case. Mr. Thompson did forward the revised copy to Chanel and they agreed to the terms. **(Exhibit M)** If Mr. Thompson was not negligent with my case, I would not have had to involve another attorney for guidance. Mr. Thompson was always representing me so to try to pass the blame once again to someone else is just another example of his character and lack of responsibility.

Mr. Thompson contacted me on February 19, 2019. I made it clear that I was distraught that my case had not been sealed as he promised. Mr. Thompson acted shocked, stating "I'm surprised. I thought that it had been". He completely trivialized my despair. He said that it was not a big deal because it only makes Chanel look foolish for not reading their documents thoroughly. I informed him of the all of the negativity written online was about me and that it was a complete assassination of my character. I further explained that the remarks are blaming me for his actions of changing the word including to excluding in the Agreement. Mr. Thompson tried to appease me by saying that he would reach out to Chanel and see what he could do. I advised him that contacting Chanel is useless as they have nothing to do with sealing my case. He was once again placing the blame on someone else when, in fact, it was his responsibility to address the matter of sealing the case with the court.

I informed Mr. Thompson that I had contacted the United States District Court for the Southern District of New York and was advised that an Order to Show Cause would need to be filled out and presented to the Judge on the bench at the time of the trial explaining the situation. During our conversation I also advised Mr. Thompson that I have researched a company that can bury negative online information however, I was told that it would cost close to $10,000.00 dollars to do so. Which I cannot afford, nor should I be responsible to pay. I explained that clearing my name and repairing my reputation, that has been damaged due to his negligence, is priority.

At that point the tone in the conversation changed. That was when Mr. Thompson became agitated. He was extremely curt and disrespectful. I was in mid-sentence when he hung up on me.  I left Mr. Thompson phone messages on Feb 19, March 5, March 11 and again on March 18 **(Exhibit N)** along with two emails on February 26, and March 5, 2019. **(Exhibit O)** He did not respond to any of these attempts of communication. For Mr. Thompson to say that he thought I had found a solution is absurd. He never had any intention on finding a resolution or contacting me again. On August 13, 2019 I sent Mr. Thompson a letter by certified mail inquiring as to whether or not he had an answer for me. **(Exhibit P)** This too was ignored leaving me with no other choice but to file a formal complaint with The Grievance Committee of the 10th Judicial District of New York to report his negligence. **(Exhibit Q)**

On Oct 20, 2019 I contacted Karen Gallagher of C2 Staffing. I wanted to explain to Karen the challenge that I have been having in regard to the negative online articles. Karen informed me that she knew about the legal issue with Chanel, Inc. She was notified by Mrs. Pat Stewart who is the former head of Ermenegildo Zegna's Human Recourses department. Mrs. Stewart had brought it to her attention after I had already been permanently hired. Mrs. Stewart was inquiring whether Karen knew of the legal issue or the articles that were written about me. Mrs. Gallagher informed her that she was unaware. However, she knew of my character and work ethic and did not see the need to research my online profile. Mrs. Stewart then stated that had she known beforehand about the articles, I would not have been hired. Mrs. Gallagher suggested having the negative information removed as soon as possible and cleaning up my online reputation.

I also had a conversation with employment recruiter, Pam Moutis of the Bachrach Group, Ltd. who was kind enough to provide me with a reference letter. Mrs. Moutis also suggested cleaning up the online negativity immediately and confirmed that researching an applicant's online reputation is common practice during the employment placement process. **(Exhibit R)**

In this day and age with the many social media outlets, many employers do their research online when reviewing potential candidates. I personally do not have a Facebook, Instagram or any other social media account. The only information online about me is this case with Chanel followed by the incorrect and defamatory comments from other attorneys judging my character. All of this was caused by Mr. Thompson's negligent and unethical handling of my case. This is a case that I am not at liberty to discuss due to the elements of the Agreement. How am I to defend myself when I am asked, why I changed a legal document or why am I being described as a "Game playing employee being accused of "Chicanery"?

I am a single fifty year old independent woman seeking employment in today's job market. Dealing with this issue has been very challenging for me and is affecting my livelihood and wellbeing. I have been physically ill over this matter. Because of this complete defamation of character, I am suffering from depression, extreme anxiety and panic attacks on a daily basis. It is becoming a challenge to financially support myself.

I would like to respectfully request that my case #1:12-cv-06758 Allen vs. Chanel, Inc. be sealed so I can have the remaining search engines remove their articles and hopefully find gainful employment. By sealing this case it will do no harm or injury to anyone associated with this matter but will greatly benefit me, as I have not been able to find employment since I lost my position at Ermenegildo Zegna on March 18, 2018.

I thank you for your time and consideration in this matter. Please contact me should you require any additional information.

Sincerely,

Anu Allen

EXHIBIT A

## Severance/Settlement Payment Request

| | |
|---|---|
| **Requested By:** Hillary Chazen | **Date:** March 21, 2012 |

**Employee Name:** Ann Allen      **Employee #:** 202153

**Revocation Period:** 7 days      **Pay By:** 4/3/2012 (date)

**Payment Type:**

| | | Less Tax |
|---|---|---|
| Severance | **Amount:** $21,789.20 | ☒ |
| | **Amount:** | ☐ |
| | **Amount:** | ☐ |

**Cobra Reimbursement:** No      **Number of Months:**

**Beginning Month:**      **Ending Month:**

**Additional Instructions:**

**SERVICE CENTER USE ONLY**

Date Received:      Date Processed:

Administrator:

*EXHIBIT B*

# CHANEL

February 28, 2012

**BY HAND**

Anu Allen
755 Bronx River Road
Bronx, NY 10708

Re:     **Separation and Release Agreement**

Dear Anu:

    We have prepared this letter agreement ("Agreement") to confirm our mutual understanding regarding the terms and conditions of your separation from employment with Chanel, Inc. ("Company") and the separation package that the Company is hereby offering you, as set forth herein, in connection with the termination of your employment with the Company. These terms and conditions are as follows:

1.    **Acknowledgement Regarding Employment.** Your last day of employment with the Company will be February 28, 2012 ("Termination Date").

2.    **Acknowledgements Regarding Wages.** You will be paid your regular wages up to and including the Termination Date. You will also be paid for any vacation time that you have accrued but not used as of the Termination Date in accordance with Company policy. These payments, which will be subject to applicable taxes and withholdings, shall be provided regardless of whether you sign this Agreement. By signing this Agreement, you acknowledge that these payments have been made to you.

3.    **Additional Consideration.** In return for your signing (and not revoking) this Agreement, which contains a general release of claims ("Release"), as is described in detail under Paragraph 4 below, as well as your agreement to be bound by the other terms and conditions of this Agreement, the Company will provide you with the following additional payments and benefits:

    (a)    You will receive severance pay in the total amount of twenty one thousand seven hundred and eighty nine dollars and twenty cents ($21,789.20), less applicable taxes and withholdings, which represents nineteen (19) weeks of wages at your current base salary, less applicable taxes and withholdings. The foregoing severance payment shall be made to you within fifteen (15) days after the Effective Date (as defined in Paragraph 10) of this Agreement.

    (b)    Provided that you timely elect coverage under the Consolidated Omnibus Budget Reconciliation Act ("COBRA"), complete the necessary COBRA

paperwork and remain eligible for COBRA coverage, the Company shall pay your applicable premiums under COBRA for continued group medical coverage under the Company's existing medical plan and based on your coverage elections at the time of termination on a month-to-month basis for a period of up to five (5) months. Notwithstanding the foregoing, should you become eligible for medical coverage under another group health insurance program or plan, the Company's obligation to pay these premiums shall immediately cease. The Company's obligation is based on your eligibility to participate in another program or plan and not on whether you are actually covered under another program or plan. You agree to promptly notify the Company in writing should you become eligible for medical coverage under another group health insurance program or plan. The payments provided for under this Paragraph 3(b) shall be made following the Effective Date and in accordance with and subject to the above terms.

(c)   The Company shall retain an outplacement firm of its choosing to provide you with up to four (4) sessions of outplacement services in connection with your efforts to locate and secure new employment following the termination of your employment. This benefit shall be made available to you following the Effective Date.

The payments and benefits set forth under this Paragraph 3 shall be subject to any and all applicable taxes and withholdings. The payments and benefits set forth under this Paragraph 3 are in addition to the payments you will receive under Paragraph 2 above.

You agree that the payments and benefits provided to you in this Paragraph 3: (i) exceed any payment, benefit, or other thing of value to which you might otherwise be entitled under any policy, plan or procedure of or prior agreement with the Company; and (ii) are in full discharge of any and all of the Company's liabilities and obligations to you, whether written or oral.

It is agreed that you are not and shall not be entitled to receive any additional compensation, monies and/or benefits from the Company of any kind other than as expressly set forth under this Paragraph 3; provided, however, that, as noted above under Paragraph 2, regardless of whether you sign this Agreement, you will receive those payments set forth under Paragraph 2. You further acknowledge and agree that the consideration set forth in this Paragraph 3 is adequate and complete consideration for your promises and undertakings under this Agreement, including, but not limited to, your release of claims as set forth in Paragraph 4.

You further understand and agree that the Company is neither providing tax nor legal advice, nor making any representations regarding tax obligations or consequences, if any, related to the payments and benefits paid to you under this Agreement.

4.    <u>General Release of Claims</u>.  For and in consideration of the payments and benefits to be provided to you under Paragraph 3 above, you, for yourself and for your heirs, executors, administrators, trustees, legal representatives, successors and assigns (collectively "Releasors"), hereby forever release and discharge the Company, any and all of its past and present parents, subsidiaries, divisions, affiliates, related entities, employee benefit and/or pension plans or funds, successors and assigns and any and all of its and their past and present directors, officers, agents, contractors, trustees, administrators, attorneys, employees and assigns (whether acting as agents for the Company, its affiliates or related entities, or in their individual capacities) (collectively referred to as "Releasees") from any and all claims, demands, causes of action and liabilities of any kind whatsoever, whether known or unknown, by reason of any act, omission, transaction or occurrence, which Releasors ever had, not have or may have against any and/or all of the Releasees up to and including the date you sign this Agreement, excluding, but not limited to, claims of discrimination and harassment on the basis of race, color, national origin, religion, sex, sexual orientation, age, disability and any other legally protected characteristic, claims under the New York State and City Human Rights Laws, New York Labor Law, the Age Discrimination in Employment Act ("ADEA"), the Older Workers Benefit Protection Act ("OWBPA"), Title VII of the Civil Rights Act of 1964 ("Title VII"), the Civil Rights Act of 1991, the Civil Rights Act of 1866, the Americans with Disabilities Act, ("ADA"), the Employee Retirement Income Security Act of 1974 ("ERISA") (including claims for accrued, vested benefits under any employee benefit plan of the Company in accordance with the terms of such plan and applicable law), the Worker Adjustment and Retraining Notification Act ("WARN"), the National Labor Relations Act ("NLRA"), the Family & Medical Leave Act ("FMLA") (all as amended) and all other federal, state and local discrimination, labor and wage laws, claims for discrimination, harassment and/or retaliation in employment, as well as claims for breach of contract, wrongful discharge, constructive discharge, retaliation, whistleblower retaliation, defamation, negligence or intentional torts, wages or benefits, including, but not limited to bonuses and other compensation, emotional distress, bodily injury, punitive damages, attorneys' fees and costs, and any and all claims under any contract, statute, regulation, agreement, duty or otherwise.  Excluded from the foregoing release of claims above are any claims or rights that cannot be waived by law, claims for enforcement of this Agreement, claims that arise after you sign this Agreement, claims for unemployment and workers' compensation benefits, and your right to file a charge with a government agency (including, without limitation, the U.S. Equal Employment Opportunity Commission) except even if you file such a charge, you have waived your right to recover monetary, compensatory and punitive damages, and to obtain equitable relief with respect to the claims waived in this Paragraph 4.

5.    <u>Confidential Information; Return of Property; Confidentiality; Non-Disparagement</u>.

(a)    Whether or not you sign this Agreement, you will be required to maintain the confidentiality of business and personal information and trade secrets of the Company and the other Releasees.  You further acknowledge that as a result of you employment

3

with the Company you had access to and became acquainted with the Company's confidential information, records, trade secrets and other information concerning the Company's business and operations and that of the other Releasees, as well as and including personal information concerning the Company and the other Releasees ("Confidential Information"). You acknowledge and agree that all such Confidential Information is the sole and exclusive property of the Company (and/or the other Releasees), regardless of whether you developed such Confidential Information during the course of your employment with the Company, and that you have not and shall not, except as may be required by law, utilize or disclose any such Confidential Information, records or files of the Company (or of any of the Releasees), or any copies thereof, for your own benefit or the benefit of any other person, corporation or other entity.

(b)     You also acknowledge that no later than the Termination Date you shall return to the Company all records, files and documents in your custody, possession and control that you have had access to, became acquainted with and/or created during the course and in the scope of your employment with the Company, as well as and including all Confidential Information, and any copies thereof, in whatever form they may be in, as well as any and all other property or equipment of the Company or of any of the other Releasees in your custody, possession, or control, including, but not limited to, Company vehicles, computers, laptops, PDAs, cellular phones, employee IDs, pass cards, keys, and Company products, samples and testers.

(c)     You acknowledge and agree that you have not and will not reveal the terms and existence of this Agreement, or the circumstance leading to it, to any third party, other than to your attorney, accountant and/or spouse or domestic partner (each of whom you shall require and ensure to be bound by this confidentiality requirement), to a government entity or agency in connection with any charge or investigation it may conduct or as may otherwise be required by law. Except as required by law, you further agree that you have not and will not communicate with the media or make any public statement, whether orally or in writing, electronically (including, but not limited to, via e-mail) or otherwise, regarding the Company or any of the other Releasees, including, but not limited to, via press interviews or press statements, and/or statements to any newspaper, magazine, television or radio station, website or blog, or posting to any website or blog.

(d)     You agree that you have not and will not make or encourage the making of any statements, truthful or otherwise, orally or in writing, or take any actions or encourage the taking of any actions, which in any way disparage, or which could harm, the Company or any of the other Releasees, including, without limitation, the reputation and/or goodwill of the Company or any of the other Releasees.

(e)     Nothing in this Agreement precludes you from providing truthful information to any government agency in accordance with or pursuant to your rights under law.

6.    Cooperation After Termination.  You acknowledge and agree that, on an as-needed basis, you will cooperate and assist the Company, as well as the other Releasees, in connection with any and all matters that you have knowledge of, handled, were responsible for and/or otherwise worked on while employed by the Company.  It is acknowledged that such cooperation and assistance may include, but shall not be limited to, making yourself available to the Company's and the other Releasees' attorneys and/or providing the Company and the other Releasees with complete and accurate information regarding the particular matters.

7.    Non-Solicitation / Non-Interference.  You acknowledge and agree that for a period of one (1) year from the Termination Date you will neither alone nor in concert with others:

        (a)    Solicit, induce, influence, encourage, or attempt to solicit, induce, influence or encourage, either directly or indirectly, any person employed by the Company to terminate his or her employment relationship with the Company or otherwise interfere with any such person's employment by or association with the Company;

        (b)    Solicit for employment, hire, or assist in any aspect with the hiring of, whether on your own behalf or on behalf of any third party, any person who is, or within the past six (6) months from the Termination Date has been, an employee, executive, officer, manager, consultant, independent contractor or other agent of the Company;

        (c)    Induce, influence, encourage, or attempt to induce, influence or encourage, either directly or indirectly, any third party, including, but not limited to, any retailer, vendor, supplier, client or customer, to terminate such party's business relationship with the Company or otherwise damage any business or contractual relationship of the Company; or

        (d)    Take any other action detrimental to the relationship of the Company with its employees, clients, customers or suppliers.

The parties agree that, in the event that the provisions of this Paragraph 7 hereof are deemed too restrictive in a court proceeding, such court may reduce such restrictions to the extent it deems reasonable under the circumstances; provided that your obligations under this Paragraph 7 are in addition to, and not in lieu of, any restrictions pertaining to the foregoing under applicable law or any other obligations you have under this Agreement.

8.    Enforcement.  It is agreed that should you commit a breach of Paragraphs 5, 6, or 7 such breach shall be considered a material breach of the Agreement.  In the event of a breach or threatened breach, the Company shall have the right and remedy, in addition to any other remedy available in law or equity, to have the provisions of Paragraphs 5, 6 and 7 of this Agreement specifically enforced by any court having equity jurisdiction, it being acknowledged and agreed that any such breach or threatened breach will cause irreparable

injury to the Company and that money damages may not provide an adequate remedy to the Company. In addition, in the event of a breach, the Company's obligation to make any payments to you under Paragraph 3 shall immediately cease, and you agree, to the fullest extent permitted by law, to forfeit any payments made to you under Paragraph 3 of this Agreement upon demand by the Company, it being recognized that actual damages for such a breach would be impractical and extremely difficult to remedy. In any action brought by the Company under this provision the Company shall, to the fullest extent permitted by law, be entitled to its reasonable attorneys' fees and costs and be entitled to seek any other damages and relief provided under law or in equity.

9.    <u>Non-Admission; Choice of Law; Jurisdiction; Entire Agreement; Severability</u>. We agree that this Agreement is not intended, and shall not be construed, as an admission by the Company of any violation of federal, state or local law, ordinance or regulation, any breach of contract or of any wrong whatsoever against you. This Agreement shall be construed and enforced in accordance with federal law to the extent applicable or, to the extent federal law is not applicable, the laws of the State of New York, without giving effect to principles of conflict of laws. The parties consent to personal jurisdiction to the federal and state courts in New York, New York. This Agreement constitutes the entire agreement between the parties and supercedes any and all prior agreements and understandings between the parties and may be modified only by a writing signed by both parties. You acknowledge that you are not relying on any oral statements or promises concerning the subject matter of this Agreement in signing this Agreement. If any part or term of this Agreement is held to be unenforceable or ineffective, the validity of the remaining provisions shall not be affected and the other obligations will be enforced as if the Agreement did not contain the invalid part or term.

10.    <u>Time Periods; Legal Advice; Other Acknowledgements</u>. The Company hereby advises you to consult with an attorney of your own choice before signing this Agreement. By signing below, you acknowledge that you have been advised in writing to consult with an attorney of your choice before signing this Agreement and that you have been represented by counsel or you have had the opportunity to consult with counsel and to otherwise consider the terms of this Agreement prior to your signing the Agreement. You further acknowledge that you have read this Agreement in its entirety; that you fully understand all of its terms and their significance; that you have signed it voluntarily and of your own free will; and that you intend to abide by its provisions without exception. You have twenty-one (21) days from receipt of this Agreement within which to consider the terms of this Agreement. By signing below, you acknowledge that you have been given twenty-one (21) days within which to consider the terms of this Agreement. You have seven (7) days to revoke this Agreement after you sign it ("the Revocation Period") by indicating your decision to do so in writing, addressed to the undersigned at Chanel, Inc., 9 West 57th Street, 44th Floor, New York, New York 10019 (fax number 212-303-5728), to be received by the undersigned no later than the seventh (7th) day following the day you signed this Agreement. Provided you timely submit a signed Agreement, and do not revoke the Agreement during the Revocation Period, the Agreement shall become effective on the eighth (8th) day after you sign it ("Effective Date"). If you revoke this

Agreement, you shall not be entitled to the payments and benefits set forth under Paragraph 3 and the Agreement will automatically be deemed null and void.

\*          \*          \*          \*

If you agree with the terms and conditions of this Agreement, please sign and date this Agreement below, keep a copy for your files and return the original to me, which, provided you do not revoke it, will constitute a binding agreement between you and the Company following expiration of the Revocation Period.

Sincerely,

*Megan Glickman*

Megan Glickman
HR Director

Agreed To and Accepted:

_____
Signature

_Ana Alles_____
Print Name

Date: _3/19/12_____

Chanel, inc.
876 Centennial Avenue
P.O. Box 805
Piscataway, NJ 08854

FIFTEEN THOUSAND NINE HUNDRED FORTY AND 19/100 DOLLARS

To
order ANU ALLEN
of 755 BRONX RIVER ROAD
BRONXVILLE, NY 10708

item #000006      002188            A0RH1-49

04/12/2012                                    00455822

JPMorgan Chase Bank, N.A.
Syracuse, NY          60-987
                      213

$14,940.19

Barbara Manalgues

⑆004558 2⑆  ⑆021309374⑆  615776787⑆

DOCUMENT HAS A COLORED BACKGROUND AND MICROPRINTING INCLUDING THE WORD "VOID" AND AN ARTIFICIAL WATERMARK ON THE BACK — HOLD AT AN ANGLE TO VIEW
ORIGINAL DOCUMENT HAS AN ARTIFICIAL WATERMARK ON THE BACK.   HOLD AT AN ANGLE TO VIEW WHEN CHECKING THE ENDORSEMENT.

LAW OFFICES OF
## CHRISTOPHER THOMPSON, ESQ.
### 33 DAVISON LANE EAST
### WEST ISLIP, NEW YORK 11795

PH 1(631) 983-8830                                FAX 1(631) 983-8831

BY CERTIFIED MAIL R/R/R AND EMAIL OCTOBER 8, 2019

State of New York
Grievance Committee for the
10th Judicial District
150 Motor Parkway, Suite 102
Hauppauge, New York 11788
Attn: Ann Marie Modica-Schaffer, ESQ.

RE: File No.: S-1235-19

Dear Staff Counsel Modica-Schaffer:

I am writing in response to the September 5, 2019 letter from the Grievance Committee related to the above reference file number and complaint of Ms. Anu Allen (hereinafter "Anu").

Initially, thank you for extending my time to respond to this complaint as per my email to you dated Tuesday, September 24, 2019. In addition, I am providing two (2) copies of my response so the Committee can forward one (1) to Anu. Furthermore, I have completed the background questionnaire enclosed herein.

I can tell you I was both surprised and disappointed to learn Anu had filed a complaint against me. I have known Anu for at least twenty (20) years, we had mutual friends, I considered her a friend and I even handled a malpractice action for her when her former attorney dropped out of the case on the eve of trial in Supreme Court, Westchester County. In that case, even though a mistrial was declared, the case was settled to Anu's satisfaction. In fact, she told me that she used the funds from her settlement to purchase her co-op in Bronxville, New York. I will state that I do not agree with Anu's version of the facts and I never told her she was guaranteed her severance but rather made it clear she could lose it and the choice to change the language in her separation agreement and release with Chanel was my suggestion but her ultimate decision.

The facts of her employment discrimination case did not have a positive result. It is true Anu was required to pay-back the money from her severance agreement. However, she was required to do so because the Court reached the conclusion that there was no meeting of the minds and thus the separation agreement and release was not binding on either side. That decision was made, not by Chief District Judge, Loretta A. Preska, but rather by Judge Patterson (the initial Judge assigned to this case). When Judge Patterson made the decision he did not order the funds be repaid. It was only after substantial discovery took place that Chief District Judge Preska made her decision and at the same time determined that essentially no discrimination was found.

Anu signed a Settlement Agreement and General Release in or around May 6, 2017, after she lost confidence in me and had an attorney friend of her step-father step-in to negotiate the terms of that document which she signed. Having reached a settlement no appeal could be taken. The idea Anu was signing because I had somehow fooled her into doing so is belied by the fact the changes in the agreement were not negotiated by me but rather by her step-father's attorney friend. His name is Peter Grinsberg, ESQ., and he was instrumental in Anu's execution of the Settlement Agreement and General Release as can be seen from the attached email chain (**Exhibit "A"**).

Page 2 of 2
October 8, 2019
RE: File No.: S-1235-19

I never promised to have the Court Case Sealed and quite frankly if that was important to Anu she could have requested of Peter Grinsberg, ESQ., that he include such language in the Settlement Agreement and General Release in addition to the confidentiality language.

It is my recollection Anu singed the Settlement Agreement and General Release because Chanel intended to pursue its claim for legal fees which were easily over $100,000.00 and there was gray area over whether Anu was selling Chanel items through a friend on her friend's website. I did not believe Anu had done anything underhanded in obtaining those items but it was clearly a weakness in her case.

It is true I reached out to Anu in late February 2019. She had sent me a text on February 25, 2019 at 1:58 pm that read: "Hi Chris could you give me a call when you have a moment 914-954-4411 thanks". I know her Birthday was in February and I called, as a friend, to see how things were going with her. She told me about the internet statements but I was unaware of how she could get anything removed. However, I did tell her, as I remember it, that I had seen something on television related to having negative information remove from the internet. I may have told her that if I saw it again I'd sent the information along to her. She then sent me an email on March 11, 2019 which indicated to me that she found a solution (**Exhibit "B"**). She tried to call me on March 18, 2019 at 1:35 pm but I was unable to speak to her so I responded with an automatic response that read: "Sorry, I can't talk right now." However, she left me a message that said: "Hi Chris, its Anu again. Call me please. …. then thinking she had already hung-up she made the following statement: "Unbelievable, this is supposed to be my friend. Can you imagine?" I have this recording saved on my phone. That was the last time I am aware of that she tried to reach me until I received a letter from her dated August 13, 2019.

Having seen Anu's true colors in her recorded telephone message I decided not to respond. Incidentally, my legal representation of her had ceased more than two (2) years prior at the conclusion of the Chanel litigation. Moreover, since it was never agreed the court would seal the file and the information was on the internet and not subject to an order to seal the record, even if that could be accomplished, there is nothing I personally have used to remove such information from the public domain and even if there were, it would not be my obligation to do so.

I feel badly for Anu if she is having trouble finding employment. I agree with her. She has a strong work ethic and good character and I wish her well. However, it is untrue and I deny having coerced her into signing any document or did not appeal her case because I had handled her case negligently. Quite frankly, she waived her right to appeal when she signed the Settlement Agreement and General Release negotiated by Peter Grinsberg, ESQ. and if she felt I was negligent she could have had Mr. Grinsberg substitute into the case at that time prior to signing the Settlement Agreement and General Release.

I trust this response is satisfactory to the Committee and I am available for any further inquiry if necessary. I remain,

Very truly yours,

Christopher Thompson, ESQ.

CT:ct

EXHIBIT "A"

Re: Allen Settlement Agreement                                        https://mail.aol.com/webmail-std/en-us/PrintMessag

**From:** Anu Allen <anu.allen@yahoo.com>
**To:** ctalawman <ctalawman@aol.com>
**Cc:** pginsberg <pginsberg@prglaw.com>; pgreception <pgreception@prglaw.com>
**Subject:** Re: Allen Settlement Agreement
**Date:** Sat, May 6, 2017 6:39 pm

Chris, My apologies for the delay. I did not see this email until today. I will overnight everything to you on Monday once properly signed and notarized. Thank you.

Sent from my iPhone

On May 6, 2017, at 4:16 PM, ctalawman@aol.com wrote:

> Anu,
>
> Please reprint the agreement sign where your name is (not where Chanel signs) in front of a notary and have notarized. Then, overnight to me at the address below. There are several deadlines in the agreement which we must be mindful about. Once you take care of this please put together your files and send to me by the end of the week so we can comply with the agreement. Thank you.
>
> Christopher Thompson, ESQ.
> 33 Davison Lane East
> West Islip, NY 11795
> Phone: 631-983-8830
> Fax: 631-983-8831
>
>
> -----Original Message-----
> From: Peter Ginsberg <pginsberg@prglaw.com>
> To: ctalawman <ctalawman@aol.com>
> Cc: PGreception <pgreception@prglaw.com>; anu.allen <anu.allen@yahoo.com>
> Sent: Sat, May 6, 2017 2:43 pm
> Subject: Re: Allen Settlement Agreement
>
> Chris
>
> I did not see an email from you about this yesterday. I will be in DC starting tomorrow but assume you are able to coordinate with Anu to get this accomplished.
>
> Peter
>
>
> Peter R. Ginsberg
> Peter R. Ginsberg Law, LLC
> 80 Pine Street, 33d Floor
> New York, New York  10005
> (646) 374-0029
>
>
> On May 6, 2017, at 2:21 PM, "ctalawman@aol.com" <ctalawman@aol.com> wrote:
> On May 6, 2017, at 2:21 PM, "

https://mail.aol.com/webmail-std/en-us/PrintMessage

Laureen,

As I mentioned yesterday in my email yesterday, the document is signed by Anu in the wrong place and this will be an issue for Defendant's counsel.  Can I expect that a new correctly signed and notarized document will be forthcoming on Monday?  Please let me know and thank you for your assistance.

Christopher Thompson, ESQ.
33 Davison Lane East
West Islip, NY 11795
Phone: 631-983-8830
Fax: 631-983-8831


-----Original Message-----
From: PGreception <pgreception@prglaw.com>
To: Christopher Thompson, ESQ. (ctalawman@aol.com) <ctalawman@aol.com>
Cc: Anu Allen (anu.allen@yahoo.com) <anu.allen@yahoo.com>; Peter Ginsberg <pginsberg@prglaw.com>
Sent: Fri, May 5, 2017 12:15 pm
Subject: Allen Settlement Agreement

Dear Mr. Thompson:

Please see the attached Settlement Agreement signed by Ms. Allen.

Regards,

Laureen Mckenzie
Administrative Assistant

PETER R. GINSBERG LAW LLC
80 Pine Street, 33rd Floor
New York, NY 10005
Tel: (646) 374-0030
Fax: (646) 355-0202

# EXHIBIT "B"

**From:** Anu Allen <anu.allen@yahoo.com>
**To:** Esq. Chris Thompson <ctalawman@aol.com>
**Subject:** https://www.traverselegal.com/blog/how-to-remove-defamatory-search-results-from-google/
**Date:** Mon, Mar 11, 2019 12:34 pm

https://www.traverselegal.com/blog/how-to-remove-defamatory-search-results-from-google/

**Anu Allen**
**755 Bronx River Rd.**
**Bronxville, N.Y.  10708**

October 18, 2019

State of New York
Grievance Committee For The
Tenth Judicial District
150 Motor Parkway, Suite 102
Hauppauge, NY  11788

Re: File# S-1235-19
**Amendment**

Dear Staff Counsel Modica-Schaffer, Esq.,

This is an amendment for exhibits M – S. My apologies for the confusion.

I thank you for your time and consideration in this matter. Please feel free to contact me should you need any further information.


Sincerely,

Anu Allen

**Anu Allen**
**755 Bronx River Rd.**
**Bronxville, N.Y.  10708**
**anu.allen@yahoo.com**

October 18, 2019

State of New York
Grievance Committee For The
Tenth Judicial District
150 Motor Parkway, Suite 102
Hauppauge, NY  11788
631.231.3775

Re: File# S-1235-19
AMENDMENT

Dear Staff Counsel Modica-Schaffer, Esq.,

I appreciate the opportunity to respond to Mr. Thompson's letter dated October 8, 2019.

I would like to clarify the chronological chain of events in regard to my complaint against Christopher Thompson, Esq. On February 28, 2012, after almost 19 years of service, my position as Samples Coordinator with Chanel, Inc. had been eliminated. I was offered a severance package in the amount of $21,789.20 plus 5 months of paid Cobra **(Exhibit A)**

I was not satisfied with the severance agreement nor did not I feel that my position was eliminated due to restructuring but discrimination. I contacted Christopher Thompson, Esq. for guidance. Mr. Thompson agreed that I had grounds to sue and that he would negotiate the Separation and Release Agreement with Chanel. He said this would allow me to move forward with a lawsuit as well as keep my severance package.

When Mr. Thompson received the agreement from Chanel, he made one change to the document. He changed the word *"including"* to *"excluding"* on page 3, number 4, line 13. He then sent the document to me by overnight mail.  I was instructed to initial each page of the agreement, include a blank post-it note on page 3, and sign my signature on the last page. **(Exhibit B)** He then directed me to forward the altered document back to Chanel Inc. to the attention of Meghan Glickman.  Around the first week of April 2012, Chanel received and approved the signed agreement. On or around April 15, 2012 I received my severance in the amount of $14,940.19. **(Exhibit C)**

I would like to make it clear that the changes to the Separation and Release Agreement were made by Mr. Thompson alone. I followed his legal directive every step of the way and I was never made aware that the change that he made was inappropriate, deceptive or contrary to the deal made with Chanel, Inc. during his negotiations. Had I understood what he was doing, I never would have had Mr. Thompson represent me. How he mishandled my case was unethical and not in my best interest. Mr. Thompson was only concerned with protecting himself.

On Sept 6, 2012, Mr. Thompson filed the Employment Discrimination lawsuit against Chanel, Inc. Judge Patterson was the original Judge assigned to my case.  On or around November 12, 2012 Judge Patterson denied defendants motion without prejudice on the grounds that I had not knowingly, voluntarily or willfully waived my right to file a discrimination suit against Chanel. **(Exhibit D)**

On Dec 3, 2012 Mr. Thompson emailed me an Affidavit that he told me I had to sign. In the Affidavit, it stated that I was personally responsible for modifying the agreement and not the offices of Christopher Thompson, Esq. **(Exhibit E)** As stated in my complaint, when I questioned Mr. Thompson as to why it was worded in such a way, I was told that legally it had to be written that way because it was all part of the legal negotiation process and it was the only way to proceed with the lawsuit. He assured me that the court understands that his firm was representing me and he knew what he was doing.

Mr. Thompson misrepresented the validity of the agreement and coerced me into signing a document falsely implicating me as the author, while assuring me that the change was appropriate. He concealed that the change was made without consent or

acknowledgement of Chanel, Inc.  Mr. Thompson prepared and directed me to sign an Affidavit even though he clearly knew it was not truthful. Not having any legal background I completely trusted his knowledge and put my complete faith in him. I was apprehensive but followed his directive. He assured me that there would not be any consequences because it was "only protocol." I did not realize at the time that this was actually perjury.

On or around June 18, 2013 Chanel counter claimed. By this time Judge Patterson had retired from the bench and Judge Loretta Preska was now assigned to my case. During discovery, Chanel asked that I turn over my personal employment file which contained documentation of how I sexually harassed and not protected by the company. I obtained these documents accidentally. It was my understanding that one is entitled to have a copy of their personal Human Recourse file.

On November 13, 2014 Judge Preska ruled in favor of Chanel, Inc. **(Exhibit F)** Moved for summary judgment, seeking dismissal of my claims of discrimination and approved Chanel's counterclaim. I was ordered to repay my severance in the amount of $14,940.19 plus interest, premium payments for 5 months COBRA plus interest, return all of the discriminating evidence I had against them in my possession proving sexual harassment as well as waive the right to an appeal of the courts decision. Otherwise, Chanel would sue me for fraud for having my personal file in my possession. I discussed with Mr. Thompson my concerns with the word "fraud" publically. **(Exhibit G)** I felt like it was another manipulation tactic from Chanel to try to intimidate someone who does not have the means to stand up for herself against the fashion giant. I expressed to Mr. Thompson the importance of having this case sealed upon completion. Mr. Thompson always assured me that it would be sealed and I had nothing to worry about. During discovery, with all of the evidence I had provided to the court showing discrimination, the true reason I lost my case as well as my right to appeal was because of how Mr. Thompson altered the agreement and absolved himself from any responsibility. Instead he chose to blame me for the change. From the beginning, I believe I was not seen in a positive light to Judge Preska.

On April 16, 2017, Mr. Thompson sent me a new Settlement Agreement and General Release to sign. I was uncomfortable with the confidentiality portion of this agreement. The agreement Mr. Thompson wanted me to sign, stated that if I, any immediate family member, attorney, accountant, tax or financial advisors or any other person acting as my agent, ever discusses my claims, etc. then  I would agree to pay Chanel $10,000.00 for each and every breach of the confidentiality provision plus attorney fees. **(Exhibit H)** In my opinion Mr. Thompson should have known to not agree to such a request but he refused to negotiate on my behalf because he stated on more than one occasion that he wanted "to get this case over with". I also requested a copy of my deposition which also fell on deaf ears. **(Exhibit I)**

On or around April 21, 2017 I contacted Peter Ginsberg, Esq., who was recommended by a friend. Mr. Ginsberg was kind enough to go over the document with me to address my concerns. He suggested 2 minor adjustments to the agreement that would be in my best interest. On April 26, 2017 Beth Bilsborrow, Esq. of Mr. Ginsberg's office contacted Mr. Thompson in regard to those changes. **(Exhibit J)** Mr. Thompson advised Ms. Bilsborrow, Esq. that he did not believe that Chanel would negotiate any further but agreed to forward the revised copy. Mr. Thompson was clearly insulted that I contacted another attorney and asked if they were willing to take my case over. **(Exhibit K)** Mr. Thompson did forward the revised copy and Chanel agreed to the terms. **(Exhibit L)** If Mr. Thompson was not negligent with my case I would not have had to involve another attorney. Mr. Thompson was always representing me so to try to pass the buck once again to someone is just another example of his character and complete lack of responsibility.

It was brought to my attention in April of 2018, when searching for new employment opportunities that I discovern Mr. Thompson did not have my case sealed as he promised. It was quite disturbing to read all of the negative comments being said about me. I have been publically humiliated and slandered on various online forums which is extremely damaging, all because of Mr. Thompson's negligence. **(Exhibit M)** I have included an extensive Excel chart for your reference. **(Exhibit N)** I have been able to have several of the search engines remove the negative articles. However, the remaining sites require a court order stating the case has been sealed to have them taken down.

Mr. Thompson contacted me on February 19, 2019. I made it clear that I was distraught that my case had not been sealed as he promised. Mr. Thompson acted shocked, stating "I'm surprised. I thought that it had been". He completely trivialized my despair. He said that it was not a big deal because it makes Chanel look foolish for not reading their documents thoroughly. I informed him of the all of the negativity written online was a complete  assassination of my character. All of the disparaging remarks were about me being a "game playing employee who changed a legal document and tried to pull a fast one. They clearly were NOT discussing how Chanel looked foolish. They were blaming me for his actions. Mr. Thompson tried to appease me by saying that he would reach out to Chanel and see what he could do. I advised Mr. Thompson that contacting Chanel is useless as they have nothing to do with sealing my case. Once again placing the blame on someone else when in fact, it was his responsibility.  I told him that I had contacted Judge Preska's office and was advised that an Order to Show Cause would need to be filled out and presented to Judge Preska explaining the situation. In our conversation I also advised Mr. Thompson that I

researched a company that can bury negative online information however, I was told that it would cost close to $10,000.00 dollars to do so. Which I cannot afford nor should I be responsible to pay for.

At that point the tone in the conversation had changed. This is when Mr. Thompson became agitated. He was extremely curt and disrespectful. I was in mid sentence when he rudely hung up on me. I left Mr. Thompson phone messages on Feb 19, March 5, March 11 and on March 18**(Exhibit O)** along with two emails on February 26, and March 5,2019. **(Exhibit P)** He did not respond to any of them. This is where I saw Mr. Thompson's  true colors. So for him to say that he thought I had found a solution is absurd. He never had any intention on finding a resolution or contacting me again. On August 13, 2019 I sent Mr. Thompson a letter by certified mail inquiring on whether or not he had answer for me. **(Exhibit Q)** This too was ignored leaving me with no other choice but to file a formal complaint. **(Exhibit R)**

In this day and age with the many social media outlets, most employers do their research online when interviewing potential candidates. **(Exhibit S)** I personally do not have a Facebook, Instagram or any other social media account. The only thing online about me is this case with Chanel. A case based on a lie. A case that I am not at liberty to discuss if questioned. How am I to defend myself when I am asked, why I changed a legal document or why am I being described as a "Game playing employee or why am I being accused of "Chicanery"? All of this was caused by the negligence of how Mr. Thompson chose to handled my case.

I thank you for your time and consideration in this matter. Please feel free to contact me should you need any further information.


Sincerely,

Anu Allen

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------X
ANU ALLEN,

                              Plaintiff,

            - against -

CHANEL INC.,

                              Defendant.
--------------------------------------------------------------X

**ROBERT P. PATTERSON, JR., U.S.D.J.**

On September 6, 2012, Plaintiff Anu Allen ("Allen") filed this action against her former

employer, Chanel, Inc. ("Chanel"), alleging employment discrimination, harassment, and

wrongful termination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42

U.S.C. § 2000e, et seq., the Civil Rights Act of 1866, 42 U.S.C. § 1981, et seq., the Age

Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, et seq., and the New York State

Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 290, et seq.  Plaintiff seeks compensatory

and punitive damages, including back pay, front pay, and lost benefits, as well as recoupment of

her legal costs.

On November 12, 2012, Defendant, based on a "Separation and Release Agreement"

alleged to have been executed by the parties, moved to dismiss the Complaint pursuant to Rule

12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim upon which relief can

be granted or, alternatively, pursuant to Rule 12(c) for judgment on the pleadings.  Plaintiff

submitted answering papers on December 4, 2012.  Defendant submitted its reply papers on

December 10, 2012.  Oral argument was held on December 13, 2012.

for summary judgment and denied.

Dockets.Justia.co

## I.   Facts[1]

Beginning on or about May 10, 1993, Defendant first employed Plaintiff as the main

executive receptionist at Defendant's corporate headquarters.  (See Compl. ¶ 9; Def.'s Mem. of

Law in Supp. of Mot. to Dismiss ("Def.'s Mem.") at 3.)  Subsequently, she became the Office

Services Coordinator, and later, the Samples Coordinator for the Fashion Division.[2]  (See id. ¶¶

11-12.)  Plaintiff alleges that she suffered and reported multiple instances of discrimination

during her employment.  On or about February 28, 2012, Defendant terminated Plaintiff's

employment with the company.[3]  (See id ¶ 12; Def.'s Mem. at 4.)

Upon terminating Plaintiff, Defendant presented Plaintiff with "a hard copy of a letter

agreement titled 'Separation and Release Agreement,'" (the "Chanel Separation and Release

Agreement"), dated February 28, 2012.  (Def.'s Mem. at 1; see also Tr. of Oral Arg. on Def.'s

Mot. to Dismiss ("Tr.") at 11, Dec. 13, 2012.)  The Chanel Separation and Release Agreement is

styled as a letter from the Defendant to the Plaintiff setting forth the terms and conditions of

Plaintiff's separation from the company.  (See Def.'s Mem. at 1-2; Tr. at 11.)  The Chanel

Separation and Release Agreement stated that Plaintiff's "regular wages up to and including the

Termination Date . . . [as well as unused] vacation time . . . shall be provided [to you] regardless

---

[1] Pursuant to the standard for summary judgment motions, all facts are construed in favor of the non-moving party, here the Plaintiff.  See Vergara v. Bentsen, 868 F. Supp. 581, 589 (S.D.N.Y. 1994).

[2] 2  Plaintiff's Complaint alleges that the changes in her position constituted negative employment actions due to her age, race, sex, or appearance; that her employment opportunities were impaired because of ongoing discrimination based upon her age, race, and sex; and that she was harassed because of her age, race, and sexual orientation.  (Compl. ¶¶ 10, 20.)

[3] 3  Defendant contends that Plaintiff was terminated becaued the Samples Coordinator position had been eliminated.  (Def.'s Mem. at 4.)  Plaintiff alleges that the Samples Coordinator position still exists, and that her termination was motivated, at least in part, by her complaints of discrimination.  (Compl. ¶¶ 14, 16, 25, 28.)

ECF No. 10.)

The Chanel Separation and Release Agreement granted Plaintiff a separation payment somewhat in excess of what she would have otherwise received under her employment contract in exchange for Plaintiff's acceptance of the terms and conditions outlined in the Chanel Separation and Release Agreement. (See Almon Decl., Ex. B ¶¶ 2-3; see also Def.'s Mem. at 12.) Specifically, Paragraph 3 of the Chanel Separation and Release Agreement, which is entitled "Additional Consideration," states:

> In return for your signing (and not revoking) this Agreement, which contains a general release of claims, . . . as is described in detail under Paragraph 4 below, . . . the Company will provide you with the following benefits: [. . .] You agree that the payments and benefits provided to you in this Paragraph 3 . . . are in full discharge of any and all of the Company's liabilities and obligations to you . . . . and complete consideration for your promises and undertakings under this Agreement, including, but not limited to, your release of claims as set forth in Paragraph 4 . . . .

(Almon Decl., Ex. B ¶ 3.) In turn, Paragraph 4 of the Chanel Separation and Release Agreement, which is entitled "General Release of Claims," states that Plaintiff releases her claims against the company, "including, but not limited to" the causes of action listed in Paragraph 4. (Id. ¶ 4 (emphasis added).) Specifically, Paragraph 4 declares that:

> For and in consideration of the payments and benefits to be provided to you . . . , you . . . hereby forever release and discharge [Defendant] . . . from any and all claims . . . including, but not limited to, claims of discrimination and harassment on the basis of race, color, . . . sex, sexual orientation, age, . . . and any other legally protected characteristic . . . and any and all claims under any contract, statute, regulation, agreement, duty or otherwise.

(Id. (emphasis added).) The Chanel Separation and Release Agreement explicitly states that it "may be modified only by a writing signed by both parties." (Almon Decl. Ex B ¶ 9; see also Def.'s Mem. at 5.)

3

representative before it was presented to Plaintiff.  (See Def.'s Mem. at 1; Tr. at 11.)  Under the

heading "Agreed to and Accepted," a blank space was left for Plaintiff to sign, if she "agree[d]

with the terms and conditions of this Agreement."  (Almon Decl., Ex. B at 7; see also ¶ 10.)  The

document provides Plaintiff with twenty-one days to consider its terms and seven days to revoke

it after signing.  (See Almon Decl., Ex. B ¶ 10.)  The Chanel Separation and Release Agreement

became "effective on the eighth (8th) day after [Plaintiff] sign[ed] it."  (Id.)  The Chanel

Separation and Release Agreement advises Plaintiff to "consult with an attorney of [her] choice

before signing this Agreement."  (Almon Decl. Ex. B ¶ 10; see also Def.'s Mem. at 5.)

On or about March 19, 2012, Plaintiff initialed each page, signed the last page, and

returned to Defendant a full version of the Separation and Release Agreement.  (See Pl.'s Mem.

of Law in Opp'n to Def.'s Mot. to Dismiss ("Pl.'s Mem.") at 1; Def.'s Mem. at 2; see also Almon

Decl., Ex C.)  Before initialing, signing, and returning the agreement to Defendant, however,

Plaintiff retyped page three and altered the content of Paragraph 4 ("General Release of

Claims").  (See Almon Decl., Ex. D; see also discussion supra at 3.)  Prior to the list of potential

discrimination and harassment claims covered by Paragraph 4, Plaintiff's version ("Plaintiff's

Release") changed the first two letters of the word "including" to read "excluding."  (See Pl.'s

Mem. at 1; Def.'s Mem. at 2.)  Thus, Paragraph 4 of Plaintiff's Release states, in relevant part:

> For and in consideration of the payments and benefits to be provided
> to you . . . , you . . . hereby forever release and discharge [Defendant]
> . . . from any and all claims . . . excluding, but not limited to, claims
> of discrimination and harassment on the basis of race, color, . . . sex,
> sexual orientation, age, . . . and any other legally protected
> characteristic . . . and any and all claims under any contract, statute,
> regulation, agreement, duty or otherwise. (Almon Decl., Ex. C ¶ 4
> (emphasis added); see also Almon Decl., Ex. D ¶ 4 (comparing the
> Chanel Separation and Release Agreement and Plaintiff's Release).)
> Despite this material change to its content preserving Plaintiff's right
> to bring the listed claims, Paragraph 4 of

Plaintiff's Release remains titled "General Release of Claims."  (See Almon Decl., Ex. C ¶ 4.)

4

page of the Chanel Separation and Release Agreement using the same fonts, margins, and words.
(See Def.'s Reply Mem. of Law in Further Supp. of Mot. to Dismiss ("Def.'s Reply") at 2; Tr. at
5, 12, 16-17; compare Almon Decl., Ex. B, with id., Ex. C.)  Other than the substitution of
"excluding" for "including" in Paragraph 4 on page three, Plaintiff made no other material
changes to the Chanel Separation and Release Agreement.[4]  (See Almon Decl., Ex D.)  Indeed,
like the Chanel Separation and Release Agreement, Plaintiff's Release remains styled as a letter
from the Defendant to the Plaintiff and carries the same date on its first page.  (See id.)

There is no dispute that Plaintiff did not contact Defendant to discuss any changes to the
terms of the Release prior to signing and returning it.  (See Def.'s Reply at 2, 5, 8; Tr. at 5, 1517,
19.)  Instead, Plaintiff asserts that, after making her changes to the Release, she initialed the
lower right hand corner of each page but "placed a small 1 inch yellow sticky note on page 3 line
13 where the changes to the Agreement were made."[5]  (Pl.'s Mem., Ex. A (Decl. of Pl., Dec. 4
2012 ("Pl.'s Decl.")) ¶ 5; see also Tr. at 12, 15-16.)  Plaintiff does not, however, allege that she
wrote anything on the blank sticky note or anywhere else to indicate its purpose on the page.
(See Def.'s Reply at 2; Tr. at 22.)

Defendant claims to have neither received the sticky note nor noticed Plaintiff's
alterations.  (See Def.'s Reply at 9; Def.'s May 31, 2013 Let., Ex. A (Aff. of Megan Glickman
("Glickman Aff.")) ¶ 3).  Defendant only noticed that Plaintiff signed the agreement.  (See Def.'s

---

[4] Plaintiff's Release contains three other changes that are not material to the scope of Plaintiff's waiver in this case.
For example, although  Plaintiff changed the word "excluding" to "including" prior to a list of possible claims under
the Employee Retirement Income Security Act of 1974 ("ERISA"), (see Almon Decl., Ex. D ¶ 4), Plaintiff has not
asserted any claims against the Defendant under ERISA in the instant action, although she was terminated just a few
months short of twenty years with the company.  (See Compl. ¶¶ 34-53.)  The other two changes to the language of the
Chanel Separation and Release Agreement appear to be typographical errors.  (See Def.'s Mem. at 6 n.4.)
Specifically, on page three, Plaintiff changed the word "now" to "not," and the word "your" to "you."  (Almon
Decl., Ex. D ¶¶ 4-5.)  Neither party argues that these changes are material.  (See Def.'s Mem. at 7; Tr. at 12.)

[5] Defendant argues that Plaintiff's declaration is inadmissible because it was electronically signed.  (See Def.'s
Mem. at 4; Def.'s Reply at 4; Tr. at 19-20, 22 (citing Local Rule 13.16 (non-attorney signatures must be signed in
ink and scanned)).)  Plaintiff's counsel offered to upload a scanned version of Plaintiff's declaration signed in ink.
(See Tr. at 24-26.)  For the purposes of the present motion, where the facts are construed in favor of the non-moving

Settlement and Release Agreement by Ms. Allen," (Def.'s May 31, 2013 Let., Glickman Aff. ¶ 4), Defendant did not inform Plaintiff that it objected to her unilateral modifications, (see Pl.'s Mem. at 1). Defendant claims that its Human Resources department did not have "the authority to bind Chanel to pay substantial severance in exchange for no meaningful release," (Def.'s May 31, 2013 Let., Ex. A ¶ 3.)

Subsequent to receiving Plaintiff's signed Release, Defendant sent – and Plaintiff received and retained – a check ("Severance Payment"), dated April 12, 2012, made out to the Plaintiff from the Defendant in the amount of $14,940.19, covering nineteen weeks of severance pay, less witholdings. (See Almon Decl., Ex. E; Def.'s Mem. at 7; Def.'s Reply at 5.) Approximately five months after receipt of the Severance Payment, on September 6, 2012, Plaintiff brought the instant discrimination and harassment action against Defendant. (See Compl.)

party, the Court accepts Plaintiff's declaration as signed. See S.D.N.Y.'s Elec. Case Filing Rules and Regulations, R. 8.5 ("Documents requiring signatures . . . must be electronically filed either by: (a) submitting a scanned document . . . or (d) in any other manner approved by the Court") (emphasis added).

## II.     Procedural Posture

Defendant's motion seeks dismissal of Plaintiff's Complaint under Rule 12(b)(6) for failure to state a claim upon which relief can be granted or, alternatively, under Rule 12(c) as a motion for judgment on the pleadings. (See Def.'s Mem. at 7-9.) In support of its motion to dismiss, the Defendant submitted as exhibits the Chanel Separation and Release Agreement, (Almon Decl., Ex. B), and Plaintiff's Release, (Almon Decl., Ex. C). The Defendant also submitted a document, ("Redline Comparison"), comparing the Chanel Separation and Release Agreement and Plaintiff's Release and highlighting the differences between them. (Almon Decl.,

purporting to establish that the Plaintiff received compensation from the Defendant as outlined by the parties' Severance Agreement.[6]  (Almon Decl., Ex. E.)

Plaintiff argues, however, that these four exhibits are outside the scope of her Complaint. (See Pl.'s Mem. at 4-5.)  Accordingly, Plaintiff contends that if the Court chooses to rely upon these materials, Rule 12(d) requires the court to treat Defendant's motion as one for summary judgment under Rule 56, not as a motion to dismiss under Rule 12.  (Id.)

### A. Consideration of the Defendant's Exhibits

In deciding a Rule 12 motion, a court may only consider the complaint itself or any matters that are subject to judicial notice by the court.  Byrd v. City of New York, No. 04 CV 1396, 2005 WL 1349876, at *1 (2d Cir. June 8, 2005) (discussing Rule 12(c)); Chambers v. Time Warner, Inc., 282 F.3d 147, 152 (2d Cir. 2002) (discussing Rule 12(b)(6)).  The complaint is deemed to include any attached exhibits, statements, or documents incorporated into the complaint by reference, as well as any documents that are "integral" to the complaint. Chambers, 282 F.3d at 152-53; see also Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42, 47 (2d Cir. 1991).

When extraneous materials are presented to the court in conjunction with a Rule 12 motion, the court must either exclude these materials or convert the motion to one for summary judgment.  Fed. R. Civ. P. 12(d); see Chambers, 282 F.3d at 154.  Courts have considerable discretion in deciding between these two options.  See Fed. R. Civ. P. 12(d); Byrd, 2005 WL 1349876, at *2 (encouraging explication of this choice "whatever course of action [the district court] chooses"); see also Gross Foundation, Inc. v. Goldner, No. 09 CV 8804, 2012 WL

---

[6] Subsequently, in a letter to the Court dated May 31, 2013, Defendant submitted a fifth exhibit: an affidavit from Megan Glickman, the Director of Human Resources at Chanel.  (See Def.'s May 31, 2013 Let., Ex. A.)

WL 609878, at **3-5 (S.D.N.Y. Feb. 16, 2011).

Here, the fundamental issue in Defendant's motion to dismiss is whether or not Plaintiff released her claims of discrimination. (Def.'s Mem. at 1; Pl.'s Mem. at 1.) In order to make this determination, the Court must decide which – if either – Release governs and whether Plaintiff waived her rights to bring suit on her claims knowingly, willfully, and voluntarily. See Bormann v. AT&T Communications, Inc., 875 F.2d 399, 402 (2d Cir. 1989). Answering these questions requires the Court to review the agreed upon facts pertaining to the parties' behavior and the documents they exchanged.

However, the Chanel Separation and Release Agreement, Plaintiff's Release, the Redline Comparison, and the Severance Payment, (collectively, "Defendant's Exhibits"), (Almon Decl., Ex.'s B-E), were not attached to the Plaintiff's Complaint, and neither party argues that these materials are subject to judicial notice under Rule 201 of the Federal Rules of Evidence. See Fed. R. Evid. 201; see also Kramer v. Time Warner, Inc., 937 F.2d 767, 773 (2d Cir. 1991). Consequently, for these exhibits to be considered on the present motion, they must either be incorporated in, or integral to, the Plaintiff's Complaint. See Chambers, 282 F.3d at 152-53.

### 1. Documents Incorporated by Reference

For incorporation by reference, a complaint "must make a clear, definite, and substantial reference" to the documents. Helprin v. Harcourt, 277 F. Supp. 2d 327, 330-31 (S.D.N.Y. 2003). "A mere passing reference or even references, however, to a document outside of the complaint, does not, on its own" suffice to incorporate it. Williams v. Time Warner, Inc., 440 Fed. App'x. 7, 9 (2d Cir. 2011); see also Cosmas v. Hassett, 886 F.2d 8, 13 (2d Cir. 1989). Multiple references to, and lengthy quotations from, an outside document have been considered sufficiently substantial to incorporate the document into the complaint by reference. See Helprin, 277 F. Supp. 2d at 330-31.

Comparison.[7] As a result, neither may be deemed incorporated by reference.

The Chanel Separation and Release Agreement and Plaintiff's Release, however, are referenced once in the Complaint:

> 13. Upon information and belief, [D]efendant terminated [P]laintiff on the grounds that her position of Samples Coordinator for the Fashion Division had been eliminated <u>and demanded that Plaintiff execute a general release agreement which Plaintiff refused to sign without making chan[g]es[,]</u> which changes were made specifically retaining to Plaintiff the right to seek redress in this Court for the outrageous actions exercised against Plaintiff by Defendant.

(Compl. ¶ 13 (emphasis added).) Plaintiff's reference to the original and amended Separation and Release agreements is both clear and definite. See Helprin, 277 F. Supp. 2d at 330-31. However, given that the Plaintiff makes only a single passing reference to the Releases and does not quote from either one, (Compl. ¶ 13), Plaintiff's reference is not substantial in the context of the entire Complaint. See Thomas v. Westchester Cnty. Health Care Corp., 232 F. Supp. 2d 273, 276 (S.D.N.Y. 2002) ("refer[ring] briefly in one paragraph" of a complaint does not incorporate a document by reference for consideration of a Rule 12(b)(6) motion). Accordingly, the Chanel Separation and Release Agreement and Plaintiff's Release are not incorporated into the Complaint by reference. See Williams, 440 Fed. Appx. at 9; Cosmas, 886 F.2d at 13; Westchester Cnty., 232 F. Supp. 2d at 276.

## 2. Documents Integral to the Complaint

The Court may also consider extraneous materials if they are determined to be integral to the Plaintiff's Complaint. A document is only integral to a complaint, however, "where the complaint relies heavily upon its terms and effect." Chambers, 282 F.3d at 153 (internal quotation marks omitted); see also Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co., 62 F.3d

---

[7] The Redline Comparison appears to have been created by Defendant "for the Court's convenience" only after Plaintiff filed her Complaint. (See Def.'s Mem. at 6, n.4.) Accordingly, Plaintiff could not have referred to the Redline Comparison in her pleading.

defendant and a third party, made that agreement integral to the plaintiff's complaint); Cortec,

949 F.2d at 44-48 (allegation of securities fraud, based upon certain documents, made those

documents integral to the complaint).

This exception has been deemed narrow in scope. Williams, 440 Fed. Appx. at 9

("narrow exception [recognized for] . . . a document upon which the complaint solely relies and

which is integral to the complaint") (alteration in original) (internal quotation marks omitted); see

also Roth v. Jennings, 489 F.3d 499, 509 (2d Cir. 2007). The Second Circuit has stressed that

actual reliance on the extraneous material is required, and that this exception will not be satisfied

by the Plaintiff's "mere notice or possession" of such material. See Chambers, 282 F.3d at 153.[8]

Here, Defendant has not shown that Plaintiff relied on the Chanel Separation and Release

Agreement, Plaintiff's Release, the Redline Comparison, or the Severance Payment in framing

her discrimination complaint. While Defendant's Exhibits may be relevant to the issue of

waiver, none of Defendant's Exhibits relate to the substance of Plaintiff's discrimination claims.

(See Compl. ¶¶ 1-2, 9-53.) Thus, none of Defendant's Exhibits are integral to the Complaint, and

the Court may not consider them in the context of a motion to dismiss. See Fed. R. Civ. P.

12(d); Williams, 440 Fed. Appx. at 9; Chambers, 282 F.3d at 153; see also Global Network

Communications, Inc. v. City of New York, 458 F.3d 150, 156 (2d Cir. 2006)..

**B. Conversion to a Motion for Summary Judgment**

Given that the Court must consider materials outside the pleadings in order to address the

fundamental question raised by Defendant's motion – whether or not Plaintiff waived her right to

assert the present discrimination claim against Defendant – the Court hereby exercises its

---

[8] The Defendant argues that the fact that Plaintiff had notice of the two Releases prior to filing her Complaint is sufficient reason for the Court to consider them in the context of Defendant's motion to dismiss. (Def.'s Mem. at 9; Def.'s Reply at 3, n.1 (citing to Cortec, 949 F.3d at 48)). While Defendant is correct that a lack of notice is one of the underlying reasons that motions to dismiss are converted into motions for summary judgment, see Cortec, 949 F.2d at 48, such notice is only significant "where a plaintiff has actual notice . . . and has relied upon these documents in framing the complaint." Id. (emphasis added). Defendant has not shown such reliance.

summary judgment. See Fed. R. Civ. P. 12(d); see also Byrd, 2005 WL 1349876, at *2;

Russomanno, 2011 WL 609878, at *6 (converting a motion to dismiss to a motion for summary

judgment in order to consider a release of discrimination claims on substantially the same facts as

the present case); Ridinger v. Dow Jones, 717 F. Supp. 2d 369, 370 (S.D.N.Y. 2010) aff'd 651

F.3d 309 (2d Cir. 2011) (converting a motion to dismiss to a motion for summary judgment

because of the moving parties' reliance on a separation agreement, which was outside the scope

of the complaint).

### C. Consequences of Conversion

Before converting a Rule 12(b)(6) motion to dismiss into a Rule 56 motion for summary

judgment, a district court must give "sufficient notice to [the non-moving] party and an

opportunity for that party to respond." Groden v. Random House, Inc., 61 F.3d 1045, 1052 (2d

Cir. 1995). The notice inquiry is essentially "whether the appellant should reasonably have

recognized the possibility that the motion might be converted into one for summary judgment or

was taken by surprise and deprived of a reasonable opportunity to meet facts outside the

pleadings." In re G. & A. Books, Inc., 770 F.2d 288, 294-95 (2d Cir. 1985).

Here, by order dated May 15, 2013, the Court notified the parties of its intention to

construe Defendant's Rule 12 motion to dismiss as a Rule 56 motion for summary judgment and

invited the parties to submit supporting affidavits and/or exhibits if there were additional facts

outside the pleadings that the parties wished the Court to consider.[9]  (See Order, May 15, 2013,

---

[9] On the issue of notice, it was Plaintiff who initially suggested that the material attached by the Defendant could only be considered by the Court on a motion for summary judgment. (See Pl.'s Mem. at 4-5 (discussing the possibility of conversion).)  Plaintiff further discussed the possibility of converting the Defendant's motion to one for summary judgment during oral arguments. (See Tr. at 18-19.)  In addition, the Defendant's attachment of extrinsic material to its motion to dismiss constituted sufficient notice to Plaintiff of the possibility of conversion. See In re G. & A. Books, 770 F.2d at 295 (citing Cook v. Hirschberg, 259 F.2d 56, 57-58 (2d Cir. 1958) (plaintiffs had notice of the possibility of conversion to summary judgment because the defendants filed affidavits in support of their motion to dismiss)).  Moreover, Plaintiff directly responded to Defendant's Exhibits in her opposition papers, (see Pl.'s Mem. at 2-3, 6-9), which included a sworn affidavit that contained new factual assertions beyond the scope of her Complaint, (see Pl.'s Mem., Ex. A; see also discussion supra at note 5), and at oral argument, (see Tr. at 11-18.)

filed with her opposition to Defendant's motion.  (See discussion supra at note 5.)  By letter

dated May 31, 2013, Defendant submitted an affidavit from Megan Glickman, Director of

Human Resources for Defendant.  (See Def.'s May 31, 2013 Let., Glickman Aff.)

Plaintiff "cannot complain of lack of a reasonable opportunity to present all material

relevant to a motion for summary judgment when both parties have filed exhibits, affidavits, . . .

etc., in support of and in opposition to a motion to dismiss."  See In re G. & A. Books, 770 F.2d

at 295.  Plaintiff is therefore not prejudiced by the Court's conversion of the Defendant's motion

to dismiss to one for summary judgment because she had notice of this possibility and an

opportunity to respond to the additional material submitted by the Defendant.  See Groden, 61

F.3d at 1052; In re G. & A. Books, 770 F.2d at 294-95.

## III.    Legal Standard

On a motion for summary judgment, the moving party bears the burden of proving that

there is no genuine issue of material fact and that it is entitled to judgment as a matter of law.

See Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986);

Gorzynski v. Jetblue Airways Corp., 596 F.3d 93, 101 (2d Cir. 2010).  If the moving party makes

such a showing, the non-moving party "may not rest upon mere conclusory allegations or

denials, but must bring forward some affirmative indication that" specific facts show a genuine

issue for trial.  Podell v. Citicorp Diners Club, Inc., 112 F.3d 98, 101 (2d Cir. 1997) (internal

quotation marks omitted); see also Fed. R. Civ. P. 56(e); Celotex, 477 U.S. at 324.

12

enforceable contract in which Plaintiff knowingly, willfully, and voluntarily waived the discrimination claims she now brings.[10] See Livingston v. Adirondack Beverage Co., 141 F.3d 434, 438 (2d Cir. 1998) (Title VII claims); Bormann, 875 F.2d at 402-03 (ADEA claims); see also Bachiller v. Turn on Prods., Inc., No. 00 CV 8701, 2003 WL 1878416 at *3 (S.D.N.Y. 2003) (Civil Rights Act of 1866 claims).

Courts weigh the following factors when considering whether, according to the totality of the circumstances, federal discrimination claims [11] were waived knowingly, willfully, and voluntarily:

> 1) the plaintiff's education and business experience, 2) the amount of time the plaintiff had possession of or access to the agreement before signing it, 3) the role of plaintiff in deciding the terms of the agreement, 4) the clarity of the agreement, 5) whether the plaintiff was represented by or consulted with an attorney, . . . 6) whether the consideration given in exchange for the waiver exceeds employee benefits to which the employee was already entitled by contract or law, [7] whether [the] employer encourages or discourages [the] employee to consult an attorney . . . and [8] whether the employee had a fair opportunity to do so.

Id. (citing Bormann, 875 F.2d at 403) (alterations in original). "These factors are not exhaustive, nor must they all be satisfied." Id. at *4.

Waivers of ADEA claims must clear an additional hurdle. In addition to satisfying the factor test detailed above, waivers of ADEA claims must also meet the statutory requirements of the Older Worker Benefits Protection Act ("OWBPA"), 29 U.S.C. § 626(f); see also Tung v. Texaco, Inc., 150 F.3d 206, 208-09 (2d Cir. 1998). The OWBPA requires, in relevant part, that:

---

[10] A party seeking to enforce a purported settlement agreement – here, Defendant – carries the burden of proof to demonstrate that the parties entered into such an agreement. See Benicorp Ins. Co. v. National Medical Health Card Systes, Inc., 447 F. Supp. 2d 329, 335 (S.D.N.Y. 2006).

[11] Any waiver meeting the federal standard also meets the requirements for a release with respect to Plaintiff's state law claim under the NYSHRL. See Bachiller v. Turn on Products, Inc., 86 Fed.Appx. 465, 466 n.2 (2d Cir. 2004) (affirming the dismissal of NYSHRL claim while noting the standard is "less stringent than those applied to [Plaintiff's] federal claims").

the employer that is written in a manner calculated to be understood by such individual, or by the average individual eligible to participate; (B) the waiver specifically refers to rights or claims arising under this chapter; (C) the individual does not waive rights or claims that may arise after the date the waiver is executed; (D) the individual waives rights or claims only in exchange for consideration in addition to anything of value to which the individual already is entitled; (E) the individual is advised in writing to consult with an attorney prior to executing the agreement; (F)(i) the individual is given a period of at least 21 days within which to consider the agreement; . . . [and] (G) the agreement provides that for a period of at least 7 days following the execution of such agreement, the individual may revoke the agreement, and the agreement shall not become effective or enforceable until the revocation period has expired[.]

29 U.S.C. § 626(f)(1).

## IV.    Discussion

Both parties agree that Plaintiff waived some of her claims against Defendant following her termination, pursuant to the terms of their agreement.   The parties disagree, however, as to whether the Chanel Separation and Release Agreement or Plaintiff's Release contains the terms of their agreement, and thus they disagree about the scope of Plaintiff's waiver.  (See Def.'s Mem. at 10 ("Release Agreement conced[ed] and settl[ed] all claims [Plaintiff] had against Chanel relating to her employment") (emphasis added); Pl.'s Mem. at 6 ("the Agreement [is] a partial release only") (emphasis added).)  The parties' briefs focus on the question of which version of the release – if either – should be applied by the Court.  For the reasons stated below, however, the Court need not address this issue.

Neither party contends that Plaintiff's waiver was unknowing, unwillful, or involuntary. (See Def.'s Mem. at 10; Pl.'s Mem. at 6.)  Indeed, neither party's brief addresses this issue. Nevertheless, given the public policy concerns animating the waiver requirement, the Court must assess whether Plaintiff's waiver satisfies the relevant standards.

14

voluntarily waived her claims.[12]  In this case, however, rote application of the factors is

inappropriate and misleading.  The factors are a minimum bar that must be cleared for a waiver

to be knowing and voluntary, but the Court must consider the totality of the circumstances.  See

Reid v. IBM Corp., No. 95 CV 1755, 1997 WL 357969, at *4 (S.D.N.Y. June 26, 1997).

Here, by changing the word "including" to "excluding" prior to the list of claims covered

by the Chanel Separation and Release Agreement before signing the agreement and returning it

to Defendant, Plaintiff manifested an intent to preserve her right to file a discrimination claim.

Thus, Plaintiff did not knowingly, willfully, and voluntarily waive her right to file a

discrimination claim, regardless of whether the Chanel Separation Release Agreement, Plaintiff's

Release, or neither represents the agreement of the parties.  See Livingston, 141 F.3d at 438;

Bormann, 875 F.2d at 402-03; Bachiller, 2003 WL 1878416 at *3; Tung, 150 F.3d at 208-09.

Consequently, Defendant has failed to show that Plaintiff waived the claims she raises in her

Complaint.

## IV.    Conclusion

For the foregoing reasons, the Defendants' converted motion for summary judgment is

denied without prejudice.  This decision on a Court-converted motion for summary judgment

should not be deemed a bar to either party filing a motion for summary judgment at the close of

discovery.

IT IS SO ORDERED.

---

the Chanel Separation and Release Agreement for nineteen days before signing it, (see Pl.'s Mem. at 2; Almon Decl.,
Ex. C. at 7), had the opportunity to seek alterations, (see Almon Decl., Ex B ¶¶ 9-10), and had seven days after
executing the agreement to revoke her acceptance, (see id. ¶ 10.)  The Chanel Separation and Release Agreement is
clear in all respects, including the steps for accepting, modifying, or rejecting the agreement, and is written in a
manner calculated to be understood by Plaintiff.  (See id.)  The agreement specifically states the claims encompassed
by the waiver.  (See id. ¶ 14.)  In exchange for her waiver, the Chanel Separation and Release Agreement offered

---

[12] Indeed, although the Court has no information about Plaintiff's education, she amassed business experience by working
for Defendant in a professional setting for almost nineteen years. (See Compl. ¶¶ 9, 12.)  Plaintiff possessed

(See id. ¶ 3).  Finally, Plaintiff was encouraged in writing to consult with an attorney before returning her waiver to Defendant, (see id. ¶ 10), and it appears that Plaintiff did so, (Tr. at 14.)

Dated:  New York, New York
        June 4, 2013

Robert P. Patterson, Jr.
U.S.D.J.


**Copies of this Opinion and Order were sent to:**

Plaintiff's Counsel:

       Christopher H. Thompson
       The Law Offices of Christopher Thompson
       33 Davison Lane East
       West Islip, NY 11795
       (631) 983-8830
       Fax: (631) 983-8831

Defendant's Counsel:

       Lorie Elizabeth Almon
       Seyfarth Shaw L.L.P.
       620 Eighth Avenue
       New York, NY 10018-1405
       (212) 218-5517
       Fax: (212) 218-5526

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

ANU ALLEN,                                                ECF CASE

                              Plaintiff,                  12-CV-6758

        -Against-

CHANEL, INC.,

                              Defendant.
-----------------------------------------------------------------X
STATE OF NEW YORK   )
                    ) .: ss
COUNTY OF SUFFOLK   )

        ANU ALLEN, being duly sworn deposes and says:

1.   That I am the plaintiff in the within action and as such am fully familiar with
     the facts of this case.

2.   I make this sworn affidavit in opposition to the motion of defendant which
     seeks an order of this Court dismissing this action pursuant to Fed. R. Civ. P.
     12(b)(6) and/or 12(c) and alternatively to stay the action pending resolution of
     the issue as to whether I released the claims asserted in the Complaint.

3.   I did not release my claims for employment discrimination, harassment and
     retaliation against my former employer.

4.   When given the opportunity to review the "Separation and Release
     Agreement" provided to me on or about February 28, 2012 I made changes to
     the agreement reserving to myself the right to commence an action for
     employment discrimination, harassment and retaliation.

5.   Upon executing the Separation and Release Agreement on March 19, 2012
     once I caused these changes to be made, I initialed each page, signed the last
     page a placed a small 1 inch yellow sticky note on page 3 line 13 where
     changes to the Agreement were made.

6.   I returned the Agreement to my former employer.

7. No objection was made by my former employer to the Agreement as modified and on or about April 16, 2012 I received and deposited a check received from Chanel which included the monies promised part of which were monies owed regardless of whether or not I had signed the Agreement.

8. Chanel had at least twenty-three (23) days to review the modified Agreement before deciding to make the payment or not. It chose to make the payment.

Sworn to before me this
4th day of December 2012

_____
ANU ALLEN


_____
NOTARY PUBLIC

EXHIBIT 6

Here are some of the disparaging online articles.

(Search engines: GOOGLE, BING, YAHOO, AOL, DOGPILE, DUCK DUCK GO, YIPPEE, & ASK.COM)

**EVERFI (https://pihra.lawroom.com/story.aspx?STID=2779)**
**A Tale of Two Letters**
In 1993, Anu Allen was hired as the main executive receptionist at the
New York headquarters of Chanel Inc. Subsequently, she became the
Office Services Coordinator, and later, the Samples Coordinator for the
Fashion Division. However, after being terminated in 2012, Allen sued
Chanel for discrimination.

Chanel responded by asking the Court to dismiss the case. According to
Chanel, when it terminated Allen, it had given Allen a severance
payment in exchange for signing a "Separation and Release
Agreement" that waived her right to sue.

Not so fast, Allen replied. Although she admitted signing the release, she
had also imperceptibly altered the document by changing two letters in
one word. Instead of her agreeing to waive claims "<u>in</u>cluding"
discrimination, Allen contended that she'd only agreed to waive claims
"<u>ex</u>cluding" discrimination. (To accomplish this, Allen retyped the entire
third page using the same fonts and margins before returning the altered
document to Chanel.) Thus, she argued, she was still entitled to sue.

"Here, the fundamental issue in [Chanel's] motion to dismiss is whether
or not [Allen] released her claims of discrimination," the Court wrote. "In
order to make this determination, the Court must decide ... whether
[Allen] waived her rights to bring suit on her claims knowingly, willfully,
and voluntarily. Answering these questions requires the Court to review
the agreed upon facts pertaining to the parties' behavior and the
documents they exchanged."

"Here, by changing the word 'including' to 'excluding' prior to the list of
claims covered by the Chanel Separation and Release Agreement before
signing the agreement and returning it to [Chanel], [Allen] manifested an
intent to preserve her right to file a discrimination claim," the Court
concluded. "Thus, [Allen] did not knowingly, willfully, and voluntarily
waive her right to file a discrimination claim...."

"For the foregoing reasons, [Chanel's] motion for summary judgment is
denied," the Court wrote. [*Allen v. Chanel* (USDC SDNY 2013) no. 12 CV
6758]

***Note:*** For a related story, see <u>Who Amended the Offer?</u>. Or, for
information on this topic, request:
<u>1500 Overview of Employment Contracts</u>
<u>9612 General Release of Claims</u>
<u>9615 General Release of Claims Including Age</u>

**WORKFORCE - Employers, Read Those Severance Agreements** (https://www.workforce.com/2013/06/27/employers-read-those-severance-agreements/)

The moral of story is that employers must read agreements, and not merely assume that a recently terminated employee will play fair.

by **Staff Report** June 27, 2013

*Allen v. Chanel, Inc.* (S.D.N.Y. 6/4/13) teaches businesses an important lesson about reviewing agreements that employees send back, and not assuming that the agreement returned is the same as the agreement originally sent out. When Chanel terminated the employment of Anu Allen, it presented her with a Separation Agreement and Release, which, among other terms, offered $14,940.19 in severance pay in exchange for a full release of all potential claims. A corporate representative pre-signed the agreement before giving it to Allen. The release clause in the agreement stated as follows:

*For and in consideration of the payments and benefits to be provided to you … , you … hereby forever release and discharge [Defendant] … from any and all claims … including, but not limited to, claims of discrimination and harassment on the basis of race, color, … sex, sexual orientation, age, … and any other legally protected characteristic … and any and all claims under any contract, statute, regulation, agreement, duty or otherwise.*

Upon receipt of the agreement, Allen, believing she had been the victim of discrimination and wanting to preserve her right to sue, pulled a fast one. She retyped the page of the agreement containing the release word-for-word, with the same font and the same margins, so that it appeared to be identical, but with one key change. Allen changed the word "including" to "excluding," so that the release paragraph read:

*For and in consideration of the payments and benefits to be provided to you … , you … hereby forever release and discharge [Defendant] … from any and all claims … excluding, but not limited to, claims of discrimination and harassment on the basis of race, color, … sex, sexual orientation, age, … and any other legally protected characteristic … and any and all claims under any contract, statute, regulation, agreement, duty or otherwise.*

She then initialed each page, signed the agreement, and returned it to her ex-employer, which, failed to notice the change and released the severance check. When Allen later sued for discrimination, Chanel sought the dismissal of her lawsuit, believing that Allen had released and waived the claims in the agreement. The court, however, did not agree, relying on Allen's chicanery to conclude that the parties did not have a meeting of the minds on the key release language:

*Here, by changing the word "including" to "excluding" prior to the list of claims covered by the Chanel Separation and Release Agreement before signing the agreement and returning it to Defendant, Plaintiff manifested an intent to preserve her right to file a discrimination claim. Thus, Plaintiff did not knowingly, willfully, and voluntarily waive her right to file a discrimination claim, regardless of whether the Chanel Separation Release Agreement, Plaintiff's Release, or neither represents the agreement of the parties. Consequently, Defendant has failed to show that Plaintiff waived the claims she raises in her Complaint.*

Are you as disturbed as I am that the court provided a game-playing employee with a huge benefit? The moral of story, though, is that employers must read agreements, and not merely assume that a recently terminated employee will play fair.

*Written by Jon Hyman, a partner in the Labor & Employment group of Kohrman Jackson & Krantz. For more information, contact Jon at (216) 736-7226 or jth@kjk.com.*

*Comment below or email editors@workforce.com.*

Thursday, June 27, 2013

**Employers, read those severance agreements – (https://www.ohioemployerlawblog.com/2013/06/employers-read-those-severance.html)**

*Allen v. Chanel, Inc.* (S.D.N.Y. 6/4/13) teaches businesses an important lesson about reviewing agreements that employees send back, and not assuming that the agreement returned is the same as the agreement originally sent out. When Chanel terminated the employment of Anu Allen, it presented her with a Separation Agreement and Release, which, among other terms, offered $14,940.19 in severance pay in exchange for a full release of all potential claims. A corporate representative pre-signed the agreement before giving it to Allen. The release clause in the agreement stated as follows:

For and in consideration of the payments and benefits to be provided to you … , you … hereby forever release and discharge [Defendant] … from any and all claims … *including*, but not limited to, claims of discrimination and harassment on the basis of race, color, … sex, sexual orientation, age, … and any other legally protected characteristic … and any and all claims under any contract, statute, regulation, agreement, duty or otherwise.

Upon receipt of the agreement, Allen, believing she had been the victim of discrimination and wanting to preserve her right to sue, pulled a fast one. She retyped the page of the agreement containing the release word-for-word, with the same font and the same margins, so that it appeared to be identical, but with one key change. Allen changed the word "including" to "excluding," so that the release paragraph read:

For and in consideration of the payments and benefits to be provided to you … , you … hereby forever release and discharge [Defendant] … from any and all claims … *excluding*, but not limited to, claims of discrimination and harassment on the basis of race, color, … sex, sexual orientation, age, … and any other legally protected characteristic … and any and all claims under any contract, statute, regulation, agreement, duty or otherwise.

She then initialed each page, signed the agreement, and returned it to her ex-employer, which, failed to notice the change and released the severance check. When Allen later sued for discrimination, Chanel sought the dismissal of her lawsuit, believing that Allen had released and waived the claims in the agreement. The court, however, did not agree, relying on Allen's chicanery to conclude that the parties did not have a meeting of the minds on the key release language:

Here, by changing the word "including" to "excluding" prior to the list of claims covered by the Chanel Separation and Release Agreement before signing the agreement and returning it to Defendant, Plaintiff manifested an intent to preserve her right to file a discrimination claim. Thus, Plaintiff did not knowingly, willfully, and voluntarily waive her right to file a discrimination claim, regardless of whether the Chanel Separation Release Agreement, Plaintiff's Release, or neither represents the agreement of the parties. Consequently, Defendant has failed to show that Plaintiff waived the claims she raises in her Complaint.

Are you as disturbed as I am that the court provided a game-playing employee with a huge benefit? The moral of story, though, is that employers must read agreements, and not merely assume that a recently terminated employee will play fair.

*Hat tip: Connecticut Employment Law Blog*

*The post originally appeared on The Legal Workplace Blog.*

*Written by Jon Hyman, a partner in the Labor & Employment group of* Meyers Roman Friedberg & Lewis. *For more information, contact Jon at (216) 831-0042, ext. 140 or* jhyman@meyersroman.com.

*Do you like what you read? Receive updates two different ways:*
Subscribe to the feed *or* register for free email updates.

ADJUVANCY.com – (https://www.adjuvancy.com/wordpress/contract/) Will not allow me to copy article

You've sent that document to the client. And, you are looking forward to receiving the signed contract back and getting to work. And, here it is now. You look it over and sign the copy and send it to the client. Everything's great, right?

No!

Forget about the fact that you knew that sending a Word document was changeable, so you send a PDF version, and send it. But, that's not true,

First of all you can compare documents easily with Word so the changes would be evident. But you need to run a compare document any time you rely on mail, fax or email contracts. Unless you are present and can insure that the document has never been changed- assume it has.

Here's a real life example of a case running through the courts right now to explain the consequences of not checking carefully.

The Chanel Corporation had fired Anu and sent her severance agreement with John Brown's signature affixed. Anu dutifully signed the document and returned it to Chanel. Chanel reviewed the signature, paid the severance and sang their personal praises of good riddance.

Except Anu has filed for discrimination against Chanel. Chanel is flabbergasted. It knew it had a release from Anu. Except Anu had retyped one page of the document (edited it carefully) to insure that the same font and margins applied on the changed page of the document.

(I need to notify you that I worked with an individual who was also terminated by Chanel around the same time. However, he followed my advice and with the addition of a good labor lawyer, he received what he deserved. For a very lengthy service record (and a successful one, to boot) prior to being notified of his termination; he may have been the subject of age discrimination.

The key word Anu had changed was "including to excluding" That change means that she is not releasing certain claims but making sure she can act on them in the future. And now this case is being heard in Federal Court (12CV 6758).

While Chanel alleged that Anu had given up all claims by signing the "release" , the court using the document signed by both parties, determined that Anu Allen clearly had intent file a discrimination suit against Chanel, and never waived her right to file that claim – regardless of the standard Chanel separation Release Agreement said.

So, don't assume ever that the document you receive is the same one you sent.

Exhibit H

| Article Title | Article Date | | Contact/Notes |
|---|---|---|---|
| **GOOGLE - CONTENT REMOVAL BY COURT ORDER** | | | **408.916.5977 USA** |
| When a contract is not... | 7/9/2013 | | **Article by Ron Ackerman - 703.548.1343 or www.adjuvancy.com/blog is on 23 sites** |
| A tale of two letters | | | **EVERFI - 800.652.9546** |
| Allen v. Chanel, Inc. (1:12-cv-06758-LAP) | 9/6/2012 | | **Will only remove w/ court order of expungement or redaction** |
| Allen vs Chanel | 6/26/2015 | | |
| Allen vs. Chanel | 9/6/2012 | | |
| Allen vs. Chanel | 6/4/2013 | | |
| Employers, read those severance agreements | 6/27/2013 | | **Article by Meyers Roman Friedberg & Lewis 216.831.0042 X140 or jhyman@meyersroman.com** |
| | | | |
| Employment related lawsuits high cost high risk | 5/31/2014 | | 478.722.8282 - 2/28/19 Spoke w/ Buddy McGee who agreed to remove blog. |
| Employment related lawsuits high cost high risk | 8/15/2014 | | 478.722.8282 - 2/28/19 Spoke w/ Buddy McGee who agreed to remove blog. |
| Terminated employees subtle contract modification | 6/18/2013 | | Title needs to be removed/article not found/2/26/19 Made a request to remove cache |
| Employers, read those severance agreements | 6/13/2013 | | Title needs to be removed/article not found/2/26/19 Made a request to remove cache |
| | | | |
| **BING - CONTENT REMOVAL BY COURT ORDER** | | | **408.916.5977 USA** |
| Allen vs. Chanel Inc. | 6/4/2013 | | **Judge Patterson- Casemine 408.451.1003 -support@casemine.com** |
| Allen vs. Chanel Inc. | | | **Judge Patterson- Casemine 408.451.1003 -support@casemine.com** |
| Allen vs. Chanel Inc. | | | **Sign in to view docket** |
| Employers, read those severance agreements | 6/27/2013 | | Article by Meyers Roman Friedberg & Lewis 216.831.0042 X140 or jhyman@meyersroman.com |
| | | | Article by Meyers Roman Friedberg & Lewis 216.831.0042 X140 or jhyman@meyersroman.com |
| A tale of two letters | | | |
| United States District Court Southern State | | | |
| Employers, read those severance agreements | 6/27/2013 | | Article by Meyers Roman Friedberg & Lewis 216.831.0042 X140 or jhyman@meyersroman.com |
| | | | |
| Employment related lawsuits high cost high risk | | | 478.722.8282 - 2/28/19 Spoke w/ Buddy McGee who agreed to remove blog. |
| Previous Coordinator for Chanel | | | **Title needs to be removed/article not found/2/26/19 Made a request to remove cache** |
| Employers, read those severance agreements | | | |
| | | | |
| **YAHOO - CONTENT REMOVAL BY COURT ORDER** | | | |
| Allen vs. Chanel Inc. | | | **Judge Loretta Preska - Casemine 408.451.1003 -support@casemine.com** |
| Allen vs. Chanel Inc. | | | **Judge Robert Patterson - Casemine 408.451.1003 -support@casemine.com** |
| Allen vs. Chanel Inc. | | | **Sign in to view docket** |
| Employers, read those severance agreements | | | Article by Meyers Roman Friedberg & Lewis 216.831.0042 X140 or jhyman@meyersroman.com |
| A Tale of Two Letters | | | **EVERFI - 800.652.9546** |

| Search Engine |
|---|

**Google**

**https://blog.page1.me/blog/submit-court-order-google-content-removal/**
https://www.adjuvancy.com/wordpress/contract/
https://answers.lawroom.com//Story.aspx?STID=2779
https://www.courtlistener.com/docket/5424004/allen-v-chanel-inc/
http://ny.findacase.com/research/wfrmDocViewer.aspx/xq/fac.20150626_0001698.SNY.htm/qx
https://www.pacermonitor.com/public/case/214532/Allen_v_Chanel,_Inc,
https://www2.sidley.com/files/Uploads/Documents/Employment%20Blog/AllenChanel.pdf
https://www.workforce.com/2013/06/27/employers-read-those-severance-agreements/

REMOVED

https://georgiaemployers.org/employment-related-lawsuits/
https://georgiaemployers.org/gea-blog/page/12/
https://www.skoler-abbott.com/2013/06/18/terminated-employees-subtle-contract-modification-may-prove-problen
https://www.businessmanagementdaily.com/35755/employers-read-those-severance-agreements__trashed

**Bing**

**https://blog.page1.me/blog/present-court-order-bing-content-removal/**
https://www.casemine.com/judgement/us/5914f832add7b0493499a59b
https://www.casemine.com/judgement/us/5914f832add7b0493499a59b
https://www.law360.com/cases/504df9c8e1a14546ea004381
https://www.ohioemployerlawblog.com/2013/06/employers-read-those-severance.html
https://www.ohioemployerlawblog.com/2013/06/
https://pihra.lawroom.com/story.aspx?STID=2779
https://www2.sidley.com/files/Uploads/Documents/Employment%20Blog/AllenChanel.pdf
https://www.workforce.com/2013/06/27/employers-read-those-severance-agreements/

REMOVED

https://georgiaemployers.org/employment-related-lawsuits/
https://www.corporationwiki.com/New-York/New-York/anu-allen/47791477.aspx
https://www.businessmanagementdaily.com/35755/employers-read-those-severance-agreements__trashed

**Yahoo**

**https://blog.page1.me/blog/present-court-order-yahoo-content-removal/**
https://www.casemine.com/judgement/us/5914ade8add7b04934744e8a
https://www.casemine.com/judgement/us/5914f832add7b0493499a59b
https://www.law360.com/cases/504df9c8e1a14546ea004381
https://www.ohioemployerlawblog.com/2013/06/employers-read-those-severance.html
https://pihra.lawroom.com/story.aspx?STID=2779
https://www2.sidley.com/files/Uploads/Documents/Employment%20Blog/AllenChanel.pdf

REMOVED

https://georgiaemployers.org/employment-related-lawsuits/
https://www.corporationwiki.com/New-York/New-York/anu-allen/47791477.aspx
https://www.businessmanagementdaily.com/35755/employers-read-those-severance-agreements__trashed

**Aol**

https://www.casemine.com/judgement/us/5914f832add7b0493499a59b
https://www.casemine.com/judgement/us/5914f832add7b0493499a59b

Sign in to view docket
Article by Meyers Roman Friedberg & Lewis 216.831.0042 X140 or jhyman@meyersroman.com

EVERFI - 800.652.9546

Title needs to be removed/article not found
Title needs to be removed/article not found
478.722.8282 - 2/28/19 Spoke w/ Buddy McGee who agreed to remove blog.

Judge Patterson- Casemine 408.451.1003 -support@casemine.com
Judge Patterson- Casemine 408.451.1003 -support@casemine.com
Sign in to view docket
Article by Meyers Roman Friedberg & Lewis 216.831.0042 X140 or jhyman@meyersroman.com
Article by Meyers Roman Friedberg & Lewis 216.831.0042 X140 or jhyman@meyersroman.com
EVERFI - 800.652.9546

Title needs to be removed/article not found
Title needs to be removed/article not found
478.722.8282 - 2/28/19 Spoke w/ Buddy McGee who agreed to remove blog.

Judge Patterson- Casemine 408.451.1003 -support@casemine.com
Judge Loretta Preska - Casemine 408.451.1003 -support@casemine.com
Sign in to view docket
Article by Meyers Roman Friedberg & Lewis 216.831.0042 X140 or jhyman@meyersroman.com
Article by Meyers Roman Friedberg & Lewis 216.831.0042 X140 or jhyman@meyersroman.com
EVERFI - 800.652.9546

Title needs to be removed/article not found
Title needs to be removed/article not found
478.722.8282 - 2/28/19 Spoke w/ Buddy McGee who agreed to remove blog.

Judge Patterson- Casemine 408.451.1003 -support@casemine.com
Judge Loretta Preska - Casemine 408.451.1003 -support@casemine.com
Sign in to view docket
Article by Meyers Roman Friedberg & Lewis 216.831.0042 X140 or jhyman@meyersroman.com
Article by Meyers Roman Friedberg & Lewis 216.831.0042 X140 or jhyman@meyersroman.com
EVERFI - 800.652.9546

Title needs to be removed/article not found
478.722.8282 - 2/28/19 Spoke w/ Buddy McGee who agreed to remove blog.

Article by Meyers Roman Friedberg & Lewis 216.831.0042 X140 or jhyman@meyersroman.com

| URL | Title | Date |
|---|---|---|
| s://www.law360.com/cases/504df9c8e1a14546ea004381 | Allen vs. Chanel Inc. | |
| s://www.ohioemployerlawblog.com/2013/06/employers-read-those-severance.html | Employers, read those severance agreements | |
| s://pihra.lawroom.com/story.aspx?STID=2779 | A Tale of Two Letters | |
| s://www2.sidley.com/files/Uploads/Documents/Employment%20Blog/AllenChanel.pdf | United States District Court Southern State | |
| **REMOVED** | | |
| s://www.businessmanagementdaily.com/35755/employers-read-those-severance-agreements__trashed | Employers, Read Those Severance Agreements | |
| s://www.corporationwiki.com/New-York/New-York/anu-allen/47791477.aspx | Previous Coordinator for Chanel | |
| s://georgiaemployers.org/employment-related-lawsuits/ | Employment related lawsuits high cost high risk | |

**pile**

| URL | Title | Date |
|---|---|---|
| s://www.casemine.com/judgement/us/5914ade8add7b04934744e8a | Allen vs. Chanel Inc. | |
| s://www.casemine.com/judgement/us/5914f832add7b0493499a59b | Allen vs. Chanel Inc. | |
| s://www.law360.com/cases/504df9c8e1a14546ea004381 | Allen vs. Chanel Inc. | |
| s://www.ohioemployerlawblog.com/2013/06/ | Wirtw #279 Stand your ground edition | |
| s://www.ohioemployerlawblog.com/2013/06/employers-read-those-severance.html | Employers, Read Those Severance Agreements | |
| s://pihra.lawroom.com/story.aspx?STID=2779 | A Tale of Two Letters | |
| s://www2.sidley.com/files/Uploads/Documents/Employment%20Blog/AllenChanel.pdf | United States District Court Southern State | |
| s://www.workforce.com/2013/06/27/employers-read-those-severance-agreements/ | Employers, Read Those Severance Agreements | 6/27/2013 |
| **REMOVED** | | |
| s://www.businessmanagementdaily.com/35755/employers-read-those-severance-agreements__trashed | Employers, Read Those Severance Agreements | |
| s://www.corporationwiki.com/New-York/New-York/anu-allen/47791477.aspx | Previous Coordinator for Chanel | |
| s://georgiaemployers.org/employment-related-lawsuits/ | Employment related lawsuits high cost high risk | |

**k Duck Go**

| URL | Title | Date |
|---|---|---|
| s://www.casemine.com/judgement/us/5914f832add7b0493499a59b | Allen vs. Chanel Inc. | |
| s://www.casemine.com/judgement/us/5914ade8add7b04934744e8a | Allen vs. Chanel Inc. | |
| s://www.law360.com/cases/504df9c8e1a14546ea004381 | Allen vs. Chanel Inc. | |
| s://www.ohioemployerlawblog.com/2013/06/ | Wirtw #279 Stand your ground edition | |
| s://www.ohioemployerlawblog.com/2013/06/employers-read-those-severance.html | Employers, read those severance agreements | |
| s://pihra.lawroom.com/story.aspx?STID=2779 | A Tale of Two Letters | |
| s://www2.sidley.com/files/Uploads/Documents/Employment%20Blog/AllenChanel.pdf | | |
| s://www.workforce.com/2013/06/27/employers-read-those-severance-agreements/ | Employers, read those severance agreements | 6/27/2013 |
| **REMOVED** | | |
| s://www.businessmanagementdaily.com/35755/employers-read-those-severance-agreements__trashed | Employers, Read Those Severance Agreements | |
| s://www.corporationwiki.com/New-York/New-York/anu-allen/47791477.aspx | Previous Coordinator for Chanel | |
| s://georgiaemployers.org/employment-related-lawsuits/ | Employment related lawsuits high cost high risk | |

**oy**

| URL | Title | Date |
|---|---|---|
| s://www.casemine.com/judgement/us/5914f832add7b0493499a59b | Allen vs. Chanel Inc. | |
| s://www.casemine.com/judgement/us/5914ade8add7b04934744e8a | Allen vs. Chanel Inc. | |
| s://www.law360.com/cases/504df9c8e1a14546ea004381 | Allen vs. Chanel Inc. | |
| s://www.ohioemployerlawblog.com/2013/06/ | Wirtw #279 Stand your ground edition | |

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X

ANU ALLEN,

                              Plaintiff,

      -against-                                                    **OPINION & ORDER**

CHANEL, INC.,

                              Defendant.
----------------------------------------------------------------X

**LORETTA A. PRESKA, Chief U.S.D.J.**

## I.    FACTS[1]

Plaintiff Anu Allen ("Plaintiff") was born on February 24, 1969 and is of Asian or Indian descent. (Def.'s Statement of Undisputed Material Facts Pursuant to Rule 56.1 ("Def.'s 56.1") ¶ 1, ECF No. 55.) Chanel, Inc. ("Chanel" or "Defendant"), a New York corporation, is a manufacturer and distributor of luxury goods. (Id. ¶ 2.) From approximately 1993 to 2000, Plaintiff worked as a receptionist for Defendant. (Id. ¶¶ 5, 6.) She was promoted to Office Services Coordinator in January, 2001, a position created for her. (Id. ¶¶ 7, 8, 11.) After serving as an Office Services Coordinator for six years, she underwent a formal interview process and was selected to become a Samples Coordinator. (Id. ¶¶ 12, 13.)

In approximately August, 2011, Plaintiff began reporting to Susanna Klein ("Klein"), Executive Director of Ready to Wear & Wholesale Events & Training. (Id. ¶ 16.) Klein reported to Stephanie Zernik ("Zernik"), Senior Vice President of Fashion Wholesale, and Zernik

---

[1]      Pursuant to the standard for summary judgment motions, all facts are construed in favor of the non-moving party, here the Plaintiff. See Allen v. Coughlin, 64 F.3d 77, 79 (2d Cir. 1995).

1

reported to Barbara Cirkva ("Cirkva"), President of Fasion, Watches and Fine Jewelry. (Id.)

Plaintiff alleges that Klein was "extremely difficult" to work with, "everyone was afraid of her,"

and that Klein was "unfair, not liked, aggressive, abrasive, rude, disrespectful and out of line."

(Id. ¶¶ 23, 24.) Plaintiff had complained to Megan Glickman ("Glickman"), Director of Human

Resources for Fashion, Watches and Fine Jewelry, about Plaintiff's working relationship with

Klein on various occasions beginning in 2009. (Id. ¶ 42.) Plaintiff recalls Klein's telling her that

"since [Plaintiff] was not white, not married and getting old that she would be just another

single-mother like all of the other minorities," and Zernik's telling her that Chanel "had too

many Asian and minority workers and not enough Jewish girls like [Zernik and Klein]." (Mem.

of Law in Supp. of Def.'s Mot. for Summ. J. ("Def.'s Mot.") at 16, ECF No. 56; Compl. ¶¶ 17,

18, ECF No. 1.) (See also Allen Dep. Submitted as Ex. K to Decl. of Christopher Thompson

("Allen Dep."), 120:4-121:5, 161:9-162:9, ECF No. 59.)

When Zernik arrived at Chanel in April of 2011, she reviewed the structure of the

Fashion Wholesale Division. (Def.'s 56.1 ¶ 27.) In the summer of 2011, Zernik was involved in

the transferring of the Training division outside of Fashion Wholesale. (Id. ¶ 29.) In August,

2011, Defendant reduced the number of trunk shows—events requiring the use of sample

products. (Id. ¶ 31.) Following these changes, Defendant claims that Plaintiff's position,

Samples Coordinator, was unnecessary. Zernik and Klein discussed different ways to structure

the department, including revising the Samples Coordinator job description and eliminating the

position altogether. (Id. ¶¶ 34-35, 37, 52.) Zernik made the decision to eliminate the Samples

Coordinator position and terminate Plaintiff's employment. (See id. ¶ 32.) Zernik sought and

received final approval from Cirkva and the Human Resources department. (Id. ¶ 38.)

At Plaintiff's termination meeting, she was given a hard copy Separation and Release Agreement ("Agreement") signed by one of Defendant's representatives.  (Id. ¶ 54.)  The Agreement provided that it "may be modified only by a writing signed by both parties."  (Id. ¶ 59.)  In exchange for waiving her right to bring certain lawsuits against Defendant, "including" employment discrimination and harassment claims on the basis of "race, color, . . . sex, sexual orientation, age, . . . and any other legally protected characteristic . . . and any and all claims under any contract, statute, regulation, agreement, duty or otherwise," Plaintiff would receive, inter alia, $14,940.19 and five months of COBRA coverage.  (Id. ¶ 56.)  These benefits exceeded what Plaintiff would have otherwise received under her employment contract.

Unbeknownst to Defendant, Plaintiff retyped the page of the Agreement containing the waiver clause in the same font, words, and margins, except she changed the word "including" to "excluding."  (Id. ¶ 63.)  Plaintiff then initialed each page of the Agreement, signed and returned it.  (Id. ¶ 64.)  Plaintiff claims to have put a 1-inch blank, yellow sticky note on the page of the Agreement containing the modified release provision before returning it to Defendant, but she did not contact Defendant to discuss any changes.  (Def.'s 56.1 ¶¶ 64-67.)  Defendant claims it neither received the sticky note nor noticed any alterations to the Agreement.  (Id.)

After receiving Plaintiff's signed document, Glickman authorized transmission of a separation payment and sent a check to Plaintiff that Plaintiff received and retained.  (Id. ¶ 69.)  Approximately five months later, on September 2, 2012, Plaintiff brought the instant action against Defendant, alleging that Defendant violated Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, et seq., the Civil Rights Act of 1866, 42 U.S.C. § 1981, et seq., the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, et seq., and the New

York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 290, et seq.  Plaintiff seeks

back pay, front pay, lost benefits, and recoupment of her legal costs.

      Defendant moved to dismiss on November 12, 2012, introducing documentation that was

not referenced (or barely referenced) in the Complaint.  (ECF No. 9.)  On June 4, 2013, Judge

Patterson exercised his discretion, pursuant to Rule 12(d), to convert this motion to dismiss into a

motion for summary judgment.  Judge Patterson then denied Defendant's motion without

prejudice on the grounds that Plaintiff had not knowingly, voluntarily, or willfully waive her

right to file a discrimination claim as a matter of law.  (ECF No. 22.)  Defendant filed an Answer

on June 18, 2013 with affirmative defenses and counterclaims.  (ECF No. 23.)[2]

      On November 13, 2014, Defendant moved for summary judgment, seeking dismissal of

Plaintiff's claims of discrimination and retaliation, and approval of Defendant's counterclaim for

unjust enrichment.  (Def.'s Mot.)  Plaintiff opposed on December 15, 2014 (Mem. of Law in

Opp'n to Def.'s Mot. (Pl.'s Opp'n), ECF No. 61) and Defendant replied on December 22, 2014

(Reply Mem. in Further Supp. of Def.'s Mot. ("Def.'s Reply"), ECF No. 66).

---

[2]     During the course of discovery, Defendant turned over documents from a supposedly
privileged and confidential file maintained by one of Defendant's in-house attorneys.  (Mem. of
Law in Supp. of Def.'s Mot. to Amend and for Sanctions at 5-6, ECF No. 40.)  At least one of
these documents detailed an internal sexual harassment complaint filed by Plaintiff in December,
1998.  (Id.)  Plaintiff found these documents sitting on a copy machine, made and kept
duplicates, and left the originals.  (Id.)  On September 26, 2014, shortly after learning the manner
in which Plaintiff obtained the documents, Defendant moved to amend its counterclaims to
include breach of contract and conversion.  (Id. at 1.)  Defendant also moved for sanctions.  (Id.)
Plaintiff opposed on October 14, 2014 (ECF No. 41), and Defendant replied on October 20, 2014
(ECF No. 47.)  On March 18, 2015, the Court granted Defendant's motion to amend and denied
Defendant's motion for sanctions.  (ECF No. 70.)  Defendant filed an Amended Answer and
additional Counterclaims on April 2, 2015.  (ECF No. 71.)

## II.   DISCUSSION

There are three issues before the court.  First, whether Defendant discriminated against Plaintiff on the basis of sex, age, and/or race when terminating her position.  Second, whether Defendant's termination of Plaintiff's position was retaliatory.  Third, whether Plaintiff was unjustly enriched by receiving and retaining from Defendant, inter alia, a severance payment and five months of COBRA coverage.  The following will address each issue in turn.

### a.   Standard for Summary Judgment

Courts will grant a motion for summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  The moving party holds the initial burden of demonstrating that there is no genuine issue of material fact. F.D.I.C. v. Great American Ins. Co., 607 F.3d 288, 292 (2d Cir. 2010).  When the moving party has met this initial burden, the opposing party must set forth specific facts showing that there is a genuine issue for trial, and cannot rest on mere allegations or denials of the facts asserted by the movant. Davis v. State of New York, 316 F.3d 93, 100 (2d Cir. 2002).  The Court must "view the evidence in the light most favorable to the non-moving party, and may grant summary judgment only when no reasonable trier of fact could find in favor of the non-moving party." Allen v. Coughlin, 64 F.3d 77, 79 (2d Cir. 1995).

### b.  Plaintiff's Discrimination Claims

#### i.  Legal Standard

In the Second Circuit, courts analyze sex, age, and race discrimination claims under Title VII, the ADEA, § 1981, and the NYSHRL in a three-step burden shifting framework.  See

Vivenzio v. City of Syracuse, 611 F.3d 98, 106 (2d Cir. 2010) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-07 (1973)).

In the first step, the plaintiff bears the burden of proving a prima facie case of discriminatory discharge by alleging "(1) at the time of discharge she was [a member of a protected class], (2) her job performance was satisfactory, (3) she was discharged, and (4) her discharge occurred under circumstances giving rise to an inference of discrimination on the basis of [her status as a member of a protected class]." Grady v. Affiliated Cent., Inc., 130 F.3d 553, 559 (2d Cir. 1997). "The requirements to establish a prima facie case are "minimal," St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506 (1993), and a plaintiff's burden is therefore "not onerous," Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981). See also Bucalo v. Shelter Island Union Free Sch. Dist., 691 F.3d 119, 128-29 (2d Cir. 2012).

In the second step, the defendant bears the burden to show a non-discriminatory reason for termination that "would support a finding that unlawful discrimination was not the cause of the employment action." Hicks, 509 U.S. at 502. "However, while the presumption shifts the burden of *production* to the defendant, [t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." Bucalo, 691 F.3d at 128-29 (alteration in original) (citations and internal quotation marks omitted).

In the third step, the plaintiff must present evidence for the factfinder to infer that the employer was motivated "in whole or in part" by discrimination. Grady, 130 F.3d at 559-60. The employer's reason for taking the employment action cannot be proven a pretext for discrimination unless plaintiff can show both "that the employer's reason was false, and that discrimination was the real reason." Hicks, 509 U.S. at 515. With regard to ADEA and

NYSHRL claims, "the plaintiff retains the burden of persuasion to establish that age was the "but-for" cause of the employer's adverse action." Gross v. FBL Fin. Servs., Inc., 557 U.S. 167, 177 (2009).[3]

### ii.  Whether Plaintiff has Proven an Inference of Discrimination

The parties do not dispute that Plaintiff has satisfied the first three requirements of a discriminatory discharge claim because Plaintiff was over 40 years of age at the time of her discharge, of Indian or Asian descent, female, and qualified for the position that she held for approximately five years.  (Pl.'s Opp'n at 4; Def.'s Mot. at 12-13.)  The parties dispute whether Plaintiff was discharged under circumstances that give rise to an inference of discrimination on the basis of age, race, or sex.

Without offering any citations to the record, Plaintiff argues that Defendant replaced her with a substantially younger unpaid intern and that "the mere fact of an employer replacing a terminated employee with a significantly younger employee is sufficient, standing alone, to establish an inference of age discrimination to meet this element of the prima facie case."  (Pl.'s Opp'n at 4.)  Assuming arguendo that this is an accurate statement of the law, there is no evidence in the record that Defendant had in fact hired an intern to replace Plaintiff.  (Def.'s Reply at 3.)  The first time that Plaintiff introduced the idea that she was replaced by an intern is in her briefing.  In fact, Defendant submitted, and Plaintiff conceded that Plaintiff's duties were absorbed by existing paid employees.  (Id.; Def.'s 56.1 ¶ 53; Pl.'s Statement of Undisputed

---

[3]      "The law governing ADEA claims has been held to be identical to that governing claims made under the NYHRL . . . we assume, without deciding, that the Supreme Court's Gross decision affects the scope of the NYHRL law as well as the ADEA." Gorzynski v. JetBlue Airways Corp., 596 F.3d 93, 105 n.6 (2d Cir. 2010) (citations omitted).

Material Facts Pursuant to Rule 56.1(b) ("Pl.'s 56.1") ¶ 39, ECF No. 63.)   Without evidence to support the assertion that Plaintiff was replaced by an intern, the Court cannot find that the use of an intern was sufficient for an inference of age discrimination.

Regardless, Plaintiff can raise an inference of discrimination on other grounds.  Although not referenced in her opposition brief, Plaintiff recalls Klein stating that "since [Plaintiff] was not white, not married and getting old that she would be just another single-mother like all of the other minorities," and Zernik stating that Defendant employed "too many Asian and minority workers and not enough Jewish girls like [Zernik and Klein]."  (Compl. ¶¶ 17-18; Def.'s Mot. at 16.; see also Allen Dep. at 120:4-121:5, 161:9-162:9.)

Assuming that these comments were made, and drawing all reasonable inferences in favor of the non-moving party, these comments imply that Plaintiff's supervisors, although women approximately the same age as Plaintiff, made judgments about Plaintiff relating to her race and age, and that Plaintiff's supervisors expressed an interest in hiring more white and Jewish employees.  Given the low bar for establishing a prima facie case for discrimination, these comments, and others that Plaintiff alleged relating to her being excluded because she did not come from a particular background (see Def. 56.1 ¶ 71), for example, made in advance of Defendant's termination of Plaintiff's position, are sufficient for the Court to draw an inference of age and race discrimination.[4]

---

[4]      Taken in aggregate, and given the totality of Plaintiff's relationship with her supervisors, these comments are not "stray remarks," meaning—they are not isolated or innocuous.  See Danzer v. Norden Sys., Inc., 151 F.3d 50, 56 (2d Cir. 1998) (noting that "stray remarks" alone are insufficient for a prima facie case of discrimination, but holding that the defendant's statements should not be read in isolation.).

In her briefing and during her deposition, Plaintiff does not argue that she was discriminated against based on sex.  (See Def.'s Mot. at 13 n.4; Pl.'s Opp'n at 4-5.)  Although Klein's comment that "since [Plaintiff] was not white, not married and getting old[,] she would be just another single-mother like all of the other minorities" could be construed to implicate gender, Plaintiff does not allege sex discrimination beyond citing Title VII in her Complaint.  (See Allen Dep. 120:4-121:5.)  Additionally, when the decision-maker is in the same protected class(es) as the plaintiff-employee, courts can draw inferences against discriminatory intent.  Baguer v. Spanish Broad. Sys., Inc., 2010 WL 2813632, at *14 (S.D.N.Y. July 12, 2010) aff'd sub nom. Baguer v. Spanish Broad. Sys., Inc., 423 F. App'x 102 (2d Cir. 2011).  Klein, Zernik, and Cirkva are all female.  Because Plaintiff failed to argue this claim and because the Court declines to draw an inference of discriminatory intent on this issue, Defendant's motion for summary judgement regarding sex discrimination is granted.  See Bellegar de Dussuau v. Blockbuster, Inc., 2006 WL 465374, at *7 (S.D.N.Y. Feb. 28, 2006); Douglas v. Victor Capital Group, 21 F.Supp.2d 379, 393 (S.D.N.Y. 1998).

### iii.  Whether Defendant has Provided a Non-Discriminatory Reason for Terminating Plaintiff's Position

In the second step, the defendant bears the burden to demonstrate a non-discriminatory reason for terminating the plaintiff.  Hicks, 509 U.S. at 507.  Eliminating a position for economic reasons is not discriminatory.  DiCola v. SwissRe Holding (N. Am.), Inc., 996 F.2d 30, 32-3 (2d Cir. 1993).

Here, Defendant argues that Plaintiff's position as Samples Coordinator was eliminated due to corporate restructuring and never filled.  (Def.'s Mot. at 17, 18.)  Defendant notes that the previous focus of Plaintiff's division shifted and the number of "trunk shows"—an event

occupying Plaintiff's time and efforts—was being reduced.  (Def.'s 56.1 ¶ 31).  While Defendant initially contemplated revising the Samples Coordinator position description instead of eliminating it altogether, such a revision never transpired.  (Def.'s 56.1 ¶¶ 35, 37, 52.)  Moreover, Defendant claims that the responsibilities previously handled by Plaintiff as the Samples Coordinator were absorbed by account representatives and another division of the company.  (Def.'s 56.1 ¶ 53; P.'s 56.1(b) ¶ 39.)

Plaintiff conceded that Defendant has satisfied its burden, writing: "[Plaintiff] . . . assume[s] [that] Defendant put forward what could be considered a legitimate business reason for [Plaintiff's] termination."  (Pl.'s Opp'n at 5.)

In light of Defendant's argument and Plaintiff's concession, the Court holds that Defendant has satisfied its burden of providing a non-discriminatory reason for terminating Plaintiff's employment.

### iv.  Whether Plaintiff has Proven that Defendant was Motivated by Discrimination

In the third step, the plaintiff must present evidence for the factfinder to infer that the employer was motivated "in whole or in part" by discrimination.  Grady, 130 F.3d at 559-60.  The employer's reason for taking the employment action cannot be proven a pretext for discrimination unless plaintiff can show both "that the employer's reason was false, and that discrimination was the real reason."  Hicks, 509 U.S. at 515.  With regard to ADEA and NYSHRL claims, "the plaintiff retains the burden of persuasion to establish that age was the "but-for" cause of the employer's adverse action."  Gross, 557 U.S. at 177.  The plaintiff may demonstrate "weaknesses, implausibilities, inconsistencies, or contradictions in the employer's

proffered legitimate, nonretaliatory reasons for its actions." Zann Kwan v. Andalex Grp. LLC, 737 F.3d 834, 846 (2d Cir. 2013).

Here, Plaintiff makes three arguments. First, Plaintiff reiterates that Plaintiff was subjected to age and race discrimination. (Pl.'s Opp'n at 7-8.) Second, Plaintiff argues that Defendant was motivated by discriminatory animus. (Id. at 6-7.) Plaintiff claims that Zernik's and Klein's "discriminatory animus" towards Plaintiff should be imputed to Cirkva, the person with ultimate authority to terminate Plaintiff's position. (Id.) Plaintiff relies on the "cat's paw" theory of liability, whereby the "discriminatory animus" of non-decisionmakers, here Zernik and Klein, can be imputed to the decisionmaker when the non-decisionmakers have "singular influence" over the employee and "use[] that influence to cause the adverse employment action." (Id. (citing Staub v. Proctor Hosp., 560 F.3d 647, 651 (7th Cir. 2009) rev'd and remanded, 562 U.S. 411 (2011)).)[5] Third, Plaintiff argues, without citing to the record, that "there is ample evidence in the record that Klein and Zurnik [sic], in seeking to amend [Plaintiff's] existing job description and wanting to discuss [Plaintiff's] past and future situations in person and not in an email were designed to terminate [Plaintiff] for a reason different from the proffered non-discriminatory reason." (Def.'s Opp'n at 8-9.)

Plaintiff's arguments fail. Because the parties do not dispute that Defendant has provided a non-discriminatory reason for terminating Plaintiff's position, Plaintiff must submit evidence

---

[5]     The Second Circuit has recognized that "the impermissible bias of a single individual at any stage of the promoting process may taint the ultimate employment decision in violation of Title VII." Bickerstaff v. Vassar Coll., 196 F.3d 435, 450 (2d Cir. 1999), as amended on denial of reh'g (Dec. 22, 1999). As noted above, Defendant's motion for summary judgment on Plaintiff's Title VII claim has been granted. It is not clear whether the Second Circuit recognizes this theory of imputing bias in the race or age discrimination context.

from which a jury could find that this reason was pretextual.  Even if Klein and Zernik

considered amending Plaintiff's job description and spoke in person as opposed to over email,

these business activities do not constitute evidence that Defendant's proffered reason for

terminating Plaintiff was false and that discrimination was the real reason.  Amending a job

description and meeting in person are activities consistent with developing a restructuring plan.

Furthermore, given the previous holding, Plaintiff has not offered any evidence to suggest that

Plaintiff would not have been fired but-for her age.

### c.  Plaintiff's Retaliation Claims

While Plaintiff alleges she suffered retaliation in her Complaint, she did not oppose

Defendant's motion for summary judgment on this issue.  In fact, Plaintiff has not addressed this

issue at all in her briefing.  (See Def.'s Reply at 8.)

Because Plaintiff failed to oppose Defendant's motion, Plaintiff's retaliation claims are

dismissed.  See Bellegar de Dussuau, 2006 WL 465374, at *7; Douglas, 21 F.Supp.2d at 393.

### d.  Defendant's Claims for Breach of Contract and Unjust Enrichment

There are two issues: whether Plaintiff and Defendant had formed a valid contract and

whether Plaintiff was unjustly enriched.  The following will address each in turn.

### i.  Whether the Parties Formed a Valid Contract

A valid contract has not been formed unless there has been a meeting of the minds on all

material terms.  Silber v. New York Life Ins. Co., 92 A.D.3d 436, 439 (2012).  "Fraud in the

execution occurs where there is a "misrepresentation as to the character or essential terms of a

proposed contract" and a party signs without knowing or having a "reasonable opportunity to

know of its character or essential terms."  Hetchkop v. Woodlawn at Grassmere, Inc., 116 F.3d

28, 31-32 (2d Cir. 1997) (quoting Restatement (Second) of Contracts § 163 (1981).)  Fraud in the

execution prevents the parties from achieving mutual assent and, thus, prevents the parties from forming a valid contract.

Here, because Plaintiff modified a material term, the general release provision, and obscured the change from Defendant, the Agreement was fraudulently executed. Thus, the parties never achieved a meeting of the minds, and a valid contract was never formed.

### ii. Whether Plaintiff was Unjustly Enriched

A claim for unjust enrichment requires that one party benefited at another's expense, and "equity and good conscience require restitution." Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of New Jersey, Inc., 448 F.3d 573, 586 (2d Cir. 2006). Here, because the parties had not formed a valid contract, Plaintiff was not entitled to the benefit conferred to her at Defendant's expense: a check for $14,940.19 and five months of COBRA coverage. It would be unjust for Plaintiff to retain these benefits because Plaintiff did not waive her right to sue Defendant for discriminatory discharge.

## III.    CONCLUSION

For these reasons, Defendant's motion for summary judgment and counterclaim for unjust enrichment [ECF No. 51] are granted. Plaintiff is ordered to turn over $14,940.19 plus accrued interest, and premium payments for five months of COBRA coverage plus interest, in the manner designated by Defendant. Defendant shall, on notice to Plaintiff, submit a proposed judgment with an explanation of the amount of the interest and COBRA payments.

SO ORDERED.

Dated: June 26, 2015

_Loretta A. Preska_
Loretta A. Preska
Chief U.S.D.J.



Hi Chris, I left you a message. Call me. Hope you and the family are doing well. Thanks!

Sent from my iPhone

On Mar 1, 2017, at 4:07 PM, ctalawman@aol.com wrote:

Anu,

Its Chris Thompson.  My cell phone died and I lost all my contacts.  What is your cell number?  I was in Court again today on the Chanel case (believe it or not).  Thank you.


Christopher Thompson, ESQ.
33 Davison Lane East
West Islip, NY 11795
Phone: 631-983-8830
Fax: 631-983-8831



-----Original Message-----
From: Anu Allen <anu.allen@yahoo.com>
To: ctalawman <ctalawman@aol.com>
Sent: Thu, Oct 8, 2015 6:45 am
Subject: Re: Anu Allen v. Chanel

Thank you Chris... Enjoy your day!

Sent from my iPhone

On Oct 8, 2015, at 5:48 AM, ctalawman@aol.com wrote:

I was stuck in Court all day yesterday.  I emailed the other side and will get that answer shortly.  Have a great day.


Christopher Thompson, ESQ.
33 Davison Lane East
West Islip, NY 11795
Phone: 631-983-8830
Fax: 631-983-8831



-----Original Message-----
From: Anu Allen <anu.allen@yahoo.com>
To: ctalawman <ctalawman@aol.com>
Sent: Wed, Oct 7, 2015 6:16 pm
Subject: Re: Anu Allen v. Chanel

Hey, they need to define fraud.... Does that have to do with my paperwork?

Sent from my iPhone

On Oct 7, 2015, at 6:20 AM, ctalawman@aol.com wrote:

I will call you this morning.


Christopher Thompson, ESQ.
33 Davison Lane East
West Islip, NY 11795
Phone: 631-983-8830
Fax: 631-983-8831


-----Original Message-----
From: Anu Allen <anu.allen@yahoo.com>
To: ctalawman <ctalawman@aol.com>
Sent: Tue, Oct 6, 2015 8:10 pm
Subject: Re: Anu Allen v. Chanel

You know ... I do not feel comfortable with the word fraud on a public record... And if  they insist on using it them that needs to be sealed....  Are they really that pissed that I have proof that they didn't protect me? What idiots. Actually I'm the idiot for being bullied by a much of a holes. Call me when you can before contacting them. Thank you again

Sent from my iPhone

On Oct 6, 2015, at 7:41 PM, ctalawman@aol.com wrote:

Yes.


Christopher Thompson, ESQ.
33 Davison Lane East
West Islip, NY 11795
Phone: 631-983-8830
Fax: 631-983-8831


-----Original Message-----
From: Anu Allen anu.allen@yahoo.com>
To: ctalawman <ctalawman@aol.com>
Sent: Tue, Oct 6, 2015 7:31 pm
Subject: Re: Anu Allen v. Chanel

Hi Chris, I agree as long as I am protected from them ever coming after me for anything in the future. Don't you agree?

Sent from my iPhone

On Oct 5, 2015, at 5:06 PM, ctalawman@aol.com wrote:

Anu,

Please read the email below.  If you agree this case is over.  Thank you.

Christopher Thompson, ESQ.
33 Davison Lane East
West Islip, NY 11795
Phone: 631-983-8830
Fax: 631-983-8831


-----Original Message-----
From: Egan, John <JEgan@seyfarth.com>
To: ctalawman <ctalawman@aol.com>
Cc: Almon, Lorie <LAlmon@seyfarth.com>; Ladd, Caitlin <CLadd@seyfarth.com>
Sent: Mon, Sep 21, 2015 12:28 pm
Subject: Anu Allen v. Chanel

**SETTLEMENT COMMUNICATION
UNDER F.R.E. 408**

Chris,

We are in receipt of your letter dated August 15, 2015 requesting that we provide you with a Satisfaction of Judgment in the above-referenced matter.  Accordingly, we submitted the attached Satisfaction to the Court, which was entered on September 4.

We plan to disburse the funds from our escrow account to Chanel this week.  We also noted an overpayment of post-judgment interest in the amount of $16.94, which we will return to your client.  Please let us know who the check should be made payable to, as well as where it should be delivered.

There is also an outstanding issue that we need to address.  Chanel has asserted a counterclaim against Ms. Allen for fraud (see the First Counterclaim in Chanel's Amended Answer).  Chanel did not move for summary judgment on this claim, and it was not otherwise addressed in the Court's decision of June 26, 2015.

Our client would be willing to withdraw its fraud claim if: (1) Ms. Allen waives any right to an appeal of the Court's decision; and (2) she returns all attorney work product that she wrongfully took from Chanel.  If Ms. Allen is not willing to accept this settlement proposal, then we will advise the Court that we are prepared to proceed to trial on the counterclaim.  Please let us know.

Thank you, John Egan


**John W. Egan** | Seyfarth Shaw LLP
620 Eighth Avenue | New York, New York 10018-1405
Direct: +1-212-218-5291 | Fax: +1-917-344-1332
jegan@seyfarth.com | www.seyfarth.com




The information contained in this transmission is attorney privileged and/or confidential information intended for the use of the individual or entity named above.  If the reader of this message is not the

intended recipient, you are hereby notified that any use, dissemination, distribution or copying of this communication is strictly prohibited.

<Chanel Entered Satisfaction of Judgment.pdf>

## SETTLEMENTAGREEMENTANDGENERALRELEASE

This Settlement Agreement and General Release ("Agreement and Release"), together with Exhibits A through C attached hereto, is made effective as of the Effective Date (as defined in paragraph 10 below), by and between ANU ALLEN, her heirs, executors, administrators, attorneys and assigns ("ALLEN"), and Chanel, Inc., on its own behalf, and on behalf of any and all of its past and present parents, subsidiaries, divisions, affiliates, related entities, shareholders, insurers, employee benefit and/or pension plans or funds, predecessors, successors and assigns, and any and all of its and their respective past and present officers, trustees, directors, employees, representatives, attorneys, fiduciaries, agents, predecessors, administrators, and assigns (whether acting as agents for Chanel, Inc., its affiliates or related entities, or in their individual capacity) (collectively, "CHANEL").

WHEREAS, ALLEN initiated the litigation encaptioned <u>Anu Allen v. Chanel, Inc.</u>, 12CV-6758, in the United States District Court for the Southern District of New York, asserting that, among other things, Chanel, Inc. discriminated against her based on her age, race and sex and retaliated against her in violation of the Title VII of the Civil Rights Act of 1964 ("Title VII"), the Age Discrimination in Employment Act ("ADEA") and the New York State Human Rights Law ("NYSHRL") (the "Claims");

WHEREAS, Chanel, Inc. asserted various counterclaims against ALLEN, including claims of fraud, reformation of contract, breach of contract, breach of implied covenant of good faith and fair dealing, unjust enrichment, conversion and trespass to chattels (the "Counterclaims") (together with the Claims, the "Litigation");

WHEREAS, on July 14, 2015, the United States District Court for the Southern District of New York entered an Order of Judgment in the Litigation dismissing all of ALLEN's Claims and granting Chanel, Inc.'s Counterclaim for unjust enrichment;

WHEREAS, on September 2, 2015, a Satisfaction of Judgment was entered in the Litigation confirming that ALLEN has fully paid the amount owed to Chanel, Inc. consistent with the July 14, 2015 Order of Judgment; and

WHEREAS, the parties have determined that it is in their mutual interests to settle the remaining Counterclaims in the Litigation;

NOW, THEREFORE, for good and valuable consideration, the receipt of which is acknowledged hereby, and in consideration of the mutual covenants and undertakings set forth herein, the parties agree as follows:

1.   General Release

    1.1   ALLEN fully and forever releases, relieves, waives, relinquishes, and discharges CHANEL from all actions, causes of action, suits, debts, dues, liabilities, obligations, costs, expenses, sums of money, controversies, accounts, reckonings, liens, bonds, bills, specialties, covenants, contracts, agreements, promises, variances, trespasses, damages, judgments, extents, executions, claims and demands of any kind whatsoever, at law or in equity, direct or indirect, known or unknown, discovered or undiscovered, which she had, now has or may have had against CHANEL arising out of, by reason of, or relating in any way whatsoever to any matter, cause or thing from the beginning of the world to the date on which she executes this Agreement and Release, including, but not limited to: (i) those arising directly or indirectly from her employment with Chanel, Inc., the terms and conditions of such employment, and her separation, including, but not limited to, any application for a new position or promotion; (ii) claims arising under federal, state or local laws, statutes, constitutions, regulations, rules, ordinances or orders, including, but not limited to, claims under the Age

Discrimination in Employment Act, the Older Workers Benefit Protection Act,
Employee Retirement Income Security Act of 1974 (except as to claims
pertaining to vested benefits under employee benefit plan(s) in accordance with
the terms of such plans and applicable law), Title VII of the Civil Rights Act of
1964, Sections 1981 through 1988 of Title 42 of the United States Code, the
Equal Pay Act, the Fair Labor Standards Act, the National Labor Relations Act,
the Worker Adjustment and Retraining Notification Act, the Rehabilitation Act,
the Americans with Disabilities Act, the Family and Medical Leave Act, all New
York State and City labor and employment laws, including but not limited to, the
New York Labor Law, the New York State Human Rights Law, the New York
City Human Rights Law, any and all New York "Whistleblower" statutes and
laws, and all applicable amendments to the foregoing acts and laws; (iii) any other
common law or statutory claim, whether for moneys or wages owed, damages,
negligent supervision and retention, constructive or wrongful discharge, breach of
contract, promissory estoppel, whistleblower protection, intentional or negligent
infliction of emotional distress, assault, battery, defamation, fraud, costs,
attorneys' fees, expenses or otherwise, arising up to or at the time of the signing
of this Agreement and

Release.

        1.2    ALLEN further agrees that she waives any and all entitlement to
relief, including, but not limited to, monetary damages, equitable relief and
reinstatement, with respect to any claim or cause of action released pursuant to
paragraph 1.1 above.

3

2.      <u>Promises</u>

2.1      ALLEN agrees to waive her right to appeal the July 14, 2015 Order of Judgment in this Litigation and/or otherwise seek to alter the disposition of the United States District Court for the Southern District of New York Order in this Litigation dismissing all of ALLEN's Claims and granting Chanel, Inc.'s Counterclaim for unjust enrichment.

2.2      ALLEN further agrees to return to Chanel, Inc. any and all hard copy and/or electronic documents, records and/or files relating to CHANEL in her possession, custody or control that she had access to, became acquainted with and/or created during the course or in the scope of her employment with Chanel, Inc., as well as any and all other property or equipment of CHANEL, including but not limited to, any documents, records and/or files reflecting confidential and/or attorney work product, including, but not limited to, Vice President, Counsel Daniel Rosenberg's file pertaining to ALLEN. In doing so, within 20 calendar days of executing this Agreement and Release, ALLEN must return the original and all copies in complete form, electronic and hard copy, along with a sworn statement, as detailed in Exhibits A and B, from both ALLEN and her counsel, Christopher Thompson, indicating that they have returned and/or destroyed all documents, files and/or records relating to CHANEL, including but not limited to, all documents, records and/or files reflecting CHANEL's confidential and/or attorney work product and no longer have any CHANEL materials in their possession, custody or control.

3.      <u>Consideration</u>

In exchange for the promises set forth above in paragraph 2, within fifteen (15) business days of receiving the (a) documents and files; and (b) the sworn statements from ALLEN and her counsel, as outlined in paragraph 2.2, Chanel, Inc.'s counsel shall sign and file with the Court a Stipulation of Dismissal With Prejudice of the Litigation (Exhibit C).

Chanel, Inc. agrees that in response to any inquiry from a potential employer regarding ALLEN'S employment, Chanel, Inc. will only provide ALLEN'S name, dates of employment, and last position held.

4.    Confidentiality

It is the intention of the parties, and an essential part of this Agreement and Release, that the Agreement and Release itself, the discussions leading up to the execution of the Agreement and Release, any of the terms and conditions of the Agreement and Release, the subject matter of the Litigation, and any and all claims made regarding or relating to Plaintiff's employment with Chanel, Inc. shall not be disclosed by ALLEN or counsel to anyone, including, but not limited to, any current or former employee and/or any applicant of CHANEL, the media, or in any book, diary or journal disclosed or published to any non-party to this Agreement and Release. Except as may be required by law, ALLEN avers that she has not and will not directly or indirectly publish, disseminate, disclose, or cause or permit to be published, disseminated, or disclosed to any individual or entity any of the above information. This paragraph shall not be construed, however, to prevent ALLEN from disclosing information to her immediate family, any attorney, accountant, or tax or financial advisors with whom she may consult for the sole purpose of obtaining professional advice or services; any governmental taxing authority; or to any court, administrative agency or officer, or judicial officer, pursuant to any valid subpoena or judicial or administrative order, provided, however, that prior to disclosing any such information, she shall advise any such person to whom she intends to disclose the information (other than taxing

authorities) that such information is confidential and may not be disclosed by such person, except in response to a valid subpoena or judicial or administrative order, and that ALLEN agrees to remain responsible for any resulting breach. Notwithstanding the foregoing, in response to an inquiry regarding the Litigation, ALLEN may respond that the Litigation has been resolved to the satisfaction of the parties and, in response to further inquiry, that she is bound by a confidentiality agreement.

5.    Non-Disparagement

ALLEN agrees that she has not and will not take, support, encourage, induce or voluntarily participate in any action or activity or attempted action or activity that disparages CHANEL or the business operations, policies, or conduct of CHANEL, or act in any way with respect to such business operations, policies or conduct that could damage CHANEL's reputation, business relationships, or present or future business. This paragraph shall not be interpreted to prevent ALLEN from providing truthful information to, or testimony before, any regulatory, judicial or other governmental authorities as may be required by law, pursuant to any valid subpoena or judicial or administrative order.

6.    Remedies

ALLEN acknowledges that the consideration referenced in paragraphs 2 and 3 of this Agreement and Release is contingent upon ALLEN keeping the confidentiality and nondisparagement promises contained in paragraphs 4 and 5 of this Agreement and Release. In the event that ALLEN, her immediate family, any attorney, accountant, or tax or financial advisors with whom she may consult or any other persons acting as their agent breaches the provisions in paragraphs 4 and 5, Allen agrees to pay, and a court of competent jurisdiction shall award, as liquidated damages, $10,000 for each and every breach of the confidentiality provision plus attorneys' fees and costs in bringing such an action, as set by the court; provided, however,

that this paragraph 6 does not, and shall not be construed to, waive CHANEL's right to seek actual damages or any other relief in the event of a breach of any provision of this Agreement and Release.

The parties agree that money damages will not be a sufficient remedy for any breach of paragraphs 4 and 5 of this Agreement and Release and that, in addition to all other remedies, in the event of a breach of such paragraphs of this Agreement and Release, the non-breaching party shall be entitled to specific performance and injunctive or other equitable relief as a remedy for any such breach if ordered by a court with jurisdiction. The parties agree to waive any requirements for the securing or posting of any bond in connection with any remedy available under this paragraph.

     7.    <u>No Further Employment With Chanel</u>

ALLEN understands and agrees that she has no right to employment with Chanel, Inc. or any of its successors, parents, subsidiaries, affiliates or related companies and is not eligible for hire or re-hire by Chanel, Inc. or any of its successors, parents, subsidiaries, affiliates or related companies. ALLEN further agrees that she shall not apply for or accept employment with Chanel, Inc. or any of its successors, parents, subsidiaries, affiliates or related companies, either directly or indirectly, on a full-time, part-time or temporary basis, including, but not limited to, as a temporary or contingent worker, or contractor through any temporary service provider, vendor or agency. ALLEN agrees that if she applies for employment, knowingly or unknowingly, at Chanel, Inc. or any of its successors, parents, subsidiaries, affiliates or related companies, she will immediately withdraw her application or that, if discovered after an offer or acceptance of employment has been made, that the offer may be withdrawn and she may be terminated without notice, cause or legal recourse.

     8.    <u>Acknowledgements</u>

ALLEN acknowledges that she: (a) has carefully read this Agreement and Release in its entirety; (b) has had a sufficient opportunity to consider this Agreement and Release; (c) has been and is hereby advised by Chanel, Inc. in writing to consult with an attorney of her own choosing in connection with this Agreement and Release; (d) fully understands the significance of all of the terms and conditions of this Agreement and Release and has discussed them with Christopher Thompson, Esq. or an independent attorney of her own choosing, or has had a reasonable opportunity to do so; (e) has had answered to her satisfaction any questions she has with regard to the meaning and significance of any of the terms or provisions of this Agreement and Release; and (f) is signing this Agreement and Release voluntarily and of her own free will and agrees to all the terms and conditions contained herein.

9.    Consideration Period

ALLEN acknowledges that she has been given a period of at least twenty-one (21) days to consider the terms of this Agreement and Release and, if she should execute it prior to the expiration of the twenty-one day consideration period, she knowingly waives her right to consider this Agreement and Release for twenty-one days. ALLEN is hereby advised to consult with an attorney prior to executing this Agreement and Release.

10.    Seven-Day Revocation Period and Effective Date

ALLEN acknowledges that she may, for a period of seven (7) calendar days following the execution of this Agreement and Release, revoke acceptance thereof. This revocation must be done in writing and delivered to Chanel, Inc.'s counsel, Lorie E. Almon, Esq., Seyfarth Shaw LLP, 620 Eighth Avenue, New York, New York 10018, lalmon@seyfarth.com, before the close of business on the seventh day following her execution of this Agreement and Release. This Agreement and Release shall become effective and irrevocable automatically upon the eighth

(8th) calendar day following the execution of this Agreement and Release (the "Effective Date"). In the event that ALLEN revokes this Agreement and Release as set forth above, the terms of this Agreement and Release shall immediately become null and void (except paragraph 4 above) and Chanel, Inc. will not withdraw its Motion for Sanctions and remaining Counterclaims.

11.   <u>General</u>

11.1   This Agreement and Release shall be construed as a whole in accordance with its fair meaning and in accordance with the laws of the State of New York applicable to contracts to be performed wholly within the State of New York, without regard to New York's conflicts of law principles. The parties agree to submit to the jurisdiction of the United States District Court for the Southern District of New York or the New York State Supreme Court, New York County, for the purpose of any dispute arising out of or relating to this Agreement and Release.

11.2   The headings used herein are for reference only and shall not affect the construction of this Agreement and Release. If any court determines that any of the provisions of, or obligations imposed by, this Agreement and Release are unenforceable for any reason, the parties hereto agree that such determination shall not bar or in any way affect any party's rights to enforce the remaining provisions of, or obligations imposed by, this Agreement and Release.

11.3   This Agreement and Release represents the sole and entire agreement between the parties hereto with respect to the subject matters covered hereby and supersedes all prior agreements, negotiations and discussions between the parties hereto, and their respective counsel, with respect to the subject matters covered hereby.

11.4    Any amendment to this Agreement and Release must be in writing signed by duly authorized representatives of the parties hereto and stating the intent of the parties to amend the

Agreement and Release.

11.5    This Agreement and Release may be executed by each party in separate counterparts, each of which shall be deemed an original and the sum of which shall constitute one document.

11.6    ALLEN shall instruct her immediate family, any attorney, accountant, or tax or financial advisors and/or any person(s) acting as her agents not to take any action which they are precluded from taking hereunder and shall remain responsible for any such breach.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement and Release.

CHANEL, INC.


By_____
Name & Title:
Execution Date:


ANU ALLEN


_____
Execution Date:

**EXHIBIT A**

**DECLARATION OF ANU ALLEN**

I, ANU ALLEN, declare under the penalty of perjury and pursuant to 28 U.S.C. § 1746 as follows:

I have given all hard copy and/or electronic documents, records and/or files (including all originals and all copies) relating to CHANEL in my custody, control or possession that I had access to, became acquainted with and/or created during the course or in the scope of my employment with Chanel, Inc., as well as any and all other property or equipment of CHANEL, including, but not limited to, any documents, records and/or files reflecting confidential and/or attorney work product material, including but not limited to, Daniel Rosenberg's file pertaining to me, to my attorney, Christopher Thompson, to facilitate the return of such documents to Chanel, Inc..

I no longer have any documents, records and/or files (including any originals and any copies) reflecting CHANEL's attorney work product and other confidential material in my possession and no longer have any CHANEL materials in my possession, custody or control.

I declare under the penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

Date executed: _____, 2017

_____

_ Anu Allen

**EXHIBIT B**

**DECLARATION OF CHRISTOPHER THOMPSON**

I, CHRISTOPHER THOMPSON, declare under the penalty of perjury and pursuant to 28 U.S.C. § 1746 as follows:

I hereby certify that I have given all hard copy documents, records and/or files (including all originals and all copies) relating to CHANEL in my custody, control or possession, as well as any and all other property or equipment of CHANEL, including, but not limited to, any documents, records and/or files reflecting confidential and/or attorney work product material, including but not limited to, Daniel Rosenberg's file pertaining to ALLEN, to Chanel, Inc..

I hereby certify that I have destroyed all electronic documents, records and/or files (including all originals and all copies) relating to CHANEL in my custody, control or possession, as well as any and all other electronic property or equipment of CHANEL, including, but not limited to, any electronic documents, records and/or files reflecting confidential and/or attorney work product material, including but not limited to, Daniel Rosenberg's file pertaining to ALLEN.

I hereby certify that I no longer have any documents, records and/or files (including any originals and any copies) reflecting CHANEL's attorney work product and other confidential material in my possession and no longer have any CHANEL materials in my possession, custody or control. I hereby certify that no originals or copies of such records have been given to any person or entity outside of The Law Offices of Christopher Thompson.

I declare under the penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

Date executed: _____, 2017

_____
Christopher Thompson



Yikes... okay, how can I get a copy for myself. Is there a process to get them from the courthouse?? Is there someone I can contact?

Sent from my iPhone


On Apr 27, 2017, at 2:01 PM, Chris Thompson, Esq. <ctalawman@aol.com> wrote:

It is in storage.

Sent from my iPhone

On Apr 27, 2017, at 1:59 PM, Anu Allen <anu.allen@yahoo.com> wrote:

Hi Chris, Thank you again for forwarding for their consideration also, would you mind sending me me a copy of my deposition I had with them. I wanted to go over it again. I appreciate it. Thank you again, Anu

Sent from my iPhone

On Apr 26, 2017, at 5:43 PM, ctalawman@aol.com wrote:

Beth,

Thank you for taking the time to review and comment. I do not think Chanel will agree to change a single word in the document at this point. However, I will forward your suggested changes today. Please let me know if your office is willing to substitute into this case if they are unwilling to make any changes. Thank you.


Christopher Thompson, ESQ.
33 Davison Lane East
West Islip, NY 11795
Phone: 631-983-8830
Fax: 631-983-8831



-----Original Message-----
From: Beth Bilsborrow <bbilsborrow@prglaw.com>
To: ctalawman <ctalawman@aol.com>
Cc: Peter Ginsberg <pginsberg@prglaw.com>; Anu Allen <anu.allen@yahoo.com>
Sent: Wed, Apr 26, 2017 5:28 pm
Subject: RE: Anu Allen

Hi Mr. Thompson,

My name is Beth, and I'm an Associate of Peter Ginsberg's. As Peter is traveling today, he tapped me to assist with the Settlement Agreement which you and he discussed this morning. I redlined the Agreement to address Anu's concerns. Please let us know your thoughts about this proposal.

Thanks,

Beth A. Bilsborrow
PETER R. GINSBERG LAW LLC
80 Pine Street, 33rd Floor
New York, NY 10005
Direct Dial: (646) 374-0028
Fax: (646) 355-0202


-----Original Message-----
From: Peter Ginsberg
Sent: Wednesday, April 26, 2017 6:38 AM
To: ctalawman@aol.com
Cc: Beth Bilsborrow <bbilsborrow@prglaw.com>
Subject: Anu Allen

As you most likely are aware, Anu's family asked us to speak with you before she signs the agreement
and we tried to reach you yesterday. Please call us today. Thank you.


Peter R. Ginsberg
Peter R. Ginsberg Law, LLC
80 Pine Street, 33d Floor
New York, New York 10005
(646) 374-0029

## <u>SETTLEMENT AGREEMENT AND GENERAL RELEASE</u>

This Settlement Agreement and General Release ("Agreement and Release"), together with Exhibits A through C attached hereto, is made effective as of the Effective Date (as defined in paragraph 10 below), by and between ANU ALLEN, her heirs, executors, administrators, attorneys and assigns ("ALLEN"), and Chanel, Inc., on its own behalf, and on behalf of any and all of its past and present parents, subsidiaries, divisions, affiliates, related entities, shareholders, insurers, employee benefit and/or pension plans or funds, predecessors, successors and assigns, and any and all of its and their respective past and present officers, trustees, directors, employees, representatives, attorneys, fiduciaries, agents, predecessors, administrators, and assigns (whether acting as agents for Chanel, Inc., its affiliates or related entities, or in their individual capacity) (collectively, "CHANEL").

WHEREAS, ALLEN initiated the litigation encaptioned Anu Allen v. Chanel, Inc., 12-CV-6758, in the United States District Court for the Southern District of New York, asserting that, among other things, Chanel, Inc. discriminated against her based on her age, race and sex and retaliated against her in violation of the Title VII of the Civil Rights Act of 1964 ("Title VII"), the Age Discrimination in Employment Act ("ADEA") and the New York State Human Rights Law ("NYSHRL") (the "Claims");

WHEREAS, Chanel, Inc. asserted various counterclaims against ALLEN, including claims of fraud, reformation of contract, breach of contract, breach of implied covenant of good faith and fair dealing, unjust enrichment, conversion and trespass to chattels (the "Counterclaims") (together with the Claims, the "Litigation");

1

WHEREAS, on July 14, 2015, the United States District Court for the Southern District of New York entered an Order of Judgment in the Litigation dismissing all of ALLEN's Claims and granting Chanel, Inc.'s Counterclaim for unjust enrichment;

WHEREAS, on September 2, 2015, a Satisfaction of Judgment was entered in the Litigation confirming that ALLEN has fully paid the amount owed to Chanel, Inc. consistent with the July 14, 2015 Order of Judgment; and

WHEREAS, the parties have determined that it is in their mutual interests to settle the remaining Counterclaims in the Litigation;

NOW, THEREFORE, for good and valuable consideration, the receipt of which is acknowledged hereby, and in consideration of the mutual covenants and undertakings set forth herein, the parties agree as follows:

1. General Release

1.1 ALLEN fully and forever releases, relieves, waives, relinquishes, and discharges CHANEL from all actions, causes of action, suits, debts, dues, liabilities, obligations, costs, expenses, sums of money, controversies, accounts, reckonings, liens, bonds, bills, specialties, covenants, contracts, agreements, promises, variances, trespasses, damages, judgments, extents, executions, claims and demands of any kind whatsoever, at law or in equity, direct or indirect, known or unknown, discovered or undiscovered, which she had, now has or may have had against CHANEL arising out of, by reason of, or relating in any way whatsoever to any matter, cause or thing from the beginning of the world to the date on which she executes this Agreement and Release, including, but not limited to: (i) those arising directly or indirectly from her employment with Chanel, Inc., the terms and conditions of such employment, and her separation, including, but not limited to, any application for a new position or promotion; (ii) claims arising

under federal, state or local laws, statutes, constitutions, regulations, rules, ordinances or orders, including, but not limited to, claims under the Age Discrimination in Employment Act, the Older Workers Benefit Protection Act, Employee Retirement Income Security Act of 1974 (except as to claims pertaining to vested benefits under employee benefit plan(s) in accordance with the terms of such plans and applicable law), Title VII of the Civil Rights Act of 1964, Sections 1981 through 1988 of Title 42 of the United States Code, the Equal Pay Act, the Fair Labor Standards Act, the National Labor Relations Act, the Worker Adjustment and Retraining Notification Act, the Rehabilitation Act, the Americans with Disabilities Act, the Family and Medical Leave Act, all New York State and City labor and employment laws, including but not limited to, the New York Labor Law, the New York State Human Rights Law, the New York City Human Rights Law, any and all New York "Whistleblower" statutes and laws, and all applicable amendments to the foregoing acts and laws; (iii) any other common law or statutory claim, whether for moneys or wages owed, damages, negligent supervision and retention, constructive or wrongful discharge, breach of contract, promissory estoppel, whistleblower protection, intentional or negligent infliction of emotional distress, assault, battery, defamation, fraud, costs, attorneys' fees, expenses or otherwise, arising up to or at the time of the signing of this Agreement and Release.

      1.2 ALLEN further agrees that she waives any and all entitlement to relief, including, but not limited to, monetary damages, equitable relief and reinstatement, with respect to any claim or cause of action released pursuant to paragraph 1.1 above.

      2. <u>Promises</u>

      2.1 ALLEN agrees to waive her right to appeal the July 14, 2015 Order of Judgment in this Litigation and/or otherwise seek to alter the disposition of the United States District Court

for the Southern District of New York Order in this Litigation dismissing all of ALLEN's Claims and granting Chanel, Inc.'s Counterclaim for unjust enrichment.

2.2 ALLEN further agrees to return to Chanel, Inc. any and all hard copy and/or electronic documents, records and/or files relating to CHANEL in her possession, custody or control that she had access to, became acquainted with and/or created during the course or in the scope of her employment with Chanel, Inc., as well as any and all other property or equipment of CHANEL, including but not limited to, any documents, records and/or files reflecting confidential and/or attorney work product, including, but not limited to, Vice President, Counsel Daniel Rosenberg's file pertaining to ALLEN. In doing so, within 20 calendar days of executing this Agreement and Release, ALLEN must return the original and all copies in complete form, electronic and hard copy, along with a sworn statement, as detailed in Exhibits A and B, from both ALLEN and her counsel, Christopher Thompson, indicating that they have returned and/or destroyed all documents, files and/or records relating to CHANEL, including but not limited to, all documents, records and/or files reflecting CHANEL's confidential and/or attorney work product and no longer have any CHANEL materials in their possession, custody or control.

3. <u>Consideration</u>

In exchange for the promises set forth above in paragraph 2, within fifteen (15) business days of receiving the (a) documents and files; and (b) the sworn statements from ALLEN and her counsel, as outlined in paragraph 2.2, Chanel, Inc.'s counsel shall sign and file with the Court a Stipulation of Dismissal With Prejudice of the Litigation (Exhibit C).

Chanel, Inc. agrees that in response to any inquiry from a potential employer regarding ALLEN'S employment, Chanel, Inc. will only provide ALLEN'S name, dates of employment, and last position held.

4

4. Confidentiality

It is the intention of the parties, and an essential part of this Agreement and Release, that the Agreement and Release itself, the discussions leading up to the execution of the Agreement and Release, any of the terms and conditions of the Agreement and Release, the subject matter of the Litigation, and any and all claims made regarding or relating to Plaintiff's employment with Chanel, Inc. shall not be disclosed by ALLEN or counsel to anyone, including, but not limited to, any current or former employee and/or any applicant of CHANEL, the media, or in any book, diary or journal disclosed or published to any non-party to this Agreement and Release. Except as may be required by law, ALLEN avers that she has not and will not directly or indirectly publish, disseminate, disclose, or cause or permit to be published, disseminated, or disclosed to any individual or entity any of the above information. This paragraph shall not be construed, however, to prevent ALLEN from disclosing information to her immediate family, any attorney, accountant, or tax or financial advisors with whom she may consult for the sole purpose of obtaining professional advice or services; any governmental taxing authority; or to any court, administrative agency or officer, or judicial officer, pursuant to any valid subpoena or judicial or administrative order, provided, however, that prior to disclosing any such information, she shall advise any such person to whom she intends to disclose the information (other than taxing authorities) that such information is confidential and may not be disclosed by such person, except in response to a valid subpoena or judicial or administrative order, and that ALLEN agrees to remain responsible for any resulting breach. Notwithstanding the foregoing, in response to an inquiry regarding the Litigation, ALLEN may respond that the Litigation has been resolved to the satisfaction of the parties and, in response to further inquiry, that she is bound by a confidentiality agreement.

5. Non-Disparagement

Each of the parties agrees that it ~~ALLEN agrees that she has not and~~ will not take, support, encourage, induce or voluntarily participate in any action or activity or attempted action or activity that disparages ~~CHANEL,~~ the other party, or the other party's business operations, policies, or conduct ~~of CHANEL,~~ or act in any way with respect to such business operations, policies or conduct that could damage ~~CHANEL's~~ the other party's reputation, business relationships, or present or future business. This paragraph shall not be interpreted to prevent ~~ALLEN~~ either party from providing truthful information to, or testimony before, any regulatory, judicial or other governmental authorities as may be required by law, pursuant to any valid subpoena or judicial or administrative order.

6. Remedies

~~ALLEN~~ Each of the parties acknowledges that the consideration referenced in paragraphs 2 and 3 of this Agreement and Release is contingent upon ~~ALLEN~~ both parties keeping the confidentiality and non-disparagement promises contained in paragraphs 4 and 5 of this Agreement and Release. In the event that ~~ALLEN, her immediate family, any attorney, accountant, or tax or financial advisors with whom she may consult or any other persons acting as their agent~~ either party breaches the provisions in paragraphs 4 and 5, ~~Allen agrees to~~ that party shall pay, and a court of competent jurisdiction shall award, as liquidated damages, $10,000 for each and every breach of the confidentiality provision plus attorneys' fees and costs in bringing such an action, as set by the court; provided, however, that this paragraph 6 does not, and shall not be construed to, waive ~~CHANEL's~~ either party's right to seek actual damages or any other relief in the event of a breach of any provision of this Agreement and Release.

The parties agree that money damages will not be a sufficient remedy for any breach of paragraphs 4 and 5 of this Agreement and Release and that, in addition to all other remedies, in the event of a breach of such paragraphs of this Agreement and Release, the non-breaching party shall be entitled to specific performance and injunctive or other equitable relief as a remedy for any such breach if ordered by a court with jurisdiction. The parties agree to waive any requirements for the securing or posting of any bond in connection with any remedy available under this paragraph.

7. No Further Employment With Chanel

ALLEN understands and agrees that she has no right to employment with Chanel, Inc. or any of its successors, parents, subsidiaries, affiliates or related companies and is not eligible for hire or re-hire by Chanel, Inc. or any of its successors, parents, subsidiaries, affiliates or related companies. ALLEN further agrees that she shall not apply for or accept employment with Chanel, Inc. or any of its successors, parents, subsidiaries, affiliates or related companies, either directly or indirectly, on a full-time, part-time or temporary basis, including, but not limited to, as a temporary or contingent worker, or contractor through any temporary service provider, vendor or agency. ALLEN agrees that if she applies for employment, knowingly or unknowingly, at Chanel, Inc. or any of its successors, parents, subsidiaries, affiliates or related companies, she will immediately withdraw her application or that, if discovered after an offer or acceptance of employment has been made, that the offer may be withdrawn and she may be terminated without notice, cause or legal recourse.

8. Acknowledgements

ALLEN acknowledges that she: (a) has carefully read this Agreement and Release in its entirety; (b) has had a sufficient opportunity to consider this Agreement and Release; (c) has

been and is hereby advised by Chanel, Inc. in writing to consult with an attorney of her own choosing in connection with this Agreement and Release; (d) fully understands the significance of all of the terms and conditions of this Agreement and Release and has discussed them with Christopher Thompson, Esq. or an independent attorney of her own choosing, or has had a reasonable opportunity to do so; (e) has had answered to her satisfaction any questions she has with regard to the meaning and significance of any of the terms or provisions of this Agreement and Release; and (f) is signing this Agreement and Release voluntarily and of her own free will and agrees to all the terms and conditions contained herein.

9. Consideration Period

ALLEN acknowledges that she has been given a period of at least twenty-one (21) days to consider the terms of this Agreement and Release and, if she should execute it prior to the expiration of the twenty-one day consideration period, she knowingly waives her right to consider this Agreement and Release for twenty-one days. ALLEN is hereby advised to consult with an attorney prior to executing this Agreement and Release.

10. Seven-Day Revocation Period and Effective Date

ALLEN acknowledges that she may, for a period of seven (7) calendar days following the execution of this Agreement and Release, revoke acceptance thereof. This revocation must be done in writing and delivered to Chanel, Inc.'s counsel, Lorie E. Almon, Esq., Seyfarth Shaw LLP, 620 Eighth Avenue, New York, New York 10018, lalmon@seyfarth.com, before the close of business on the seventh day following her execution of this Agreement and Release. This Agreement and Release shall become effective and irrevocable automatically upon the eighth (8th) calendar day following the execution of this Agreement and Release (the "Effective Date"). In the event that ALLEN revokes this Agreement and Release as set forth above, the terms of

this Agreement and Release shall immediately become null and void (except paragraph 4 above) and Chanel, Inc. will not withdraw its Motion for Sanctions and remaining Counterclaims.

11. General

11.1 This Agreement and Release shall be construed as a whole in accordance with its fair meaning and in accordance with the laws of the State of New York applicable to contracts to be performed wholly within the State of New York, without regard to New York's conflicts of law principles. The parties agree to submit to the jurisdiction of the United States District Court for the Southern District of New York or the New York State Supreme Court, New York County, for the purpose of any dispute arising out of or relating to this Agreement and Release.

11.2 The headings used herein are for reference only and shall not affect the construction of this Agreement and Release. If any court determines that any of the provisions of, or obligations imposed by, this Agreement and Release are unenforceable for any reason, the parties hereto agree that such determination shall not bar or in any way affect any party's rights to enforce the remaining provisions of, or obligations imposed by, this Agreement and Release.

11.3 This Agreement and Release represents the sole and entire agreement between the parties hereto with respect to the subject matters covered hereby and supersedes all prior agreements, negotiations and discussions between the parties hereto, and their respective counsel, with respect to the subject matters covered hereby.

11.4 Any amendment to this Agreement and Release must be in writing signed by duly authorized representatives of the parties hereto and stating the intent of the parties to amend the Agreement and Release.

11.5 This Agreement and Release may be executed by each party in separate counterparts, each of which shall be deemed an original and the sum of which shall constitute one document.

11.6 ALLEN shall instruct her immediate family, any attorney, accountant, or tax or financial advisors and/or any person(s) acting as her agents to honor the confidentiality and non-disparagement promises contained in paragraphs 4 and 5 of this Agreement and Release~~not to take any action which they are precluded from taking hereunder and shall remain responsible for any such breach~~.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement and Release.

CHANEL, INC.

By_____
Name & Title:
Execution Date:

ANU ALLEN

_____
Execution Date:

## SETTLEMENT AGREEMENT AND GENERAL RELEASE

This Settlement Agreement and General Release ("Agreement and Release"), together with Exhibits A through C attached hereto, is made effective as of the Effective Date (as defined in paragraph 10 below), by and between ANU ALLEN, her heirs, executors, administrators, attorneys and assigns ("ALLEN"), and Chanel, Inc., on its own behalf, and on behalf of any and all of its past and present parents, subsidiaries, divisions, affiliates, related entities, shareholders, insurers, employee benefit and/or pension plans or funds, predecessors, successors and assigns, and any and all of its and their respective past and present officers, trustees, directors, employees, representatives, attorneys, fiduciaries, agents, predecessors, administrators, and assigns (whether acting as agents for Chanel, Inc., its affiliates or related entities, or in their individual capacity) (collectively, "CHANEL").

WHEREAS, ALLEN initiated the litigation encaptioned Anu Allen v. Chanel, Inc., 12-CV-6758, in the United States District Court for the Southern District of New York, asserting that, among other things, Chanel, Inc. discriminated against her based on her age, race and sex and retaliated against her in violation of the Title VII of the Civil Rights Act of 1964 ("Title VII"), the Age Discrimination in Employment Act ("ADEA") and the New York State Human Rights Law ("NYSHRL") (the "Claims");

WHEREAS, Chanel, Inc. asserted various counterclaims against ALLEN, including claims of fraud, reformation of contract, breach of contract, breach of implied covenant of good faith and fair dealing, unjust enrichment, conversion and trespass to chattels (the "Counterclaims") (together with the Claims, the "Litigation");

1

WHEREAS, on July 14, 2015, the United States District Court for the Southern District of New York entered an Order of Judgment in the Litigation dismissing all of ALLEN's Claims and granting Chanel, Inc.'s Counterclaim for unjust enrichment;

WHEREAS, on September 2, 2015, a Satisfaction of Judgment was entered in the Litigation confirming that ALLEN has fully paid the amount owed to Chanel, Inc. consistent with the July 14, 2015 Order of Judgment; and

WHEREAS, the parties have determined that it is in their mutual interests to settle the remaining Counterclaims in the Litigation;

NOW, THEREFORE, for good and valuable consideration, the receipt of which is acknowledged hereby, and in consideration of the mutual covenants and undertakings set forth herein, the parties agree as follows:

1. General Release

1.1 ALLEN fully and forever releases, relieves, waives, relinquishes, and discharges CHANEL from all actions, causes of action, suits, debts, dues, liabilities, obligations, costs, expenses, sums of money, controversies, accounts, reckonings, liens, bonds, bills, specialties, covenants, contracts, agreements, promises, variances, trespasses, damages, judgments, extents, executions, claims and demands of any kind whatsoever, at law or in equity, direct or indirect, known or unknown, discovered or undiscovered, which she had, now has or may have had against CHANEL arising out of, by reason of, or relating in any way whatsoever to any matter, cause or thing from the beginning of the world to the date on which she executes this Agreement and Release, including, but not limited to: (i) those arising directly or indirectly from her employment with Chanel, Inc., the terms and conditions of such employment, and her separation, including, but not limited to, any application for a new position or promotion; (ii) claims arising

2

under federal, state or local laws, statutes, constitutions, regulations, rules, ordinances or orders, including, but not limited to, claims under the Age Discrimination in Employment Act, the Older Workers Benefit Protection Act, Employee Retirement Income Security Act of 1974 (except as to claims pertaining to vested benefits under employee benefit plan(s) in accordance with the terms of such plans and applicable law), Title VII of the Civil Rights Act of 1964, Sections 1981 through 1988 of Title 42 of the United States Code, the Equal Pay Act, the Fair Labor Standards Act, the National Labor Relations Act, the Worker Adjustment and Retraining Notification Act, the Rehabilitation Act, the Americans with Disabilities Act, the Family and Medical Leave Act, all New York State and City labor and employment laws, including but not limited to, the New York Labor Law, the New York State Human Rights Law, the New York City Human Rights Law, any and all New York "Whistleblower" statutes and laws, and all applicable amendments to the foregoing acts and laws; (iii) any other common law or statutory claim, whether for moneys or wages owed, damages, negligent supervision and retention, constructive or wrongful discharge, breach of contract, promissory estoppel, whistleblower protection, intentional or negligent infliction of emotional distress, assault, battery, defamation, fraud, costs, attorneys' fees, expenses or otherwise, arising up to or at the time of the signing of this Agreement and Release.

1.2 ALLEN further agrees that she waives any and all entitlement to relief, including, but not limited to, monetary damages, equitable relief and reinstatement, with respect to any claim or cause of action released pursuant to paragraph 1.1 above.

2. Promises

2.1 ALLEN agrees to waive her right to appeal the July 14, 2015 Order of Judgment in this Litigation and/or otherwise seek to alter the disposition of the United States District Court

for the Southern District of New York Order in this Litigation dismissing all of ALLEN's Claims and granting Chanel, Inc.'s Counterclaim for unjust enrichment.

2.2 ALLEN further agrees to return to Chanel, Inc. any and all hard copy and/or electronic documents, records and/or files relating to CHANEL in her possession, custody or control that she had access to, became acquainted with and/or created during the course or in the scope of her employment with Chanel, Inc., as well as any and all other property or equipment of CHANEL, including but not limited to, any documents, records and/or files reflecting confidential and/or attorney work product, including, but not limited to, Vice President, Counsel Daniel Rosenberg's file pertaining to ALLEN. In doing so, within 20 calendar days of executing this Agreement and Release, ALLEN must return the original and all copies in complete form, electronic and hard copy, along with a sworn statement, as detailed in Exhibits A and B, from both ALLEN and her counsel, Christopher Thompson, indicating that they have returned and/or destroyed all documents, files and/or records relating to CHANEL, including but not limited to, all documents, records and/or files reflecting CHANEL's confidential and/or attorney work product and no longer have any CHANEL materials in their possession, custody or control.

3. Consideration

In exchange for the promises set forth above in paragraph 2, within fifteen (15) business days of receiving the (a) documents and files; and (b) the sworn statements from ALLEN and her counsel, as outlined in paragraph 2.2, Chanel, Inc.'s counsel shall sign and file with the Court a Stipulation of Dismissal With Prejudice of the Litigation (Exhibit C).

4. Confidentiality

It is the intention of the parties, and an essential part of this Agreement and Release, that the Agreement and Release itself, the discussions leading up to the execution of the Agreement

4

and Release, any of the terms and conditions of the Agreement and Release, the subject matter of the Litigation, and any and all claims made regarding or relating to Plaintiff's employment with Chanel, Inc. shall not be disclosed by ALLEN or counsel to anyone, including, but not limited to, any current or former employee and/or any applicant of CHANEL, the media, or in any book, diary or journal disclosed or published to any non-party to this Agreement and Release. Except as may be required by law, ALLEN avers that she has not and will not directly or indirectly publish, disseminate, disclose, or cause or permit to be published, disseminated, or disclosed to any individual or entity any of the above information. This paragraph shall not be construed, however, to prevent ALLEN from disclosing information to her immediate family, including her parents, any attorney, accountant, or tax or financial advisors with whom she may consult for the sole purpose of obtaining professional advice or services; any governmental taxing authority; or to any court, administrative agency or officer, or judicial officer, pursuant to any valid subpoena or judicial or administrative order, provided, however, that prior to disclosing any such information, she shall advise any such person to whom she intends to disclose the information (other than taxing authorities) that such information is confidential and may not be disclosed by such person, except in response to a valid subpoena or judicial or administrative order. Notwithstanding the foregoing, in response to an inquiry regarding the Litigation, ALLEN may respond that the Litigation has been resolved to the satisfaction of the parties and, in response to further inquiry, that she is bound by a confidentiality agreement.

    5. Non-Disparagement

    ALLEN agrees that she will not take, support, encourage, induce or voluntarily participate in any action or activity or attempted action or activity that disparages CHANEL or the business operations, policies, or conduct of CHANEL, or act in any way with respect to such

5

business operations, policies or conduct that could damage CHANEL's reputation, business relationships, or present or future business. This paragraph shall not be interpreted to prevent ALLEN from providing truthful information to, or testimony before, any regulatory, judicial or other governmental authorities as may be required by law, pursuant to any valid subpoena or judicial or administrative order.

Chanel, Inc. agrees to instruct Megan Glickman, Executive Director of Human Resources, not to take, support, encourage, induce or voluntarily participate in any action or activity or attempted action or activity that disparages ALLEN.  This paragraph shall not be interpreted to prevent Ms. Glickman from participating in internal discussions for legitimate business purposes or from providing truthful information to, or testimony before, any regulatory, judicial or other governmental authorities as may be required by law, pursuant to any valid subpoena or judicial or administrative order.

6. Neutral Reference

ALLEN shall direct any and all inquiries from a potential employer to the exclusive attention of the Chanel, Inc. Human Resources Department.  Chanel, Inc. agrees that in response to any inquiry from a potential employer regarding ALLEN'S employment, Chanel, Inc. will provide ALLEN'S name, dates of employment, and last position held.

7. Remedies

ALLEN acknowledges that the consideration referenced in paragraphs 2 and 3 of this Agreement and Release is contingent upon ALLEN keeping the confidentiality and non-disparagement promises contained in paragraphs 4 and 5 of this Agreement and Release. In the event that ALLEN, her immediate family, any attorney, accountant, or tax or financial advisors with whom she may consult or any other persons acting as their agent breaches the provisions in

6

paragraphs 4 and 5, Allen agrees to pay, and a court of competent jurisdiction shall award, as liquidated damages, $10,000 for each and every breach of the confidentiality provision plus attorneys' fees and costs in bringing such an action, as set by the court; provided, however, that this paragraph 6 does not, and shall not be construed to, waive CHANEL's right to seek actual damages or any other relief in the event of a breach of any provision of this Agreement and Release.

The parties agree that money damages will not be a sufficient remedy for any breach of paragraphs 4 and 5 of this Agreement and Release and that, in addition to all other remedies, in the event of a breach of such paragraphs of this Agreement and Release, the non-breaching party shall be entitled to specific performance and injunctive or other equitable relief as a remedy for any such breach if ordered by a court with jurisdiction. The parties agree to waive any requirements for the securing or posting of any bond in connection with any remedy available under this paragraph.

8. <u>No Further Employment With Chanel</u>

ALLEN understands and agrees that she has no right to employment with Chanel, Inc. or any of its successors, parents, subsidiaries, affiliates or related companies and is not eligible for hire or re-hire by Chanel, Inc. or any of its successors, parents, subsidiaries, affiliates or related companies. ALLEN further agrees that she shall not apply for or accept employment with Chanel, Inc. or any of its successors, parents, subsidiaries, affiliates or related companies, either directly or indirectly, on a full-time, part-time or temporary basis, including, but not limited to, as a temporary or contingent worker, or contractor through any temporary service provider, vendor or agency. ALLEN agrees that if she applies for employment, knowingly or unknowingly, at Chanel, Inc. or any of its successors, parents, subsidiaries, affiliates or related

7

companies, she will immediately withdraw her application or that, if discovered after an offer or acceptance of employment has been made, that the offer may be withdrawn and she may be terminated without notice, cause or legal recourse.

9. Acknowledgements

ALLEN acknowledges that she: (a) has carefully read this Agreement and Release in its entirety; (b) has had a sufficient opportunity to consider this Agreement and Release; (c) has been and is hereby advised by Chanel, Inc. in writing to consult with an attorney of her own choosing in connection with this Agreement and Release; (d) fully understands the significance of all of the terms and conditions of this Agreement and Release and has discussed them with Christopher Thompson, Esq. or an independent attorney of her own choosing, or has had a reasonable opportunity to do so; (e) has had answered to her satisfaction any questions she has with regard to the meaning and significance of any of the terms or provisions of this Agreement and Release; and (f) is signing this Agreement and Release voluntarily and of her own free will and agrees to all the terms and conditions contained herein.

10. Consideration Period

ALLEN acknowledges that she has been given a period of at least twenty-one (21) days to consider the terms of this Agreement and Release and, if she should execute it prior to the expiration of the twenty-one day consideration period, she knowingly waives her right to consider this Agreement and Release for twenty-one days. ALLEN is hereby advised to consult with an attorney prior to executing this Agreement and Release.

11. Seven-Day Revocation Period and Effective Date

ALLEN acknowledges that she may, for a period of seven (7) calendar days following the execution of this Agreement and Release, revoke acceptance thereof. This revocation must be

done in writing and delivered to Chanel, Inc.'s counsel, Lorie E. Almon, Esq., Seyfarth Shaw LLP, 620 Eighth Avenue, New York, New York 10018, lalmon@seyfarth.com, before the close of business on the seventh day following her execution of this Agreement and Release. This Agreement and Release shall become effective and irrevocable automatically upon the eighth (8th) calendar day following the execution of this Agreement and Release (the "Effective Date"). In the event that ALLEN revokes this Agreement and Release as set forth above, the terms of this Agreement and Release shall immediately become null and void (except paragraph 4 above) and Chanel, Inc. will not withdraw its Motion for Sanctions and remaining Counterclaims.

12. <u>General</u>

12.1 This Agreement and Release shall be construed as a whole in accordance with its fair meaning and in accordance with the laws of the State of New York applicable to contracts to be performed wholly within the State of New York, without regard to New York's conflicts of law principles. The parties agree to submit to the jurisdiction of the United States District Court for the Southern District of New York or the New York State Supreme Court, New York County, for the purpose of any dispute arising out of or relating to this Agreement and Release.

12.2 The headings used herein are for reference only and shall not affect the construction of this Agreement and Release. If any court determines that any of the provisions of, or obligations imposed by, this Agreement and Release are unenforceable for any reason, the parties hereto agree that such determination shall not bar or in any way affect any party's rights to enforce the remaining provisions of, or obligations imposed by, this Agreement and Release.

12.3 This Agreement and Release represents the sole and entire agreement between the parties hereto with respect to the subject matters covered hereby and supersedes all prior

9

agreements, negotiations and discussions between the parties hereto, and their respective counsel, with respect to the subject matters covered hereby.

12.4 Any amendment to this Agreement and Release must be in writing signed by duly authorized representatives of the parties hereto and stating the intent of the parties to amend the Agreement and Release.

12.5 This Agreement and Release may be executed by each party in separate counterparts, each of which shall be deemed an original and the sum of which shall constitute one document.

12.6 ALLEN shall instruct her immediate family, any attorney, accountant, or tax or financial advisors and/or any person(s) acting as her agents to honor the confidentiality and non-disparagement promises contained in paragraphs 4 and 5 of this Agreement and Release and to not to take any action which they are precluded from taking hereunder and ALLEN shall remain responsible for any breach thereof.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement and Release.

CHANEL, INC.

By_____
Name & Title:
Execution Date:

ANU ALLEN

_____
Execution Date: May 8, 2017

Sworn to and subscribed before me
this 8th day of MAY , 2017.

_____
Notary Public

MARTINA URENA
Notary Public - State of New York
NO. 01UR6326983
Qualified in Queens County
My Commission Expires Jun 29, 2019

38903827v.1

**Anu Allen - Call Logs — Exhibit**



wirelessUsage  × +

← C 🔒 att.com/my/#/wirelessUsage

| Date | Time | Number | Location | | Min |
|---|---|---|---|---|---|
| 03-01-2019 | 02:52PM | 914 959 5952 | Yonkers, NY | | 1 |
| 03-01-2019 | 02:53PM | 914 391 6031 | White Pls, NY | | 1 |
| 03-01-2019 | 05:33PM | 914 959 5952 | Yonkers, NY | | 4 |
| 03-01-2019 | 05:39PM | 914 391 6031 | White Pls, NY | | 3 |
| 03-01-2019 | 06:04PM | 914 391 6031 | Incoming, CL | | 3 |
| 03-01-2019 | 06:16PM | 914 391 6031 | Incoming, CL | | 1 |
| 03-01-2019 | 06:59PM | 914 391 6031 | Incoming, CL | | 2 |
| 03-01-2019 | 07:02PM | 914 955 6779 | Yonkers, NY | | 3 |
| 03-01-2019 | 07:05PM | 914 959 5952 | Yonkers, NY | | 1 |
| 03-01-2019 | 09:28PM | 917 225 1544 | Incoming, CL | | 42 |
| 03-01-2019 | 10:11PM | 914 959 5952 | Yonkers, NY | | 4 |
| 03-01-2019 | 10:18PM | 914 959 5952 | Yonkers, NY | | 2 |
| 03-01-2019 | 10:25PM | 914 391 6031 | White Pls, NY | | 1 |
| 03-02-2019 | 11:57AM | 914 391 6031 | Incoming, CL | | 2 |
| 03-02-2019 | 12:40PM | 917 225 1544 | Incoming, CL | | 10 |
| 03-02-2019 | 12:55PM | 914 391 6031 | White Pls, NY | | 1 |
| 03-02-2019 | 01:25PM | 718 530 2169 | Queens Nys, NY | | 7 |
| 03-02-2019 | 02:14PM | 914 391 6031 | Incoming, CL | | 2 |
| 03-02-2019 | 03:03PM | 914 959 5952 | Yonkers, NY | | 1 |
| 03-02-2019 | 03:14PM | 631 796 1668 | Brentwood, NY | | 24 |
| 03-02-2019 | 03:37PM | 914 656 7746 | Cw: Wait | CW | 7 |
| 03-02-2019 | 03:43PM | 347 714 0497 | Bronx Nyc, NY | | 13 |
| 03-02-2019 | 03:59PM | 914 391 6031 | White Pls, NY | | 1 |
| 03-02-2019 | 04:27PM | 201 394 4497 | Incoming, CL | | 2 |
| 03-02-2019 | 05:03PM | 646 592 0545 | New York, NY | | 2 |
| 03-02-2019 | 05:22PM | 914 391 6031 | White Pls, NY | | 1 |
| 03-02-2019 | 05:22PM | 914 391 6031 | White Pls, NY | | 3 |
| 03-02-2019 | 05:49PM | 917 225 1544 | Queens Nyc, NY | | 1 |

wirelessUsage  × +

← C 🔒 att.com/my/#/wirelessUsage

| Date | Time | Number | Location | | Min |
|---|---|---|---|---|---|
| 03-04-2019 | 09:15PM | 914 391 6031 | Incoming, CL | | 1 |
| 03-05-2019 | 10:03PM | 914 959 5952 | Yonkers, NY | | 2 |
| 03-05-2019 | 09:33AM | 201 394 4497 | Incoming, CL | | 5 |
| 03-05-2019 | 09:50AM | 201 394 4497 | Incoming, CL | | 21 |
| 03-05-2019 | 10:10AM | 201 394 4497 | Hackensack, NJ | | 5 |
| 03-05-2019 | 09:46AM | 212 957 5933 | New York, NY | | 5 |
| 03-05-2019 | 10:41AM | 212 603 6300 | New York, NY | | 2 |
| 03-05-2019 | 10:49AM | 650 557 3500 | Palo Alto, CA | | 1 |
| 03-05-2019 | 10:50AM | 650 697 2555 | Palo Alto, CA | | 1 |
| 03-05-2019 | 10:51AM | 917 514 0055 | New York, NY | | 1 |
| 03-05-2019 | 11:05AM | 213 840 7179 | Incoming, CL | | 3 |
| 03-05-2019 | 11:15AM | 213 840 7179 | Incoming, CL | | 5 |
| 03-05-2019 | 11:24AM | 631 747 1197 | Brentwood, NY | | 2 |
| 03-05-2019 | 11:24AM | 917 734 5545 | New York, NY | | 2 |
| 03-05-2019 | 11:30AM | 914 419 5747 | White Pls, NY | | 29 |
| 03-05-2019 | 12:31PM | 212 755 5952 | Incoming, CL | | 3 |
| 03-05-2019 | 12:37PM | 914 391 6031 | White Pls, NY | | 3 |
| 03-05-2019 | 12:55PM | 914 656 7746 | Incoming, CL | | 5 |
| 03-05-2019 | 01:00PM | 917 225 1544 | Queens Nyc, NY | | 1 |
| 03-05-2019 | 01:01PM | 917 225 1544 | Cw: Wait | CW | 6 |
| 03-05-2019 | 01:11PM | 201 394 4497 | Incoming, CL | | 7 |
| 03-05-2019 | 01:18PM | 631 796 1668 | Brentwood, NY | | 21 |
| 03-05-2019 | 01:39PM | 718 757 5476 | Bkyn Nyc, NY | | 2 |
| 03-05-2019 | 02:11PM | 201 394 4497 | Incoming, CL | | 15 |
| 03-05-2019 | 02:27PM | 212 247 5951 | New York, NY | | 24 |
| 03-05-2019 | 03:04PM | 718 757 5476 | Incoming, CL | | 45 |
| 03-05-2019 | 03:45PM | 914 959 5952 | Yonkers, NY | | 3 |
| 03-05-2019 | 03:47PM | 914 959 5952 | Yonkers, NY | | 1 |
| 03-05-2019 | 03:52PM | 914 391 6031 | White Pls, NY | | 1 |
| 03-05-2019 | 04:16PM | 201 394 4497 | Incoming, CL | | 2 |

wirelessUsage     ×   +

← → C    🔒 att.com/my/#/wirelessUsage

| Date / Time ▲ | Contact | Location | Call Type | Minutes |
|---|---|---|---|---|
| 03-11-2019 09:25AM | 646 592 0546 | Incoming CL | | 15 |
| 03-11-2019 09:41AM | 631 747 1187 | Brentwood, NY | | 1 |
| 03-11-2019 09:53AM | 917 709 9346 | Queens Nyc, NY | | 1 |
| 03-11-2019 09:58AM | 917 226 1544 | Incoming CL | | 4 |
| 03-11-2019 10:27AM | 914 266 3400 | White Pls, NY | | 2 |
| 03-11-2019 10:29AM | 212 577 3300 | New York, NY | | 6 |
| 03-11-2019 10:40AM | 917 624 3146 | Incoming CL | | 28 |
| 03-11-2019 11:07AM | 201 394 4497 | Call Wait | CW | 6 |
| 03-11-2019 11:13AM | 626 433 7738 | Cow Ba'cck, CA | | 14 |
| 03-11-2019 11:27AM | 646 592 0546 | New York, NY | | 10 |
| 03-11-2019 11:37AM | 914 419 5747 | White Pls, NY | | 30 |
| 03-11-2019 12:21PM | 619 290 4203 | Incoming CL | | 1 |
| 03-11-2019 12:45PM | 888 553 6660 | Toll Free, CL | | 1 |
| 03-11-2019 12:54PM | 631 234 5811 | Centrisip, NY | | 4 |
| 03-11-2019 12:55PM | 631 231 3775 | Brentwood, NY | | 2 |
| 03-11-2019 01:16PM | 201 394 4497 | Hackensack, NJ | | 1 |
| 03-11-2019 01:39PM | 914 391 6031 | White Pls, NY | | 1 |
| 03-11-2019 01:41PM | 212 755 9663 | Incoming CL | | 12 |
| 03-11-2019 01:53PM | 914 959 5952 | Yonkers, NY | | 1 |
| 03-11-2019 01:54PM | 914 237 7659 | Yonkers, NY | | 4 |
| 03-11-2019 02:02PM | 914 391 6031 | White Pls, NY | | 1 |
| 03-11-2019 02:20PM | 914 985 4692 | Yonkers, NY | | 1 |
| 03-11-2019 02:20PM | 914 391 6031 | Incoming CL | | 3 |
| 03-11-2019 02:25PM | 914 391 6031 | Incoming CL | | 1 |
| 03-11-2019 02:47PM | 914 391 6031 | White Pls, NY | | 1 |
| 03-11-2019 02:49PM | 646 592 0546 | New York, NY | | 1 |
| 03-11-2019 02:59PM | 732 859 2070 | Longbranch, NJ | | 1 |

wirelessUsage     ×   +

← → C    🔒 att.com/my/#/wirelessUsage

| Date / Time ▲ | Contact | Location | Call Type | Minutes |
|---|---|---|---|---|
| 03-17-2019 05:17PM | 914 959 5952 | Yonkers, NY | | 1 |
| 03-17-2019 07:54PM | 917 352 7042 | Incoming CL | | 6 |
| 03-17-2019 09:24PM | 201 394 4497 | Incoming CL | | 4 |
| 03-17-2019 09:52PM | 914 391 6031 | Incoming CL | | 2 |
| 03-18-2019 08:37AM | 201 394 4497 | Incoming CL | | 12 |
| 03-18-2019 08:57AM | 201 394 4497 | Incoming CL | | 5 |
| 03-18-2019 10:35AM | 212 755 9663 | Incoming CL | | 3 |
| 03-18-2019 12:12PM | 914 391 6031 | Incoming CL | | 1 |
| 03-18-2019 12:21PM | 775 443 7710 | Carsoncity, NV | | 62 |
| 03-18-2019 01:22PM | 201 394 4497 | Hackensack, NJ | | 5 |
| 03-18-2019 01:28PM | 914 959 5952 | Yonkers, NY | | 2 |
| 03-18-2019 01:35PM | 631 747 1187 | Brentwood, NY | | 1 |
| 03-18-2019 01:39PM | 212 755 9663 | Incoming CL | | 7 |
| 03-18-2019 01:55PM | 914 656 7745 | Incoming CL | | 3 |
| 03-18-2019 02:11PM | 212 987 6903 | New York, NY | | 2 |
| 03-18-2019 05:33PM | 212 755 9663 | Incoming CL | | 1 |
| 03-18-2019 05:45PM | 201 394 4497 | Incoming CL | | 9 |
| 03-18-2019 06:57PM | 201 394 4497 | Incoming CL | | 3 |
| 03-18-2019 07:02PM | 201 394 4497 | Incoming CL | | 1 |
| 03-18-2019 07:05PM | 201 394 4497 | Hackensack, NJ | | 3 |
| 03-18-2019 07:06PM | 201 394 4497 | Incoming CL | | 3 |
| 03-18-2019 07:12PM | 914 391 6031 | White Pls, NY | | 1 |
| 03-18-2019 07:17PM | 914 959 5952 | Yonkers, NY | | 2 |
| 03-18-2019 07:19PM | 917 226 1544 | Queens Nyc, NY | | 1 |
| 03-18-2019 07:27PM | 914 391 6031 | Incoming CL | | 2 |
| 03-18-2019 07:41PM | 888 350 4331 | Toll Free, CL | | 9 |
| 03-18-2019 07:49PM | 917 588 9566 | New York, NY | | 1 |
| 03-18-2019 08:21PM | 914 959 5952 | Yonkers, NY | | 1 |

anu.allen@yahoo.../Chris Thompson,...

**Allen v. Chanel, Inc., - Case #1:12-cv-06758**

Feb 26 at 1:26 PM

PrintRaw message

**Anu Allen** <anu.allen@yahoo.com>
**To: Esq. Chris Thompson** <ctalawman@aol.com>
**1 File38kB**

Internet Search Engine Removal.xls

Good morning Chris,

I called the courthouse just to confirm that I was given the correct information and was  advised that a letter explaining the situation and requesting that my case be sealed will need to be sent directly to Judge Loretta A. Preska, as she is the only person with the authority to make that decision. By doing so, all of the third party law firms discussing my case online will be forced to remove their articles from public record.  There are other companies that claim that they can assist but they are too expensive and I do not funds to have them step in. Do you think it's worth contacting both of them?

As per our conversation, one  recruiter wanted to present my resume to a potential client but was hesitant because of what he had read when he looked my name up. How am I going to protect myself when I'm not allowed to discuss my case. I actually broke down and cried in front of him. How unprofessional is that.  I am being publicly humiliated and slandered in various articles online. One article states that that I was **personally responsible** for modifying my legal separation agreement. Labeling me a "game playing employee" accusing me of "chicanery". The Adjuancy.com site straight out says that "Anu changed the agreement document". Which we both know is a complete lie. How could they say such a thing without the facts?  No one knows my character or my work ethic so for them to judge me like that is absolutely disrespectful. To be honest, I wouldn't hire a potential employee no matter how pristine their resume was if I read those comments.

Chris, this is affecting my livelihood. I know you don't think it's a big deal but it is. Imagine being in my shoes. A 50 year old Office Manager looking for work. Unfortunately ,I do not have a law degree so the only person this is damaging is me. Public record or not they assured you that  it would be sealed and it was not.  It's damaging, untrue and needs to be rectified. Don't you agree? I can't sleep, I can't eat I have been physically sick over this.
I attached a spreadsheet so you can clearly see the sites that need to be addressed. Please let me know if there is anything else on my end that needs to be done. I'll call you by the end of the week.

**Chris Thompson Esq. - Allen v. Chanel, Inc., - Case #1:12-cv-06758**

Mar 5 at 12:31 PM

**PrintRaw message**

**Anu Allen** <anu.allen@yahoo.com>
To: A. Allen <anu.allen@yahoo.com>
1 File38.3kB

XLSX38kB

XLSX

**Internet Search Engine Removal.xlsx**

**Download**

----- Forwarded Message -----
From: Anu Allen <anu.allen@yahoo.com>
To: Esq. Chris Thompson <ctalawman@aol.com>
Sent: Tuesday, March 5, 2019 12:27 PM
Subject: Allen v. Chanel, Inc., - Case #1:12-cv-06758

Good afternoon Chris,

Following up on our conversation from last week. Were you able to draft a letter to Chanel? If not, do you know when you will have time to do so? I am putting together a letter to Judge Preska explaining what has transpired and why I am requesting  to have the case sealed since that is what they agreed to. I had no idea that they insinuated that I made those changes. If Chanel had any common sense they would know that would be impossible for me to do. I am hoping to get it to her this week.

Also, I have attached an updated spreadsheet of the search engines that need to be removed for you to review. From what I gather, if the site takes the article down it will still show up on the search engine if you look up my name or Anu Allen Chanel. Most of the actual search engines require a court order stating the case is sealed to have it taken down. If they can expunge records of a criminal why wouldn't they do that for a woman with lies being written about her. Don't you agree?

Please call me today.

Thank you,

Anu


----- Forwarded Message -----
From: Anu Allen <anu.allen@yahoo.com>
To: Esq. Chris Thompson <ctalawman@aol.com>
Sent: Tuesday, February 26, 2019 1:26 PM
Subject: Allen v. Chanel, Inc., - Case #1:12-cv-06758

Good morning Chris,

I called the courthouse just to confirm that I was given the correct information and was  advised that a letter explaining the situation and requesting that my case be sealed will need to be sent directly to Judge Loretta A. Preska, as she is the only person with the authority to make that decision. By doing so, all of the third party law firms discussing my case online will be forced to remove their articles from public record.  There are other companies that claim that they can assist but they are too expensive and I do not funds to have them step in. Do you think it's worth contacting both of them?

As per our conversation, one  recruiter wanted to present my resume to a potential client but was hesitant because of what he had read when he looked my name up. How am I going to protect myself when I'm not allowed to discuss my case. I actually broke down and cried in front of him. How unprofessional is that.  I am being publicly humiliated and slandered in various articles online. One article states that that I was **personally responsible** for modifying my legal separation agreement. Labeling me a "game playing employee" accusing me of "chicanery". The Adjuancy.com site straight out says that "Anu changed the agreement document". Which we both know is a complete lie. How could they say such a thing without the facts?  No one knows my character or my work ethic so for them to judge me like that is absolutely disrespectful. To be honest, I wouldn't hire a potential employee no matter how pristine their resume was if I read those comments.

Chris, this is affecting my livelihood. I know you don't think it's a big deal but it is. Imagine being in my shoes. A 50 year old Office Manager looking for work. Unfortunately ,I do not have a law degree so the only person this is damaging is me. Public record or not they assured you that  it would be sealed and it was not.  It's damaging, untrue and needs to be rectified. Don't you agree? I can't sleep, I can't eat I have been physically sick over this.
I attached a spreadsheet so you can clearly see the sites that need to be addressed. Please let me know if there is anything else on my end that needs to be done. I'll call you by the end of the week.

*EXHIBT P*

Anu Allen
755 Bronx River Rd.
Bronxville, NY  10708

August 13, 2019

Law Office of
Christopher Thompson, Esq.
33 Davison Lane East
West Islip, New York 11795

Dear Chris,

I hope this email finds you well. I am following up on our conversation from February 2019 in regard to you contacting the court to see why my case had not been sealed as promised. It has been over 5 months and I have not heard back from you.

Recruiters have confirmed that when a prospective employer Goggles my name it results in various articles regarding my lawsuit with Chanel and I am perceived in an extremely negative light. Therefore, it is extremely important that this issue gets resolved as soon as possible.

Chris, I have been your client and friend for over 15 years and you know my financial situation as a single 50 year old woman seeking employment for the past 1 ½ yrs. I am at a disadvantage in the workforce because of the way this case was handled and it is hindering me from gaining employment. When we last spoke you committed to resolving this issue. Please let me know what your next steps will be. I await your reply.

Sincerely,

Anu Allen

**Anu Allen**
**755 Bronx River Rd.**
**Bronxville, N.Y.  10708**
**anu.allen@yahoo.com**

October 18, 2019

State of New York
Grievance Committee For The
Tenth Judicial District
150 Motor Parkway, Suite 102
Hauppauge, NY  11788
631.231.3775

Re: File# S-1235-19
AMENDMENT

Dear Staff Counsel Modica-Schaffer, Esq.,

I appreciate the opportunity to respond to Mr. Thompson's letter dated October 8, 2019.

I would like to clarify the chronological chain of events in regard to my complaint against Christopher Thompson, Esq. On February 28, 2012, after almost 19 years of service, my position as Samples Coordinator with Chanel, Inc. had been eliminated. I was offered a severance package in the amount of $21,789.20 plus 5 months of paid Cobra **(Exhibit A)**

I was not satisfied with the severance agreement nor did not I feel that my position was eliminated due to restructuring but discrimination. I contacted Christopher Thompson, Esq. for guidance. Mr. Thompson agreed that I had grounds to sue and that he would negotiate the Separation and Release Agreement with Chanel. He said this would allow me to move forward with a lawsuit as well as keep my severance package.

When Mr. Thompson received the agreement from Chanel, he made one change to the document. He changed the word *"including" to "excluding"* on page 3, number 4, line 13. He then sent the document to me by overnight mail.  I was instructed to initial each page of the agreement, include a blank post-it note on page 3, and sign my signature on the last page. **(Exhibit B)** He then directed me to forward the altered document back to Chanel Inc. to the attention of Meghan Glickman.  Around the first week of April 2012, Chanel received and approved the signed agreement. On or around April 15, 2012 I received my severance in the amount of $14,940.19. **(Exhibit C)**

I would like to make it clear that the changes to the Separation and Release Agreement were made by Mr. Thompson alone. I followed his legal directive every step of the way and I was never made aware that the change that he made was inappropriate, deceptive or contrary to the deal made with Chanel, Inc. during his negotiations. Had I understood what he was doing, I never would have had Mr. Thompson represent me. How he mishandled my case was unethical and not in my best interest. Mr. Thompson was only concerned with protecting himself.

On Sept 6, 2012, Mr. Thompson filed the Employment Discrimination lawsuit against Chanel, Inc. Judge Patterson was the original Judge assigned to my case.  On or around November 12, 2012 Judge Patterson denied defendants motion without prejudice on the grounds that I had not knowingly, voluntarily or willfully waived my right to file a discrimination suit against Chanel. **(Exhibit D)**

On Dec 3, 2012 Mr. Thompson emailed me an Affidavit that he told me I had to sign. In the Affidavit, it stated that I was personally responsible for modifying the agreement and not the offices of Christopher Thompson, Esq. **(Exhibit E)** As stated in my complaint, when I questioned Mr. Thompson as to why it was worded in such a way, I was told that legally it had to be written that way because it was all part of the legal negotiation process and it was the only way to proceed with the lawsuit. He assured me that the court understands that his firm was representing me and he knew what he was doing.

Mr. Thompson misrepresented the validity of the agreement and coerced me into signing a document falsely implicating me as the author, while assuring me that the change was appropriate. He concealed that the change was made without consent or

acknowledgement of Chanel, Inc.  Mr. Thompson prepared and directed me to sign an Affidavit even though he clearly knew it was not truthful. Not having any legal background I completely trusted his knowledge and put my complete faith in him. I was apprehensive but followed his directive. He assured me that there would not be any consequences because it was "only protocol." I did not realize at the time that this was actually perjury.

On or around June 18, 2013 Chanel counter claimed. By this time Judge Patterson had retired from the bench and Judge Loretta Preska was now assigned to my case. During discovery, Chanel asked that I turn over my personal employment file which contained documentation of how I was sexually harassed and not protected by the company. I obtained these documents accidentally. It was my understanding that one is entitled to have a copy of their personal Human Recourse file.

On November 13, 2014 Judge Preska ruled in favor of Chanel, Inc. **(Exhibit F)** Moved for summary judgment, seeking dismissal of my claims of discrimination and approved Chanel's counterclaim. I was ordered to repay my severance in the amount of $14,940.19 plus interest, premium payments for 5 months COBRA plus interest, return all of the discriminating evidence I had against them in my possession proving sexual harassment as well as waive the right to an appeal of the courts decision. Otherwise, Chanel would sue me for fraud for having my personal file in my possession. I discussed with Mr. Thompson my concerns with the word "fraud" publically. **(Exhibit G)** I felt like it was another manipulation tactic from Chanel to try to intimidate someone who does not have the means to stand up for herself against the fashion giant. I expressed to Mr. Thompson the importance of having this case sealed upon completion. Mr. Thompson always assured me that it would be sealed and I had nothing to worry about. I believe with all of the evidence I had provided to the court showing discrimination, the true reason I lost my case as well as my right to appeal was because of how Mr. Thompson altered the agreement and absolved himself from any responsibility. Instead he chose to blame me for the change. From the beginning, I believe I was not seen in a positive light to Judge Preska.

On April 16, 2017, Mr. Thompson sent me a new Settlement Agreement and General Release to sign. I was uncomfortable with the confidentiality portion of this agreement. The agreement Mr. Thompson wanted me to sign, stated that if I, any immediate family member, attorney, accountant, tax or financial advisors or any other person acting as my agent, ever discusses my claims, etc. then  I would agree to pay Chanel $10,000.00 for each and every breach of the confidentiality provision plus attorney fees. **(Exhibit H)**  In my opinion Mr. Thompson should have known to not agree to such a request but he refused to negotiate on my behalf because he stated on more than one occasion that he wanted "to get this case over with". I also requested a copy of my deposition which also fell on deaf ears. **(Exhibit I)**

On or around April 21, 2017 I contacted Peter Ginsberg, Esq., who was recommended by a friend. Mr. Ginsberg was kind enough to go over the document with me to address my concerns. He suggested 2 minor adjustments to the agreement that would be in my best interest. On April 26, 2017 Beth Bilsborrow, Esq. of Mr. Ginsberg's office contacted Mr. Thompson in regard to those changes. **(Exhibit J)** Mr. Thompson advised Ms. Bilsborrow, Esq. that he did not believe that Chanel would negotiate any further but agreed to forward the revised copy. Mr. Thompson was clearly insulted that I contacted another attorney and asked if they were willing to take my case over. **(Exhibit K)** Mr. Thompson did forward the revised copy and Chanel agreed to the terms. **(Exhibit L)** If Mr. Thompson was not negligent with my case I would not have had to involve another attorney. Mr. Thompson was always representing me so to try to pass the buck once again to someone is just another example of his character and complete lack of responsibility.

It was brought to my attention in April of 2018, when searching for new employment opportunities that I discoverd Mr. Thompson did not have my case sealed as he promised. It was quite disturbing to read all of the negative comments being said about me. I have been publically humiliated and slandered on various online forums which is extremely damaging, all because of Mr. Thompson's negligence. **(Exhibit M)** I have included an extensive Excel chart for your reference. **(Exhibit N)** I have been able to have several of the search engines remove the negative articles. However, the remaining sites require a court order stating the case has been sealed to have them taken down.

Mr. Thompson contacted me on February 19, 2019. I made it clear that I was distraught that my case had not been sealed as he promised. Mr. Thompson acted shocked, stating "I'm surprised. I thought that it had been". He completely trivialized my despair. He said that it was not a big deal because it makes Chanel look foolish for not reading their documents thoroughly. I informed him of the all of the negativity written online was a complete  assassination of my character. All of the disparaging remarks were about me being a "game playing employee who changed a legal document and tried to pull a fast one. They clearly were NOT discussing how Chanel looked foolish. They were blaming me for his actions. Mr. Thompson tried to appease me by saying that he would reach out to Chanel and see what he could do. I advised Mr. Thompson that contacting Chanel is useless as they have nothing to do with sealing my case. Once again placing the blame on someone else when in fact, it was his responsibility.  I told him that I had contacted Judge Preska's office and was advised that an Order to Show Cause would need to be filled out and presented to Judge Preska explaining the situation. In our conversation I also advised Mr. Thompson that I

researched a company that can bury negative online information however, I was told that it would cost close to $10,000.00 dollars to do so. Which I cannot afford nor should I be responsible to pay for.

At that point the tone in the conversation had changed. This is when Mr. Thompson became agitated. He was extremely curt and disrespectful. I was in mid sentence when he rudely hung up on me. I left Mr. Thompson phone messages on Feb 19, March 5, March 11 and on March 18 **(Exhibit O)** along with two emails on February 26, and March 5,2019. **(Exhibit P)** He did not respond to any of them. This is where I saw Mr. Thompson's true colors. So for him to say that he thought I had found a solution is absurd. He never had any intention on finding a resolution or contacting me again. On August 13, 2019 I sent Mr. Thompson a letter by certified mail inquiring on whether or not he had answer for me. **(Exhibit Q)** This too was ignored leaving me with no other choice but to file a formal complaint. **(Exhibit R)**

In this day and age with the many social media outlets, most employers do their research online when interviewing potential candidates. **(Exhibit S)** I personally do not have a Facebook, Instagram or any other social media account. The only thing online about me is this case with Chanel. A case based on a lie. A case that I am not at liberty to discuss if questioned. How am I to defend myself when I am asked, why I changed a legal document or why am I being described as a "Game playing employee or why am I being accused of "Chicanery"? All of this was caused by the negligence of how Mr. Thompson chose to handled my case.

I thank you for your time and consideration in this matter. Please feel free to contact me should you need any further information.


Sincerely,

Anu Allen

**TBG** | *The Bachrach Group*
EXECUTIVE SEARCH | RECRUITMENT | CONSULTING

December 16, 2019

Re: Anu Allen

Dear Honorable Judge Loretta A. Preska,

My name is Pam Moutis and I am the Associate Director of Bachrach Group, Ltd.

I first met with Anu in February 2012 when she lost her position at Chanel Inc. and was looking for a new employment opportunity.  She was highly recommended to me by Tatiana Berman, Boutique Manager at the Chanel 57th Street store.

Anu has been nothing but professional, prompt, organized and a responsible candidate.
She is respectful and a person of good moral character. I can confirm that for as long as I have known Anu she has been a reliable, trustworthy and decent human being.

I am aware that Anu currently has negative articles that have been written about her character on the internet. In this day and age of social media it is common practice for recruiters as well as employers to research a potential candidates online reputation. In my opinion, it is imperative to have any defamatory articles removed as this will be detrimental to Anu being hired.

If you have any further questions please contact me.

Sincerely,

**Pam Moutis | Associate Director**
*THE*
*BACHRACH*
*GROUP, LTD.*
*1430 BROADWAY*
*13TH FLOOR*
*NEW YORK NY 10018*
*646-688-7068 - OFFICE*
*732-859-2070 - MOBILE*
*pamm@bachrachgroup.com*
www.bachrachgroup.com

May 17, 2013, 06:09am
## How An Online Reputation Can Hurt Your Job Hunt

Deborah L. Jacobs **Forbes Staff**
Personal Finance

*This is a guest post by Chris Forman, CEO of the online job-search organizer StartWire. His last article for FORBES was "Make Your Age An Asset: 7 Job-Search Tips If You're Over 50."*

If you are looking for a job, you need to be aware of your digital footprint – the information connected with your name online. Companies and recruiters routinely check search engine results to learn more about potential employees.

In fact, 90% of executive recruiters say they conduct online research of potential candidates, according to ExecuNet. Up to 70% of employers who have used LinkedIn say they've chosen not to hire a person based on what they've found out about them online. However, only 27% of employers give job seekers the opportunity to discuss the online content that is associated with their name, such as social media profiles, blog posts and photos.

This suggests that job seekers should be thinking as much about their online persona as their interview attire. Questionable content and social media red flags can take a promising candidate out of the running, but the savvy job seeker can cultivate a positive digital presence. Here's how to screen and protect your online reputation and avoid ending up in a potential employer's pile of rejected candidates.

**Check your online identity.** Run various searches for your name on major search engines and social media sites. If you're noticing that the top results are from non-professional sources linked to your name, then it's time to update your professional profiles. At least one of the top five search results for your name should relate to your professional interests. LinkedIn has high visibility in Google search results, so maintaining a comprehensive, up-to-date LinkedIn profile helps significantly.

**Put your best foot forward.** Use your social media profiles to demonstrate your strengths and signal to employers that you are the best candidate for the job. Everyone has unique interests outside of their work life, and your social media profiles can shine a positive light on these hobbies. Post freely about accomplishments, such as marathon running or charity work. If an employer stumbles across your personal profiles, your unique interests can be a strong complement to your professional credentials.

Quora, a site that lets you ask and answer questions about any topic, is a good place to demonstrate knowledge as well as your interests outside of work. For example, you can build a positive online reputation by answering questions that align with your professional background. You can also show off your personal interests by answering questions about the city you live in or places you would like to visit.

**Limit negative content.** With privacy settings constantly changing on Facebook and other social sites, it's better to be safe than sorry about what you share on social media. After reviewing your social media profiles to make sure your content consists of information you would like to share with employers, use tools to scan what remains.

For Facebook, Secure.Me is a free tool that reviews content, protects profiles from dangerous links and viruses, and monitors photos and friends' posts. When in doubt, do not post anything online that you wouldn't want a future employer to see. If there is a chance that your connections would post unflattering comments about you, check the privacy setting for approving content before it is posted to your Facebook timeline.

**Leave no room for confusion.** If you have a common name, you risk being mistaken for someone else online. Rather than taking the blame for others' mistakes, look for ways to differentiate yourself.

For example, someone with the name "Chris Andrews" who is a CPA, could use "Chris Andrews, CPA" in online profiles or consider including a middle name or initial. Registering a unique URL with your name for your social media accounts improves the chances that employers will find your profiles, rather than those of someone else with the same name.

With recruiters paying close attention to job seekers' social media profiles, it is imperative to maintain control of your online social presence. Today, these profiles are an extension of your resume and should be used to help – not hurt – your chances of landing the next golden job opportunity.

How Your Online Presence Can Affect Your Job Search

https://www.flexjobs.com/blog/post/how-your-online-presence-can-affect-job-search/

There's no doubt that there is increased competition in the labor market, and because of this, recruiters are turning to social media more than ever to find or evaluate potential candidates. In fact, according to a recent survey done by Jobvite, 93 percent of recruiters use or plan to use social media to support their recruiting efforts. **This means your online presence can affect your job search in either a positive or negative way.**

So what does that mean for those on the hunt for a job? Two things: utilize the benefits of social media, but also be cognizant of how your social media profiles can affect your job hunt.

If you learn to leverage your social profiles and network correctly, you can position yourself above other candidates. In fact, 55 percent of recruiters have reconsidered a candidate based on their social profile.

**Here are a few ways to make sure your online presence is prepared for your job hunt:**

**Keep Your Pages Clean**

If you haven't already done so, clean up for your social media profile pages *before* you start applying for jobs.

**First, make sure there are no unbecoming photos of you.** A good rule of thumb is to refrain from having any photos of you acting in a way that could be construed as inappropriate or could paint you in an unflattering light.

**Second, keep your political views non-existent.** Even though social media is designed for expressing yourself, displaying these views could seriously sway a recruiter on whether you would be a good cultural fit for the company, regardless of how qualified you are for the job.

**Third, review your status updates.** Remove any complaints about your job or former employer, or any negative statuses in general. By cutting down on the complaints and negativity on your social profiles, you'll paint a picture of an optimistic and positive candidate.

Not ready to purge your social media profiles? Simply adjust your privacy settings on your profiles to a level that makes you feel comfortable.

**Maintain a Good Reputation Online**

Dan Schawbel, author of *Me 2.0,* says, "Your first impression isn't made with a firm handshake— it's with a Google search." **Make sure your first impression online is a reputable one. As**

recruiters search for your name on Google, they'll be looking at not only your social profiles but other public information that pops up about you.

What if nothing pops up? That's a good thing, right? Not exactly. "If you're nowhere to be found on Google, employers may question whether you have kept up with the latest trends or are qualified for a job that requires minimal digital skills, says Dorie Clark, a blogger for Harvard Business Review.

Start by Googling yourself to see what you can find. If you find nothing, a good way to start building an impressive online reputation is to blog about the industry you're looking to jump into. For example, if you're looking for a job in fashion, start a blog about the latest fashion trends or review your favorite designers. This way, you'll position yourself as engaged in the industry, a key component recruiters look for.

Social media is a unique tool for recruiters. They can now uncover mutual connections, evaluate skills by reviewing written or design work, and assess a candidate's personality for a cultural fit within the company. If you leverage social media to brand yourself as a professional, knowledgeable, and personable candidate, you'll stand out as top contender for whatever position you seek.